EXHIBIT  L

1  LINDBERGH PORTER, Bar No. 100091
   lporter@littler.com
2  MARY D. WALSH, Bar No. 197039
   mdwalsh@littler.com
3  LITTLER MENDELSON, P.C.
   650 California Street, 20th Floor
4  San Francisco, CA  94108.2693
   Telephone:  415.433.1940
5  Facsimile:  415.399.8490

6  DOMINIC J. MESSIHA, Bar No. 204544
   dmessiha@littler.com
7  LITTLER MENDELSON, P.C.
   2049 Century Park East, 5th Floor
8  Los Angeles, CA  90067
   Telephone:  310.553.0308
9  Facsimile:  310.553.5583

10  Attorneys for Defendant
    DOLLAR TREE STORES, INC.

11

12              UNITED STATES DISTRICT COURT

13              CENTRAL DISTRICT OF CALIFORNIA

14

15  CURTIS PATTON, an individual, on          Case No. 2:15-cv-03813
    behalf of himself and all others
16  similarly situated;                       **DECLARATION OF JONATHAN
                                              POSTON IN SUPPORT OF
17            Plaintiff,                       DEFENDANT DOLLAR TREE
                                              STORES, INC.'S OPPOSITION TO
18  v.                                         PLAINTIFF'S MOTION FOR CLASS
                                              CERTIFICATION**
19  DOLLAR TREE STORES, INC., a
    Virginia corporation; and DOES 1          [Los Angeles County Superior Court
20  through 100, inclusive,                   Case No. BC577498]

21            Defendants.

22                                            Date:
                                             Time:
23                                            Place:

24                                            Complaint Filed:    April 2, 2015
                                             Trial Date:        None Set
25

26

27

28

TTLER MENDELSON, P.C.
650 California Street
20th Floor
1 Francisco, CA 94108.2693
415.433.1940

## DECLARATION OF JONATHAN POSTON

1.      All the facts contained in this Declaration are based on my own personal knowledge and, if called as a witness, I could competently testify to them.

2.      I am currently employed by Dollar Tree Management, Inc. ("Dollar Tree") as its Assistant Controller. I have been employed in this position since 2009. Prior to that, I was employed with Dollar Tree as its Director of Accounts Payable. I have been employed by Dollar Tree since 2000.

3.      In my capacity as Dollar Tree's Assistant Controller, I have overall responsibility for ensuring that Dollar Tree's payroll is processed correctly by the Payroll Department. I supervise approximately 17 individuals in the Payroll Department. One of the responsibilities of the Payroll Department is to address and respond to inquiries from Dollar Tree employees nationwide, including in the State of California, concerning their wages and compensation.

4.      With regard to California employees, there are a number of different ways in which Dollar Tree employees receive their compensation and the corresponding pay stubs.

5.      First, California employees may receive paper checks with paper pay stubs each pay period. In the absence of a specific request from an employee, this is the default.

6.      Second, employees may choose to receive electronic payment of their wages, also known as direct deposit. This is purely optional, and no Dollar Tree employee is ever required to participate in direct deposit.

7.      Direct deposit itself may take one of two forms. The employee may either receive funds deposited to their bank account, or they may receive their pay on a pay card. This is likewise the employee's choice.

8.      When receiving either form of direct deposit, an employee also receives their pay stub electronically. Employee pay stubs are available on any Dollar Tree cash register at any Dollar Tree store. Employees may access their electronic pay stubs at

ITLER MENDELSON, P.C.
650 California Street
20th Floor
Francisco, CA 94108.2693
415.433.1940

1.

any time a Dollar Tree store is open, regardless of whether they are working.   From the cash registers, employees may print copies of their wage statements, and keep copies for their records, or for any other purpose.

9.      In addition to printing their wage statement from any cash register, an employee may also request a paper copy of any wage statement at any time from Dollar Tree's Payroll or Human Resources Departments.

10.     Finally, if an employee receiving direct deposit wants to receive paper wage statements every pay period, without need to print them out from the register or request them from Payroll, the employee may always choose to return to receiving a paper pay check and pay stub.


I have read the above Declaration and do hereby declare under penalty of perjury under the laws of the United States of America and the State of California that it is true and correct.

Executed this ___ day of January, 2017 in Chesapeake, Virginia.


_____

JONATHAN POSTON

TLER MENDELSON, P.C.
650 California Street
20th Floor
Francisco, CA 94108.2693
415.433.1940

EXHIBIT  M

**DECLARATION OF FRANCES RAMIREZ**

I, Frances Ramirez, hereby state and declare as follows:

1.      I am currently employed by Dollar Tree Stores as a Store Manager for Dollar Tree Store No. 3058 located in El Cerrito, CA. I have personal knowledge of the facts in this declaration and could competently testify to these facts if called as a witness.

2.      I have worked for Dollar Tree on two separate occasions. The first time was from 1999 to 2005. I rejoined Dollar Tree in 2008 and have worked for the company since then. I started as a cashier, then became a stocker, and have worked my way up to being an Assistant Manager and now, a Store Manager. I have been a Store Manager for three years. I spent the first two and a half years as a Store Manager at the Pinole Store and have been at my current store since about July.

3.      My current store in El Cerrito is a "Racetrack" store which means it is one of the biggest stores in the Company. By contrast, the Pinole store was a medium sized store. My current store does a higher volume of sales, and has more employees and more freight delivered which makes it more challenging to run. Both Pinole and the El Cerrito store have the same departments, but El Cerrito has much larger departments, particularly the food department. El Cerrito also has a lot of shrink issues and is considered a "red flag" store. I have additional responsibilities associated with this status. I have to complete a red flag audit, like the one that my District Manager does, once a month. The audit assesses procedures relating to the safe and the deposits, as well as employee purchases. For example, in my store, a receipt must be attached to an employee purchase at all times while it is in the store. I have to ensure that employees comply with this procedure. In addition, at my store I have to audit the cash drawers twice a day, rather than once a day. I will do this, or I will assign it to an Assistant Manager to do. I also have a full-time door greeter who I have to budget hours for.

LITTLER MENDELSON
A Professional Corporation
501 W. Broadway
Suite 900
San Diego, CA 92101-3577
619.232.0441

4.     Currently, I am working six days a week because it is the holiday season. Under my prior District Manager this meant working about 55 hours a week, but now I believe it will be going up to 60 under my new District Manager.  Outside of the holiday season (which is about a 6 week period), I work 5 days or 45 hours a week.  I try to close one day, but the day of the week varies depending on what days I am taking off that week.  I almost always work on Mondays, which is my office day and Fridays which is when I do my planning for the next week and is also our truck day.  I typically take Tuesdays and Sundays off, but this varies.  While I generally work the first weekend of every month, which is a busy sales time, if I have another commitment I can take it off.  Last year my birthday fell on the first weekend of the month and I did not work then.

5.     Based on my experience working for Dollar Tree, I know that store hours at Dollar Tree stores vary.   Store hours also vary seasonally and generally are extended during the holidays.  At the moment, my store is open from 8:00 a.m. until 10:00 p.m. Monday through Saturday and from 9:00 a.m. until 9:00 p.m. on Sundays. This is our holiday schedule.  During the rest of the year we close at 9:00 p.m. rather than 10:00 p.m.

6.     My store gets its truck deliveries on Fridays.  We usually get two trucks of merchandise.   During the holidays, we are currently getting an additional truck which comes on Wednesdays.  This impacts how I schedule my staff, particularly the stockers and Merchandising Manager.

7.     I currently have four Assistant Managers in my store – three are full-time and one is part-time.  I also have 26 associates on my payroll.  I have hired a few new people for the holidays but several have already resigned, so I need to re-hire for about three positions.  I do the complete hiring process for the associates from interviewing candidates to deciding who to hire and how many people to hire. I try to schedule interviews for job candidates on Fridays.  I sometimes delegate some of the interviewing to my Assistant Managers.  With respect to management positions, if I

2.

1   see potential in an associate I will mentor them to try to move them up into a

2   management position. The part-time Assistant Manager I have now was an associate

3   in my store that I promoted up. I told my District Manager that I had a candidate and

4   he interviewed her and agreed with my recommendation.

5       8.      I prepare my store schedule on Mondays two weeks ahead of time. The

6   process takes me about 3 to 3.5 hours. I divide the sales forecast number by the SPEH

7   (sales per employee hour) provided by the company to get the total number of payroll

8   hours for the week that I have to allocate. The Compass system pre-populates the

9   total number of cashier hours and the total hours that should be allocated to the

10  recovery associates. I sometimes have to reduce the number of cashier hours that the

11  program assigns to align it with the number of cashier hours actually available to me

12  (sometimes the program overschedules). I also have to schedule 40 hours for a door

13  greeter in my store because it is a red flag store. I have to build in my management

14  team, stocking, recovery team and door greeter and ensure that there is an overlap of

15  cashiers such that they can all take legally mandated breaks. Also, now I am inputting

16  detailed comments into the schedule describing what each individual will be focusing

17  on during his or her shift. I post the schedule on Tuesdays.

18      9.      Throughout the week I modify the store schedule as needed. For

19  example, today I only had two of my three stockers report to work so I extended the

20  shifts of the two who reported. This also meant that I sent these two employees to

21  take a meal period as they were not going home after 4.5 hours, in order to comply

22  with California rest and meal period laws. If I have a cashier who calls in sick, I will

23  attempt to find another employee to come in and take their shift for them. I rarely

24  send anyone home earlier than the time they are scheduled to work at this store just

25  because there is always work to get done. Sometimes my District Manager will also

26  advise me that I am ahead in sales and can add another ten hours for the week and I

27  then decide how to allocate this time based on my store needs that week.

28

10.     As a Store Manager I am in charge of training the new hires for my store. The Company does have an iLearn program that the new hires go through. In addition to the iLearn, I ensure that the employee is provided on-the-job training. For a new stocker, either my Merchandising Manager or I will pair with the new hire to teach them how to do their job and advise them on company policies. For new cashiers, I typically assign either an Assistant Manager or another more senior cashier to shadow them.

11.     In addition to the training that I do for my employees in my Store Manager role, I am also an "MST" or Model Store Trainer. I have been in this role for about two years. Since May, I have trained eight new managers who are going to become managers at other stores. Currently, I am training an employee to become a Store Manager. The program is four weeks for internal hires and five weeks for external hires. I teach the trainees how to do the job of a Store Manager by showing them every aspect of the job. For example, when I build my schedule, I also use this as a training experience to show the trainee how to build a schedule. This week my trainee is running the front of the store. On week five she will run the entire store. I will observe and coach her as necessary and evaluate her performance. The trainees also have activities that they need to complete from a four part guide. I oversee and monitor their progress as they complete these activities. Every Friday I inform my Regional Training Manager by email or in a phone call of the status of the trainee's progress and any difficulties that they have encountered. At the end of the program I give my recommendations about whether the person is ready to be placed in a store.

12.     When I am out on the floor I am constantly coaching my staff. For example, if I see a cashier ringing up a sale but the cashier does not offer the "drive item," I will counsel them about needing to follow this procedure and promote the product. If I see a stocker on the floor near a customer but the stocker does not greet the customer or comply with our "10 feet rule" (an employee must greet any customer within ten feet or ask them if he or she needs assistance) I will talk to them about the

4.

1 | importance of doing so.  I also do annual written reviews for my Assistant Managers.
2 | Based on the Assistant Manager's performance the company will decide whether to
3 | give them a raise.

4 |     13.  I also administer discipline to my employees as necessary in my role as
5 | Store Manager.  I will usually do a verbal counseling when someone is late.  However,
6 | I will do a formal write-up for a cashier if their drawer is over or short, or for
7 | attendance issues such as no-call, no-show.  I have had to terminate an employee for
8 | being $20 short on their drawer.  In that instance I sent an email to my District
9 | Manager to keep him in the loop and copied Human Resources.  Once Human
10 | Resources approved and initiated the payroll process for paying the final pay in
11 | compliance with California law, I proceeded with the termination.  I am lucky because
12 | other than this I have not had many other types of performance issues such as
13 | insubordination/ disrespect at my store.  I think in part this is because I take steps to
14 | try and keep my employees calm.  If someone appears to be in a heated mood, I will
15 | tell them that we will discuss the issue later after they have calmed down, and I may
16 | ask them to go to the break room and sit down for a few minutes and collect
17 | themselves.  I find that this helps employees to avoid doing or saying things that they
18 | might later regret.

19 |     14.  I have a new District Manager, David Jens, as of last Thursday.  Until
20 | that time I reported to Julian Guzman.  Julian and I had a good relationship.  In fact it
21 | was Julian that encouraged me to become a Store Manager.  Julian would usually visit
22 | my store once a week, and more if needed.  One of the things he would do is complete
23 | a red flag audit at my store due to the shrink issues.  Julian would also walk the store
24 | and give me suggestions.  He offered me as much support as I needed but generally let
25 | me run my store as I saw fit.

26 |     15.  As a Store Manager, I am responsible for ensuring that employees,
27 | including the Assistant Managers, get all of their breaks, and if appropriate, their meal
28 | periods.  Most of my employees work 4 to 4.5 hour shifts and so they take a rest

5.

break, but not a lunch break.  However, if I decide to add hours to their shift (as I did today with the stockers) then I need to ensure they get a meal period in addition to rest periods.

16.     Mondays are typically my formal office day.  In addition to preparing the schedule as discussed above, I also review reports about my stores performance, sales, markdowns and inventory. I analyze the reports to ensure that I am aware of how my store is doing in these areas and identify areas where I need to focus my attention.  I place copies of these reports into a "playbook" so that they are available for my easy reference and so I can discuss them with my District Manager when he visits the store. I also highlight key points in these reports and discuss them with my Store Manager trainee.

17.     As Store Manager, I also am responsible for the ordering for my store.  I do my ordering on Monday.  I use the Store Labeling Inventory Control (SLIC) application to review data about how much of each product I have sold, how many units I ordered last week, and how many units I still have on hand.  While certain aisles in the store are replaced automatically through ASR (Automatic Store Replenishment), I do have the option to adjust the amounts of certain types of product in SLIC, which I will do based on the data I have reviewed.  There is no auto replenishment for the freezer department.  I pick out the product for that department based on what I know my clientele will buy in order to increase our sales.  I review reports that identify the top 100 and top 200 items which sell at my store and use these to place orders.

18.     As a Store Manager I have the ability to mark down items that have been damaged by a customer or been broken in the delivery truck.  I also mark down food or perishable items that are close to their expiration date.  I will choose to reduce the price to 50 cents and try to move the item.  Then I will dispose of the rest.

19.     As Store Manager I am responsible for the payroll in my store.  The payroll has to be submitted by Monday morning.  If I am not working on Sunday,

6.

1   which is often my day off, I will delegate this task to my Assistant Managers.
2   However, even when the Assistant Managers approve and submit the payroll I will
3   review and print the payroll summary and the punch detail to identify any problem
4   areas on Mondays.

5       20.   On Mondays I also review the cashier reports which show the void
6   percentages, the shorts and overages.  I analyze these to see whether there are any
7   cashiers who need counseling and I determine cashier of the week based on the
8   highest sales.  I then update the Cashier Corner with the data and post the cashier of
9   the week.  I also review the productivity of the freight team with my Merchandising
10  Manager Juan.   After we assess his team, I post the data for my merchandising
11  employees at the back of the store near the freight room.  I also place a copy of the
12  new Merchandising Bulletin there.

13      21.   On Fridays, much of my day is spent planning for the upcoming week.  I
14  review the Merchandise Bulletin, which is a guide we receive every week, and inform
15  my employees about the "Item of the Week" and the "Drive Item" that our cashiers
16  will be promoting.  For example, at the moment we are running "Operation Home
17  Front" and I have directed my cashiers to ask customers if they will purchase a toy
18  which we then place into a box and donate to an organization for the holidays.  The
19  Merchandise Bulletin also provides general guidance about upcoming activities that I
20  will then incorporate into my Daily Action Plan for the following week.

21      22.   I also receive a Sales Planner once a quarter.   This Planner contains
22  guidelines about displays or signs to put up in the store and a timeline for when to put
23  seasonal product out.  I use this as a guide but do not always follow it exactly.
24  Sometimes I will not have all of the items that are part of a display and so I choose to
25  replace them with another item.  The Planner contains a store map for each type of
26  store, but again I do not always have all the items that are on the map and so I replace
27  them with other things.  I have never been criticized by my manager because I did not
28  exactly follow this Planner.

7.

23.   On Fridays, part of my planning includes preparing seven days' worth of Daily Action Plans.  I usually prepare these throughout the day rather than sitting and completing them all at one time.  The Daily Action Plan is a plan describing all of the action items I want to have accomplished in my store each day.  I prioritize the activities by giving them a letter rating (i.e. "A" or "B") based on the relative importance to other tasks.  If items are not completed on the day assigned I will move them to the next day and may readjust priorities of other activities.

24.   On a daily basis I also prepare individual activity plans for each of my employees. Every day my Assistant Manager or I will prepare the Cashier Daily Plan, that tells each cashier what he or she is responsible for during the next day's shift.  I use the Daily Stocker Productivity Plan to assign a particular u-boat to each stocker and to track how many boxes the stocker stocked during his or her shift so that I can monitor productivity.   I sometimes allow my stocking team to fill these out themselves because I have a good team and so I trust them to report this accurately. Finally, there is a daily plan for each recovery associate that I use to assign them to a particular department.

25.   On Fridays I used to have a conference call with my District Manager and the other Store Managers in my District, however the new District Manager has informed me that these calls will be moving to Mondays.  On these calls we talk about issues such as payroll, priorities for the upcoming holiday/season, safety and security issues such as watching for counterfeit money.   We also have a 4th Quarter management in-person meeting with the managers from the district next to ours to discuss store operations and goals and any issues.

26.   Every day I do one or two walk throughs of my entire store.   During these walk throughs I am looking for areas of the store that need attention (recovery, safety issues, cleaning etc.) and am looking for merchandising opportunities.  I will include action items in my Daily Action Plans to address these issues or if they need more immediate attention direct an employee to address it sooner.  Also I will observe

8.

1   my employees working and provide feedback as necessary while I am walking
2   around.

3        27.    I also spend time each day reviewing communications from Dollar Tree's
4   corporate offices.  I implement any new policies and procedures at my store and
5   communicate those to my ASMs and Associates.

6        28.    As Store Manager I am in charge of the safety and security issues at the
7   store.  I train my employees on safety and security and try to ensure that they are in
8   compliance with company policies.  Every month I hold a safety meeting with my
9   employees to discuss a safety topic.  It is easy for me to gather the stocking crew, but
10  harder to get all the cashiers together given that their schedules do not always match
11  up and so I may have to talk to them more individually.

12       29.    As Store Manager I also have to deal with customer complaints.
13  Customers typically want to talk to me because I am in charge of the store.  Typical
14  complaints involve our returns policy.  I have to evaluate whether the customer is
15  eligible for an exchange –i.e. whether they have an original receipt and the
16  merchandise is in an unopened package.  If they are not eligible, I do my best to
17  explain this to them by referring them to the policy, which is stated on the receipt and
18  explaining.  Sometimes I also get complaints about long lines or the fact that there are
19  only two cashiers on duty.  I will explain to customers that we appreciate their
20  patience while another cashier was being cashed out or was taking a break.

21       30.    I spend time each week merchandising, or deciding on product
22  placement.  I also spend time stocking the shelves, although I know I can delegate that
23  work to my stocking associates.  However I personally really enjoy the merchandising
24  and stocking work.  I focus on the seasonal area, which tends to be the best selling
25  items to ensure that the shelves are up to my standards.  I also spend some amount of
26  time cashiering and will jump on a register if needed.

27
28

31.     At this store we have armored pickup for our bank deposits.  I do not have to go to the bank unless I need to get change, but typically the armored service brings us change as well.

32.     I understand that as a Store Manager I am expected to delegate as many tasks as possible, so that I can focus on planning and managing the overall store performance and overseeing my employees.  While it may vary slightly from week to week, I estimate that on average I spend at least 60% of my time performing managerial duties such as hiring, training (both my employees and the employees in my store for the MST program), assigning duties to, scheduling shifts for, and mentoring my employees, completing store walks to assess the store, developing my action plans, analyzing store performance data, ordering merchandise, and ensuring that company policies and my directions are being appropriately carried out.  I spend up to 40% of my time on cashiering, stocking and performing any other tasks that my hourly employees are also assigned to perform.

33.     I am voluntarily choosing to sign this declaration.  No one told me I had to sign it.  No one pressured me to sign it.  I had a chance to review the declaration before I signed it and make corrections.

I declare under penalty of perjury in accordance with the laws of the State of California and the United States that the foregoing is true and correct.

Executed on November 23 , 2015 at El Cerrito, California.

FRANCES RAMIREZ

Firmwide:137079728.1 061603.1171

10.

11/23/15

Correction:

Paragraph # 2.  " since about June "
                        instead of
                    " since about July ".

Thanks

Frances

EXHIBIT  N

# DECLARATION OF ROBERT RISSER

I, Robert Risser, hereby state and declare as follows:

1.      I am currently employed as the Store Manager at the Dollar Tree location in Dublin, California. I have personal knowledge of the facts in this declaration and could competently testify to these facts if called as a witness.

2.      I began working for Dollar Tree as an Assistant Store Manager in November 2013 in Brentwood, California. I had previous experience as a Store Manager at a previous job, but there were no open Store Manager positions at the time Dollar Tree hired me, so I worked as an ASM until a position opened up.

3.      For the next several months, I worked as an ASM at the Brentwood, Bay Point and Martinez stores. I trained to become a Store Manager at the Martinez store, and then transferred to the Pleasanton store in February 2014. In May 2014 I became acting Store Manager in Pleasanton, which meant I had not yet gone through Dollar Tree's Store Manager training program. In September 2014 I transferred to Dublin, California as the acting Store Manager in which position I worked for about three weeks until I was officially made the Store Manager in October 2014.

4.      Because I had previous experience working as a Store Manager, I went through a condensed version of Dollar Tree's Manager-In-Training program. The condensed version covered numerous important topics, including scheduling, harassment training, merchandising, and where to look on Dollar Tree's extranet for additional information.

5.      The Pleasanton and Dublin stores where I worked as a Store Manager were very different, and I faced different challenges at each. The Dublin store is over 50% bigger than the Pleasanton store, and did over twice the sales of Pleasanton. The Pleasanton store was not allowed to sell frozen food because of a local ordinance, unlike Dublin. At the Dublin store I manage four ASMs (three full time and one part time) and about 33 associates. At the Pleasanton store I had only nine employees total, three of which were ASMs (two full time and one part time).

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
501 W. Broadway
Suite 900
San Diego, CA 92101 3577
619 232 0441

1    6.    Most stores hire extra associates during the holidays (which for Dollar

2 Tree runs from August through the end of December). At my Dublin store, I have

3 such high turnover among associates that I am constantly interviewing and hiring new

4 people, and I'm not able to designate any employees as seasonal. I would estimate that

5 I only keep one out of every ten associates I hire. Unfortunately that is not unusual for

6 our business, as another Dollar Tree Store Manager told me he hired 22 new

7 associates, out of which only two stayed on permanently. I did not hire any seasonal

8 associates at Pleasanton either, but that was because of the low sales volume in that

9 store.

10    7.    I have good, but not great, ASMs working for me at the Dublin store. I

11 assign them tasks based on their strengths – for example, although all of my ASMs are

12 cross-trained, there are two ASMs I try not to put in charge of the truck unloading

13 because they unload so slowly. I don't manage by paperwork – I prefer to do my

14 training one-on-one as opposed to issuing corrective action notices, because I find it

15 helps me retain better employees. Better performing ASMs allow me to do more

16 planning in the office instead of performing the work I usually delegate to them.

17    8.    I have a number of reports I can use to monitor both associate

18 performance as well as overall store performance, including the top 100 SKU report,

19 total sales by department, and the top 10 SKUs per department. These help me to plan

20 my end caps to highlight the merchandise that needs to be moved. Although I

21 generally follow my seasonal planners closely, I am often required to design my own

22 end caps when the seasonal planner calls for merchandise that is not in my inventory.

23    9.    I meet with my District Manager frequently, because Dublin is the largest

24 store in the region, and it is the "home store" for our zone's Vice President. We also

25 receive a lot of visits from corporate employees, and which puts extra pressure on me

26 to keep my store running smoothly. When my DM visits, I meet with him to discuss

27 how things are going and to work on plans to resolve any issues. I also talk with him

28 on the phone four to five times a day, in addition to texts that we exchange.

2.

10.     As the Store Manager, I am responsible for every square inch of the store, as well as the store's financial performance. I have to plan daily activities, schedule employees, oversee cashiers, and oversee the maintenance of and repairs to the building. I plan, delegate and follow-up on all activities that occur in my store. One unique thing I try to focus on to increase sales and maximize profits is to ensure that we have all our shopping carts pulled in from the parking lot, as I have noticed that customers will spend more money when they have a clean shopping cart available to walk around the store with.

11.     I generally work 10-hour days, five days a week, with a 30-minute meal period.

12.     Monday is my office planning day. I work on planning binders, review sales reports, write the schedule, and have an hour-long conference call with my district manager. When scheduling, I take into account requests for time off and whether the day will be especially busy (e.g., paydays, days when food stamps are distributed, etc.), as well as individual strengths and weaknesses. For example, one cashier tends to have trouble working later shifts because of her back pain and medications. During the holidays I have to get creative with my scheduling, because our payroll budget is still based on sales – we do not get any additional hours because of the holidays.

13.     On Mondays I also look at the daily action plan, mark down counts and review projects that need to be done, check the previous days' sales, check emails to the store and directly to myself, and review time cards. I review and update the daily action plans throughout the day. I also print out cashier reports and meet with my Operations ASM to go over any issues, and I order frozen foods on Mondays.

14.     On Tuesdays and Thursdays we have a truck delivery, and frozen food are delivered on Wednesdays. Each delivery requires me to oversee my ASMs and help to ensure that product is moved efficiently from the truck, through the stockroom and onto the floor. I also have to determine, given the level of stock of various

3.

products, whether to highlight any products through a display. I spend up to 40% of my week managing freight deliveries, including planning, identifying what merchandise needs to come out onto the floor and how to do so, and working on end caps.

15.    On Fridays I also spend a lot of time on conference calls and planning for the next week.

16.    I try to host job fairs once a month at another store in my district. I also attend full-day district training meetings once every other month. When my regional merchandising manager visits, I spend about an hour and a half going over merchandising and related issues. Once a year I also spend close to an hour with each of my employees performing annual reviews.

17.    Dollar Tree ties our payroll budget (in hours) to our sales volume, via the sales per employee hour (SPEH) formula. As a result, throughout each day I am checking on the daily sales volume and using it to adjust my upcoming schedule. If the truck shows up late, or an employee calls in sick, I also have to decide how best to adjust the schedule, taking into concern my budgeted payroll hours.

18.    I also compare each day's sales to the same day the prior year, to see how our store is doing year over year. I communicate these figures to my district manager, and describe my action plan. I also check on the stocking station, which tracks the stock in the back room, both to oversee the store's stocking operations and also so I can work with our many customers who purchase items in bulk.

19.    Between the discrete daily tasks described above, I also walk the store to check on the status of the projects I have delegated to my ASMs (and that they have in turn delegated to the other associates). I also try to "coach on the fly," by giving employees feedback as they are working. I have found that this can quickly and effectively change employee behavior.

20.    I only spend about 2 hours out of my 50 hour week physically stocking, and about 15 hours a week cashiering. I would estimate I spend about 35% or so of

4.

1   any given week performing non-exempt duties such as cashiering, stocking, unloading

2   freight and cleaning the store. I probably spend about 15% of my week walking the

3   store, scheduling, and delegating work, and about 20% of my week directly

4   supervising, hiring, training, and disciplining. About 20% of my week is spent

5   ordering and merchandising, and about is 10% spent on office work.

6       21.    I am voluntarily choosing to sign this declaration. No one told me I had

7   to sign it. No one pressured me to sign it. I had a chance to review the declaration

8   before I signed it and make corrections.

9       I declare under penalty of perjury in accordance with the laws of the State of

10  California and the United States that the foregoing is true and correct. Executed on

11  December __16 ᵗʰ__, 2015 at Dublin, California.

13                              _____
14                                      Robert Risser

5.

EXHIBIT  O

## DECLARATION OF JOSE SOTO

I, JOSE SOTO, hereby state and declare as follows:

1.    I am currently employed by Dollar Tree Stores as a Store Manager for the Dollar Tree store located at 1218 Broadway St. in Chula Vista, California. I have personal knowledge of the facts in this declaration and could and would competently testify to these facts if called as a witness.

2.    I have worked for Dollar Tree for over seven years and have been in a Store Manager position for approximately five years. Specifically, I was first hired in around September 2008 as a part/time hourly associate. I then became a part time Assistant Store Manager ("ASM") for two years before becoming a full time salaried Store Manager in approximately November 2010.

3.    During my employment with Dollar Tree, I have worked in at least four different Dollar Tree stores, including: (1) 68401 E Palm Canyon Dr, Cathedral City, CA 92234 ("Cathedral City"); (2) 42245 Washington Street, Palm Desert CA, 92211 ("Palm Desert"); (3) 82025 Hwy. 111 Ste 101, Indio CA, 92201 ("Indio"); and (4) 1218 Broadway, Chula Vista CA, 91911 ("Chula Vista").

4.    When I was first promoted to Store Manager, I had already been working for Dollar Tree for two or three years and had learned the ins and outs of running a Dollar Tree store through experience, trial and error. During this process and after my promotion, my mentor and Store Manager at the time, Arturo Obesso, confirmed that the best way to succeed as a Store Manager is to run the store like it is your own personal business, within Dollar Tree's general guidelines. As such, his advice was to tackle one thing at a time and make it your own—whether it was scheduling, disciplining employees or handling various difficult scenarios. I take that advice seriously. Therefore, as the leader of my store, I take great care to hire the best crew I can find, to schedule my employees to provide maximum coverage and to keep my store profitable by driving sales and planning appropriately.

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
501 W. Broadway
Suite 900
San Diego, CA  92101-3577
619.232.0441

Firmwide:137181079.1 061603.1171

**Basic Store Information:**

5.      Because I have worked at several Dollar Tree stores, I know that each store is unique in terms of size/layout, customer traffic and operations.

6.      For example, the Cathedral City store was open from 8 a.m. to 9 p.m. on Monday to Saturday and on Sunday from 9 a.m. to 8 p.m.   Meanwhile, the Palm Desert store opened at 7 a.m. and closed at 9 p.m. Monday to Saturday and on Sunday was open from 8 a.m. to 9 p.m.   In contrast, the Indio and Chula Vista stores were both open from 8 a.m. to 10 p.m. Monday to Saturday and on Sunday from 9 a.m. to 9 p.m.   Generally speaking, length of store hours and the time at which the store opens and closes affects my ability to schedule employees—the more hours I need to cover, the more I need to plan to ensure that my employees' availability and the store's needs are coordinated to provide the adequate staffing necessary for excellent customer service.

7.      The overall size of the stores also differs dramatically.   For example, I estimate the Chula Vista store is only 7,000 square feet, while the Indio location was nearly double the size at around 12,000 square feet.   Store size similarly affects my planning for my store—if the store is bigger, I typically spend more time strategizing about what products to order and will have a larger workforce to manage and train.   If it is a smaller store, I generally spend more time strategizing about how to efficiently and effectively maximize the space and workforce I do have to keep my sales volume high.

8.      Interestingly enough, store size does not always translate into higher sales volume.   Although Indio was the largest store at which I worked, it did not have the highest sales volume—that honor goes to Chula Vista, which has the smallest square footage.   Indeed, my current Chula Vista Dollar Tree store is in the top 25 in the Company in terms of sales volume.   High sales volume means that I need to focus more of my time on planning for and ordering new products to come into the store, as

2.

1  well ensuring that I have adequate staffing (available and appropriately trained) so that

2  we can get those new products onto the sales floor quickly.

3      9.     Another difference between stores is whether they have a frozen food

4  section.  All of my stores, except for the Palm Desert store, had a frozen food section.

5  Generally speaking, I personally plan and place the order for frozen foods at least

6  once a week, which is different from ordering merchandise for other sections of the

7  store.   The difference is that if we don't order frozen foods, we don't get the

8  product—because there is no auto-replenishment service for this category of product.

9  This means I have to strategize carefully about our orders, so that our customers

10  always have enough of what they want, when they want it.  I have trained an hourly

11  employee to monitor our frozen food inventory and each week we work together to

12  plan for the next week and to forecast what customers will want.  When I was at the

13  Palm Desert store, though, this was not part of my job duties, since there was no

14  frozen foods department.

15      **Store Staffing Fluctuates Based on A Variety of Factors:**

16      10.    At my current store, Chula Vista, the high sales volume drives my

17  staffing needs.  Here, I have approximately 35 employees that I regularly manage,

18  including three full time and two part time ASMs, ten stockers, twelve cashiers, and

19  six recovery workers (who clean the store in the evening to make sure the sales floor

20  and display areas are clean and presentable for customers).   During the holiday

21  season, these numbers can increase dramatically.  In contrast, the other stores at which

22  I worked never employed more than 30 employees even during the busy holiday

23  season, with approximately six stockers, six cashiers and two recovery workers

24  regularly working in each store—approximately less than half the amount we have at

25  Chula Vista.   Management employees at the other stores were also limited.   At

26  Cathedral City and Palm Desert, we had only one full time and two part time ASMs.

27  At Indio, we had only two full time and one part time ASMs.

28

Firmwide:137181079.1 061603.1171

1    11.    At all the stores, our staffing levels fluctuate based on demand.  As noted,

2    during the Christmas holiday season, when customers are busy shopping for stocking

3    stuffers and gifts, the amount of employees in the store can almost double.   For

4    example, currently at Chula Vista, I already hired four new associates for the

5    Christmas holidays and I need to hire at least another six to get us through this

6    important shopping season.  To ensure that I have that many employees at Christmas,

7    I have to spend a lot of time beginning in mid-October interviewing and hiring

8    prospective applicants and training new employees to be sure they are ready to go in

9    late November through December.

10    12.    Regardless of the staffing level, my objective is to schedule and plan for

11    my week so that I have sufficient employees to accomplish the work at hand.  If I have

12    fewer employees in my store (such as in Cathedral City), I will spend less time during

13    a typical week creating schedules and personalized daily action plans (which each

14    employee receives each day they work) because there are simply fewer people to

15    manage.   At the same time, I will spend more time counseling and managing the

16    employees that I do have to make sure they are 100% efficient and effective in their

17    role.

18    **My Work Schedule:**

19    13.    I develop my own work schedule based upon my availability and the

20    needs of the store.  Generally speaking, I work 8 a.m. to 6 p.m. Monday to Wednesday

21    and Saturday and 1 p.m. to 11 p.m. on Friday.  I typically take Thursdays and Sunday

22    off—although I start to work on Thursdays after Thanksgiving so I can keep up with

23    the holiday/seasonal demands on the store.

24    14.    I have discretion over my schedule and working hours.  As such, I may

25    come in or leave early or late and/or change my schedule to accommodate personal

26    needs or the needs of the store.  For example, recently I had some problems with the

27    overnight crew, so I started coming in between 5-6 a.m. so that I could follow-up to

28    see what the night shift had accomplished the night before—when I came in early, I

4.

1  tried to leave early, assuming I had appropriately planned coverage for the afternoon.

2  If I need to change my schedule, I don't need to ask permission or get approval for

3  schedule changes.  If I leave early, I know my ASMs and employees are adequately

4  trained to manage the store in my absence.

5  **Store Manager Responsibilities**:

6       15.    As a Store Manager, I am the highest level manager in the store and am

7  accountable for efficiently and effectively managing the store's overall performance.

8  As such, I am accountable for all operations at my store and my goal is to delegate

9  100% of the tasks that are necessary to run the store, so that I can focus on setting

10  expectations and developing work tasks and then following up to ensure my directions

11  are being effectively executed.  I know the secret to ensuring a smooth-running,

12  efficient and productive store is to schedule properly and plan ahead—so I spend a

13  great deal of my time analyzing our past performance and using that information to

14  plan for the future.

15       16.    I can and do seek guidance from my District Manager, Bill Caldwell,

16  when necessary, but my District Manager generally takes a 'hands off' approach and

17  allows me the freedom to manage my store as I see fit, especially given my strong

18  record as a Store Manager.  Mr. Caldwell and I communicate by phone rarely, but Mr.

19  Caldwell does send generalized emails to all of the Store Managers at least once a day

20  in a typical week.  Mr. Caldwell also generally visits the store at least once a month,

21  sometimes more.

22       17.    In terms of my work duties, I estimate that at least 75% of my daily tasks

23  working at Dollar Tree relate directly to managing my store, including analyzing

24  various reports, analyzing the store's performance, developing action plans,

25  supervising, hiring, scheduling, counseling and training my employees and ASMs,

26  setting goals and expectations for my employees and ASMs and ensuring that

27  company policies and my guidance are being properly carried out.

28

5.

Firmwide:137181079.1 061603.1171

**Analyzing Financial & Operational Reports & Store Performance**:

18.    As a Store Manager, I focus my daily activity on management-related, high-level supervisory tasks rather than the types of lower-level tasks I would generally expect my hourly employees to conduct.  My daily tasks include reviewing the store's daily financial performance to ensure the store is performing consistently and correctly and that sales are progressing according to our expectations.  This involves analyzing store sales data, i.e. the Key Performance Reporting ("KPR"), and other financial indicators.  If I identify issues of concern, I work with my ASMs to make sure that appropriate action is being taken.  I also monitor, check and approve payroll on a daily and weekly basis and make adjustments as necessary depending on the store's performance.  For example, if the store's sales are trending lower than expected, I will generally cut man hours in an upcoming schedule.  If sales are trending higher than expectations or I expect an increase in sales based on historical data, I will generally add man hours and/or decide to hire additional employees.  My daily tasks also include reviewing and analyzing time and attendance records to make sure employees are accurately recording their work time and taking required breaks.  I also analyze and review other reports such as void sales data that may raise loss prevention concerns.

**Daily Action Plans:**

19.    Every Friday, I develop daily action plans that set out key tasks for my employees for each day in the next week.  I will then verbally review the tasks with the employees when they arrive each morning (or my ASM will do so if I am unavailable) and walk them through what needs to be done to ensure they have a good understanding of what I want to accomplish.  As needed, I update the daily action plans each morning and afternoon, so that I can re-prioritize tasks to ensure the store is always prepared to run efficiently and effectively, etc.  Tasks from the action plan that are not completed in one day are carried over to the next day.  I estimate that the majority of my work time each day is spent on developing an action plan,

6.

1   communicating it to my employees and then supervising and ensuring that the plan is

2   being properly executed.  This can encompass a number of different supervisory tasks,

3   including walking the sales floor, talking to employees, monitoring performance, etc.

4   Based on the daily action plan, I also prepare a specific cashier daily action plan and a

5   daily recovery needs plan.  Additionally, I have my merchandising ASM prepare a

6   daily stocker productivity plan, which I review and confirm is appropriate.

7   **Hiring, Training & Disciplining Employees:**

8        20.    One of my key responsibilities is hiring and training my ASMs and

9   employees.  A store is only as successful as the team that I manage—this requires me

10  to proactively train and coach my employees to be the best ASMs, cashiers, stockers,

11  etc. that they can be.

12       21.    When I first took over as Store Manager for the Chula Vista store, I was

13  brought on to really turn things around, shake things up and get the store working

14  again.  Because the prior Store Manager hadn't done an effective job of training, my

15  employees needed a great deal of up-front re-training and motivation.  Everyone was

16  so used to doing what they were not supposed to do that this took a great deal of my

17  time and energy.  The employees didn't know the proper standards in terms of making

18  sure the sales floor was presentable.  They didn't focus on customer service in the

19  morning shifts because they were busy cleaning up from the night before.  Cashiers

20  weren't focusing on part number integrity, but were sometimes scanning ten of the

21  same thing instead of scanning each item individually. To resolve the situation, I

22  focused my energy and attention on retraining my employees, promoting folks who

23  were willing to work hard and transferring or letting go of individuals who couldn't

24  work within my guidelines.

25       22.    To make sure that I can choose the best team for my store, I have

26  complete autonomy on interviewing and hiring all new employees.   The only

27  exception is ASMs, who are also interviewed by the District Manager. The amount of

28  time I spend on this varies greatly depending on the time of year and the store's

7.

turnover rate.  For example, in Chula Vista, some weeks, when the store is slow or the weather is bad, I may not interview or hire anyone.  During other time periods, like now with the holidays, I interview and hire employees fairly frequently.

23.   When we do hire a new employee, I also assist in conducting the employee's initial training and orientation by showing them around the store and introducing the new employee to everyone.  I also delegate certain training tasks to my ASMs and other store employees and then will follow-up with them to make sure the tasks are completed.

24.   I am also given the freedom to discipline employees and fire them if necessary.  When I notice an employee is having an issue, I will generally speak with them first to see if they have a reasonable explanation and to evaluate whether the problem is likely to persist.  I then have the discretion to make a judgment as to whether immediate separation is necessary or whether it is worth giving the employee additional time to improve.  While I do check with my District Manager before terminating an ASM, my opinions in that regard are given significant deference.  I cannot remember a single occasion where my opinion regarding termination was not ultimately followed.  Indeed, for regular employees, I do not need any approval for my termination decisions.  To my recollection, I have terminated at least ten employees for a variety of problems, including underperformance, not showing up for work, theft, etc.

**Scheduling:**

25.   Another regular duty I have is scheduling associates.  Dollar Tree's Compass system assists in this task by assigning a target "Sales Per Employee Hour" to the store for the week.  Once I have that target number, I can work out how many hours I have to allocate to various employees and I can begin to draft the schedules.  I typically schedule my closing and opening employees on a routine schedule, so that everyone knows exactly what they should be doing and when.  Stockers, similarly, have routine schedules so that I can ensure continuity and consistency with my

8.

workforce—still, I may need to make revisions for the stockers' schedules depending on the arrival of the freight trucks that deliver new product and merchandise to the store.   My operations ASM, in contrast, doesn't have a set schedule because that employee is intended to move around on the schedule based on business needs.   So, for example, when I need to focus more of my time on training or planning, then I will schedule my operations ASM to pick up the slack in terms of supervising the sales floor and following up on daily action plans, etc.

**Supervising/Counseling:**

26.   Another significant daily task is supervising and counseling my employees.   I regularly engage in informal counseling of employees to mentor them and show them the right way to conduct particular tasks.   I regularly review cashier reports, paying particular attention to void sales transactions, and counsel cashiers that have a higher than expected percentage of void sales to ensure they are ringing merchandise appropriately.   I also counsel other employees that are having other work-related issues, for example, not effectively keeping their area clean while restocking merchandise, not offering additional merchandise to a customer when ringing up a sale or failing to come into work on time.   I also regularly communicate company policies to employees, for example, explaining monthly safety notices.

**Ordering & Merchandising:**

27.   I am responsible for ordering new merchandise for my store and do so nearly every day.   To ensure we are always carrying just what the customer wants, I typically look through my Store Level Inventory Control ("SLIC") order book and determine what additional products might be good for my store.   I pay particular attention to seasonal interests, higher volume departments or hot items, such as balloons.   With all that in mind, I make a final determination on how much and what new product to order based on the time of year and recent sales trends.

28.   My job duties also include supervising the store to ensure appropriate merchandising and displays.   Indeed, I regularly walk through and inspect the store to

9.

1    ensure that everything is in proper order and to evaluate recovery/clean-up efforts and

2    identify merchandise shortages.  If I notice any concerns, then I can update our daily

3    action plans or otherwise provide coaching and feedback to employees and ASMs as

4    needed.

5         29.    Of note, Chula Vista has the smallest stock room of all the Dollar Tree

6    stores I have worked at or managed.  As a result, I have to pay special attention to

7    how/when I order product for this store and how/when I get the product from the stock

8    room to the sales floor, so that the small stock room does not hold up our sales volume

9    capacity.    These considerations can and do affect the time it takes for me to

10   appropriately strategize and plan for my store's ordering and merchandising efforts.

11        **Customer Complaints:**

12        30.    Another duty that I undertake is handling customer complaints.    The

13   amount of time I spend on this varies significantly depending on the day.  Dollar Tree

14   has a no refund policy so often customer complaints involve me explaining this policy

15   to customers.  I use my discretion to resolve the problem in a way that satisfies the

16   customer—sometimes this involves simply listening and explaining, but other times I

17   may need to think creatively to address a customer's need.

18        **Loss Prevention:**

19        31.    As the Store Manager, it is also my responsibility to monitor and try to

20   reduce shrink (i.e., loss of merchandise) in the store.  First, I do this by monitoring

21   cashier statistics to make sure there is no post-void fraud, items fraud, etc.  Second, I

22   also train and counsel my employees on loss prevention techniques and other methods

23   for reducing shrink such as following vendor check-in procedures and getting

24   merchandise to the floor quickly.  Indeed, one of the most important ways to reduce

25   theft is to provide excellent customer service.  Accordingly, I am constantly observing

26   and giving over the shoulder feedback regarding how employees can better greet and

27   offer customer assistance as they enter the store.

28        **Majority of Time Is Spent On High-Level Tasks:**

10.

Firmwide:137181079.1 061603.1171

32.   It is difficult to provide an exact percentage breakdown on each of the tasks described above because the time spent on these tasks vary depending on the day, season, and other factors.  However, as mentioned above, I estimate that at least 75% of my time working at Dollar Tree is spent on the tasks mentioned in these Paragraphs on any given day.

33.   I expect my hourly employees to handle the 'lower-level' tasks in the store so that I have time to effectively manage and supervise.  Even if I am performing a 'lower-level' task, like cashiering or stocking, it is a choice I make so that I can execute one of my managerial objectives.  For example, although I ring some transactions at the cash register during the day, I am also using my time at the cash register to observe how the sales floor looks, whether bags or supplies need to be stocked at the cash register, whether customers appear to be enticed by seasonal displays, etc.  I then use those observations to change or improve my guidance to my ASMs and employees regarding what tasks are priorities for the day.

34.   I do not do any type of regular cleaning duties in the store or in the parking lot or any other types of menial type duties.  Similar to stocking and cashiering, I delegate these tasks so that I have time to effectively supervise and run the store.  From time to time during my store walk through, I may notice and then correct something that is out of order or pick up something that was dropped on the floor—but my primary objective during my walk through is to note concerns so that I can delegate such tasks to my employees and/or to provide counseling and coaching to the employees responsible for the problem.

**Pay Stubs:**

35.   I receive my pay from Dollar Tree via direct deposit.  If I want to, I can print a copy of my paystub from a cash register at any time for free, but I typically do not do so except when I have a bonus check.  All Dollar Tree employees can print their paystubs from the cash register as well.

Firmwide:137181079.1 061603.1171

36.    I am voluntarily choosing to sign this declaration.  No one told me I had to sign it.  No one pressured me to sign it.  I had a chance to review the declaration before I signed it and make corrections.

I declare under penalty of perjury in accordance with the laws of the State of California and the United States that the foregoing is true and correct. Executed on November 30, 2015 at San Diego, California.

JOSE SOTO

Firmwide:137181079.1 061603.1171

EXHIBIT  P

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

CURTIS PATTON, AN INDIVIDUAL,     )
ON BEHALF OF HIMSELF AND ALL      )
OTHERS SIMILARLY SITUATED;        )
FRANCISCA GUILLEN, AN             )
INDIVIDUAL, ON BEHALF OF          )
HERSELF AND ALL OTHERS            )
SIMILARLY SITUATED,               )
                                  )
          PLAINTIFFS,             )
                                  )  NO. CV
    vs.                           )  15-3813-MWF
                                  )  (PJWX)
DOLLAR TREE STORES, INC., A       )
VIRGINIA CORPORATION; AND DOES    )
 THROUGH 100, INCLUSIVE,          )
                                  )
          DEFENDANTS.             )
_____  )

DEPOSITION OF FRANCISCA GUILLEN

WEDNESDAY, DECEMBER 14, 2016

FILE NO. 91185

REPORTED BY:  D'ANNE MOUNGEY, CSR 7872

Francisca Guillen
December 14, 2016

18

1      Q      What kind of relationship did you have with
2    Mr. Patton during your employment at Dollar Tree?
3      A      He was my manager.
4      Q      Did you consider him a friend at that time?
5      A      Yes.
6      Q      Did you ever see Mr. Patton socially outside
7    of work during your employment?
8      A      No.
9      Q      Sometime after the termination of your
10   employment, Mr. Patton contacted you to ask for your
11   help in this lawsuit?
12     A      Yes.
13     Q      How did he contact you?  Was it by cell
14   phone?
15     A      Yes.
16     Q      Had you given him your cell phone number
17   before?
18     A      Yes.
19     Q      Other than communications -- strike that.
20            Prior to that communication that Mr. Patton
21   initiated with you about this lawsuit sometime in 2015,
22   had you spoken to him for any other reason not related
23   to the lawsuit?
24     A      Prior?  Before?  Umm --
25     Q      To clarify, in between your termination and

```
 1        A       No.  They paid directly to my mother.

 2        Q       Got it.  Did you have to provide any part of

 3   the childcare cost for your mother's childcare of your

 4   child?

 5        A       At the time, no.

 6        Q       Under the MAOF, could you select any

 7   childcare provider that you wanted?

 8        A       Yes.

 9        Q       On any of the occasions when MAOF requested

10   your paystubs from Dollar Tree, were you ever unable to

11   provide them with a paystub?

12        A       I would have to wait until it was available

13   to me.  So either I would have to wait until I went to

14   work to pick up the paystub or I would have to find a

15   way to work if I wasn't working.

16        Q       But in all those instances you were able

17   either by going to work or finding a way to work to

18   provide the paystubs; correct?

19        A       Inconveniently, yes.

20        Q       And with respect to governmental assistance,

21   on all the occasions that they requested paystubs from

22   you, you were able to provide those to them; correct?

23        A       Yes.

24        Q       Any other instances that we haven't covered

25   during your employment with Dollar Tree where you were
```

1        Q      On those occasions when you went to the store

2   either because you were working or for the sole purpose

3   of printing out your wage statements, was your

4   testimony, I believe, that you were always able to print

5   those; correct?

6        A      Can you rephrase that?

7        Q      Sure.

8        A      Or say it again.

9        Q      Yes.  We talked about earlier that every

10  couple months during your employment, you were asked for

11  wage statements by these various organizations; correct?

12       A      Yes.

13       Q      You testified earlier that on those occasions

14  you had to find a way to get to the store if you weren't

15  working or do it while you were working to print out the

16  wage statements from the cash registers; correct?

17       A      Yes.

18       Q      Once you were at the store you were able to

19  print whatever paystubs you needed from the cash

20  register; correct?

21       A      As long -- if there was an open register,

22  yes.

23       Q      Were there ever occasions where there wasn't

24  an open register?

25       A      Sometimes when they were busy, some -- when

1    if the registers were down, you would have to wait for

2    one that was working.  And if the cashier for the moment

3    was ringing, you would have to wait for her to finish.

4    Or if I'm printing out my transaction and there's a

5    line, people have to wait for me to finish.

6         Q    **What was the longest that you ever had to**

7    **wait for an open register to print your paystub?**

8         A    I don't recall.  It was quite a long time

9    ago.

10        Q    **On the occasions when you were working and**

11   **you wanted to print a paystub, you could print that**

12   **paystub during your shift; right?**

13        A    I was usually working, so I would print it

14   either at the end of my shift if I remembered.

15        Q    **How many days per week typically did you**

16   **work?**

17        A    I want to say five.

18        Q    **How many occasions did you have to make a**

19   **special trip to the store to print out your paystub?**

20        A    I don't remember specifically.

21        Q    **Can you estimate for me how many occasions --**

22   **I'm sorry.  Let me finish.**

23             **Can you estimate for me on how many occasions**

24   **you had to make a special trip to the store to print out**

25   **a wage statement on one of your days off?**

Francisca Guillen
December 14, 2016

```
 1      A     Estimate.  I don't recall.  It was whenever I
 2   would get the mail request.  They would mail me a paper
 3   saying you need to turn this in or if they would call me
 4   for an appointment, it would be on my day off, I would
 5   have to go to the store, print it up and go back to the
 6   office.  And I don't drive, so I would have to walk to
 7   the store or bus it to the store and then back to the
 8   office.
 9      Q     Why couldn't you just print out your paystubs
10   whenever you were working so that you would have those
11   available when they were requested of you?
12      A     Because I didn't know I was going to need
13   them, and I'm not going to waste paper just to lose it.
14      Q     It would have been possible as far as you
15   knew to print out your paystub on or about every payday;
16   correct?
17      A     But not all paydays I needed it.
18      Q     I'm asking a slightly different question.
19            If you wanted to, you could have printed your
20   paystub on the register every time you were paid;
21   correct?
22      A     If I was there on payday.
23      Q     If you weren't there on payday, you would
24   print it out the next day or the day after that; right?
25      A     Yes.
```

Francisca Guillen
December 14, 2016

87

```
 1          Q       That way you would have had all your paper
 2   paystubs.  When they were requested of you, you could
 3   have handed those over?
 4          A       They were receipt paystubs, so yes.
 5          Q       Yeah.  I understand they're printed from the
 6   register.  My question is a little bit different,
 7   though.
 8                  There's nothing from preventing you from
 9   printing your paystub whenever you were at the store --
10          A       Yes.
11          Q       -- unless there was a wait for a register;
12   correct?
13          A       Yes.
14          Q       And were there occasions when you had to turn
15   over a paystub on less than 48 hours' notice?
16          A       Occasionally, yes.
17          Q       How often would that come up?
18          A       Whenever I had to go down to the office.
19          Q       Which office?
20          A       Either/or, either the MAOF or the DPSS.
21          Q       They would call you up and contact you and
22   say, "We need you to bring in a wage statement today"?
23          A       Not today, but whenever my appointments were.
24          Q       How far in advance did you typically know
25   about your appointments?
```

Francisca Guillen
December 14, 2016

89

```
 1    employment with Dollar Tree ever tell you that they had
 2    difficulty printing out their paystubs or wage
 3    statements?
 4              MR. STAHLE:  Objection; vague and ambiguous.
 5              You can answer.
 6              THE WITNESS:  Not that I recall.
 7    BY MR. MESSIHA:
 8         Q    During your hiring paperwork or during the
 9    completion of your hiring paperwork with Dollar Tree, at
10    that point in time was direct deposit explained to you?
11         A    No.  I had paper checks when I just started.
12         Q    Was it at some point after you just started
13    your employment that somebody at Dollar Tree raised the
14    possibility of direct deposit?
15         A    No.  I think I -- it was offered to me
16    through a prepaid card.  So that's how -- I just ended
17    up doing it there.  They told me, just take the
18    paperwork to Dollar Tree, set it up and then that was
19    that.
20         Q    Who offered you the prepaid card?
21         A    I believe it was Speedy Cash.
22         Q    I'm sorry.  Speedy Cash?
23         A    Yeah.  Because it was a hassle for me to go
24    get the paper checks when I didn't have my ID.  It was
25    hard for me to cash it.  So then I was like, okay, if I
```

**THE MCS GROUP, INC.**

Francisca Guillen
December 14, 2016

1    just get the direct deposit, I can just -- it will just

2    be on the card.

3          Q     If you didn't have transportation, you would

4    have to make a separate trip to the bank to deposit or

5    cash your paycheck too?

6          A     Uh-huh.

7          Q     Sorry.  You have to say "yes" or "no."

8          A     Yes.  Sorry.

9          Q     So in that respect the direct deposit or the

10   pay card was a convenience for you because it saved you

11   a trip to the bank?

12         A     Yes.

13         Q     How many paper paychecks did you receive

14   before you went on pay card?

15         A     I don't recall.

16         Q     Can you estimate for me?

17         A     I don't recall.

18         Q     Can you tell me whether it was more than

19   five?

20         A     Probably more than five.  I'm trying to

21   remember when I started using the card.  I'm not quite

22   sure.  Probably more than five.

23         Q     Can you tell me whether it was more than ten?

24         A     I don't think so.

25         Q     So at some point after those five or so paper

Francisca Guillen
December 14, 2016

92

```
 1        Q      No, it's not correct; or no, you never saw
 2   any documents like that?
 3        A      Oh, no.  It wasn't required of me.
 4        Q      In other words, you understood at the time
 5   that it was optional, you could choose it?
 6        A      Yes.
 7        Q      Or you could not choose it?
 8        A      Sorry.  Yes.
 9        Q      After you went on direct deposit and you
10   started experiencing difficulty in printing out your
11   paystubs because you had to go to the store on your day
12   off, for example, did you consider going back to a paper
13   paystub so that you would have the paystubs along with
14   your paycheck?
15        A      Did I consider it?  No.  I didn't think of
16   it.
17        Q      Any other reason you didn't consider it other
18   than just not having thought of it?
19        A      I didn't think of it as an option.
20        Q      Nobody told you that you couldn't go back on
21   a paper paystub; correct?
22        A      What do you mean?
23        Q      In other words, as far as you knew, you had
24   voluntarily switched over from paper checks to direct
25   deposit; correct?
```

Francisca Guillen
December 14, 2016

1      A      Yes.

2      Q      As far as you knew, you could switch back any

3   time you wanted; correct?

4      A      I didn't know that.

5      Q      Did anybody tell you that you couldn't switch

6   back?

7      A      No.

8      Q      Did you ever ask anybody if you could switch

9   back and they said no?

10     A      No.

11     Q      If you had known that you could switch back

12  to a paper paycheck from direct deposit, would you have

13  done that?

14     A      Possibly.  Now that I have a bank account,

15  yes, it would be easier to cash it.

16     Q      At the time you didn't have a bank account?

17     A      No.

18     Q      At the time because you didn't have a bank

19  account, there was a convenience to you in not having to

20  go to the bank, but there was also a trade-off with

21  direct deposit, which is your paystubs were being

22  printed from the register at the store; right?

23     A      Yes.

24            MR. MESSIHA:  I don't know what exhibit we

25  left off at.  Probably just mark this as 100, I guess.

```
1    STATE OF CALIFORNIA                    )

2    COUNTY OF LOS ANGELES                  )   ss.

3

4         I, D'Anne Moungey, C.S.R. No. 7872, in

5    and for the State of California, do hereby certify:

6         That prior to being examined, the witness named

7    in the foregoing deposition was by me duly sworn to

8    testify to the truth, the whole truth, and nothing but the

9    truth;

10        That said deposition was taken down by me in

11   shorthand at the time and place therein named and

12   thereafter reduced to typewriting under my direction, and

13   the same is a true, correct, and complete transcript of

14   said proceedings;

15        That if the foregoing pertains to the original

16   transcript of a deposition in a Federal Case, before

17   completion of the proceedings, review of the transcript

18   { } was { } was not required.

19        I further certify that I am not interested in the

20   event of the action.

21        Witness my hand this _____ day of _____  DEC 2 1 2016

22   20___.

23                          _____

24                          Certified Shorthand Reporter

25                               for the State of California
```

EXHIBIT  Q

```
 1              UNITED STATES DISTRICT COURT

 2             CENTRAL DISTRICT OF CALIFORNIA

 3

 4   CURTIS PATTON, an          )
     individual, on behalf of   )
 5   himself and all others     )
     similarly situated,        )
 6                              )
                                )
 7              Plaintiff,       )
                                )
 8      vs.                      ) NO. 2:15-CV-03813
                                )     MWF-PJW
 9                              ) (PAGES 1-309)
     DOLLAR TREE STORES, INC., a )
10   Virginia corporation; and  )
     DOES 1 through 100,         )
11   inclusive,                  )
                                )
12              Defendants.      )
     _____ )
13

14

15                    VOLUME I

16           DEPOSITION OF CURTIS PATTON

17             Los Angeles, California

18            Tuesday, October 20, 2015

19

20

21

22

23   REPORTED BY:

24   CLAY J. FRAZIER
     CSR NO. 13401, RMR, CRR
25
```



www.zahncourtreporting.com

```
 1    running a business the bottom line is, yes, you do
 2    want to make a profit or contribution.  How it was
 3    measured or the requirement criteria I don't
 4    remember.  I don't recall.
 5        Q    And, as far as you were concerned, that's
 6    what you were doing at Rite-Aid as the store
 7    manager, was running the business?
 8        A    That's what I thought I was hired for.
 9    After working there, it turned out to be something
10    a little bit different.
11        Q    And your management experience with retail
12    is quite extensive; correct?
13        A    Yes.
14        Q    Spanning 20, 25 years?
15        A    Yes.
16        Q    And in reviewing your qualifications, I
17    saw that that goes back as far as the Broadway
18    department store; is that correct?
19        A    Correct.
20        Q    Other than Broadway and Rite-Aid and
21    Dollar Tree Stores, what are some of the other
22    retail establishments that you've managed over the
23    past 25 years?
24        A    I've worked for Computer City.  I've
25    worked for CompUSA.  I've worked at Circuit City.
```



 1   similar to the other positions?  Did you have a

 2   responsibility for running the business there?

 3        A    Yes.

 4        Q    Ultimately with an eye towards

 5   profitability, towards making money; right?

 6        A    Yes.

 7        Q    How long were you at Computer City?

 8        A    I'd have to look back over my résumé.  It

 9   was -- let's see.  I don't recall the exact years

10   or dates.  It was a couple years.

11             I started out in the Cerritos location as

12   a commissioned sales manager.  It was a new

13   assignment.  And roughly six months after that,

14   Tandy, who owned the company, decided to shut down

15   the L.A. market.  So I went to work in

16   Northern California.  I think it was -- I can't

17   recall exactly but probably between then and

18   CompUSA took over, maybe two years or so.

19        Q    So by the time you came to apply at

20   Dollar Tree Stores, you had extensive experience in

21   retail store management?

22        A    Yes.  Various formats.  Different focuses,

23   yeah.

24        Q    And at the time that you applied for the

25   Dollar Tree position, you were applying for a store



1    manager position there; correct?

2        A    Correct.

3        Q    In submitting your résumé or

4    qualifications to Dollar Tree Stores, presumably

5    you emphasized at that time your very extensive

6    retail management experience; correct?

7        A    Well, I was asked some questions about it,

8    but I presented a résumé, and the person I

9    interviewed with -- typical interview -- went

10   through the résumé and some of the experience I

11   had.  I believe that he was trying to build a

12   little contrast to compare based on the different

13   retailers I had worked for and how it might apply

14   to Dollar Tree.

15       Q    As far as you can tell, did all of that

16   retail management experience assist you in getting

17   the position at Dollar Tree?

18       A    I can't make that decision.  I don't know

19   exactly what criteria the district manager uses to

20   hire.  But there was a little bit of a difference.

21   You know, we talked about it.  It's something that

22   Dollar Tree has that some other retailers that I

23   worked for didn't have, and that was a heavier

24   focus on stocking and merchandising.  So --

25       Q    But at least some of your extensive retail



 1    experience was discussed in the interview at

 2    Dollar Tree; correct?

 3        A    Yeah, there probably was.  I can't recall

 4    specifically what it was relating to it.

 5             I do remember discussing -- we talked

 6    about -- well, first of all, let me step back.

 7             The first person I ever spoke to -- and I

 8    don't have his last name.  He was a district

 9    manager by the name of Art.  And it was in the

10    Temple city location.

11        Q    Temple City?

12        A    Temple City, yes.

13             Art seemed to be, I think, a little bit

14    less concerned about the detailed retail experience

15    but was more concerned about the merchandising side

16    of it.

17        Q    Who did you speak with after Art, if

18    anybody?

19        A    Jason Jalili.  Actually, Jason had left --

20    I had worked for him for a period of time at

21    Rite-Aid.  He had called me to let me know that he

22    was at a different company.  He asked if I had any

23    interest.  At that time, I told him I didn't.  And

24    I believe it's because he was in Central

25    California.  He called me a few months later to let



1          Q      Each of the retailers does things a little
2     bit differently depending on specifically what
3     they're marketing and what their target demographic
4     is.
5               Is that a fair statement?
6               MR. STAHLE:  Objection.  Lacks foundation.
7     Vague and ambiguous.
8               Go ahead and answer.
9               THE WITNESS:  From my experience, they
10    have different focuses, yes, for different reasons.
11              I think a lot of it is impacted by the
12    vendors that they carry.
13    BY MR. MESSIHA:
14         Q      And that said, the wealth of retail
15    experience that you brought to the table at
16    Dollar Tree, at least in some measure, assisted you
17    in successfully performing your job duties;
18    correct?
19         A      I'd say yes.
20         Q      And at Dollar Tree you were, in fact,
21    successful and you were promoted; right?
22         A      I think that's a large part of the reason
23    I got promoted, sure.
24         Q      Was the talent and skill that you brought
25    to the table in retail management and your



```
 1    location and Pico Rivera location.  I wasn't --
 2    didn't actually, I think, get promoted until
 3    sometime in March.
 4              So there was roughly, you know, maybe 40,
 5    45 days of bouncing between two stores.  Part of it
 6    I think was to help out in the absence of a
 7    manager.
 8              The other part of it was maybe to see if I
 9    had an interest in it.
10        Q    Did you, in fact, have an interest in
11    managing the bigger store?
12        A    Yes.  Yes.
13        Q    The promotion to the bigger store was also
14    accompanied by a pay increase; correct?
15        A    Yes.
16        Q    Do you remember how much the pay increase
17    was?
18        A    Probably around 7 -- 7-, $8,000.
19        Q    Was it Jason at that point who was
20    responsible for promoting you?
21        A    Yes.
22              MR. MESSIHA:  Why don't we take a quick
23    break.
24              THE VIDEOGRAPHER:  The time now is 10:49,
25    and we're off the record.
```



1   trucks, stocking, cleaning.  So it varies a little

2   bit.  There were people that are at the high volume

3   store that -- great cashiers but when tested on

4   some of the stocking didn't do well with it.

5           So -- but they still had value in terms of

6   being good employees.

7      Q    And as the store manager in either the

8   smaller store or the bigger store, part of your

9   responsibilities would have been to utilize the

10  staff provided and the hours provided in a way that

11  would best serve the needs of the store; correct?

12     A    Yes.

13     Q    And that was done partially through

14  schedules that you prepared for the stores;

15  correct?

16     A    Yeah.

17          The -- there was two different pieces to

18  the schedule or two different methods.  One is an

19  automated method through their Compass scheduling

20  system.  The other would be to manually enter them.

21  I spent time with two different DMs, not long with

22  one.  They had two different perspectives.

23  Ultimately they had to approve the schedules.  But

24  there was a little bit different mind-sets on

25  scheduling.



```
 1    are you 100 hours over?"
 2          And I knew I was 100 hours over, but I
 3    submitted it anyway simply because he believed that
 4    the application would, you know, schedule
 5    automatically within the realm of the budget I was
 6    given, and it did not.
 7        Q    So you couldn't rely on that automated
 8    scheduling, in other words?
 9        A    No.  I would have been well over what the
10    company allocated at the time I was supposed to
11    create the budget.
12        Q    You had to go in and do that manually?
13        A    The manual adjustments, yes.
14        Q    How frequently did you do manual
15    adjustments to the scheduling?
16        A    Well, once you got a schedule together, I
17    tried to -- from a productivity standpoint in both
18    stores I worked with, tried to make sure that I
19    hired people and allowed them to work within the
20    company's realm when they were available.  So
21    people going to school, moms, whatever the case
22    was, second jobs.  I knew what people's
23    availability was.  And it didn't change too often.
24          So they don't --
25        Q    I'm sorry.  I didn't mean to interrupt
```



1    from week to week.  Merchandise load weeks vary.

2           Okay.  So someone that may be familiar

3    with one area one week was not familiar with

4    another area the other week.

5           It doesn't mean that you don't push on,

6    but there's some big differences in developing

7    people in small stores versus a larger.  So

8    different -- similar approach but more

9    cross-training I think takes place in smaller

10   volume stores.

11     Q    And as the store manager, you were the

12   highest ranking individual in the store, physically

13   in the store; correct?

14     A    Yes.

15     Q    So in terms of delegating employees, for

16   example, to dedicate their time to one task versus

17   another task if you had a seasonal issue or a

18   seasonal turnaround, that would be the store

19   manager's charge to delegate and make sure that

20   coverage was used to the best of its availability?

21     A    When we say seasonal, are we talking about

22   merchandising, or are we talking about serving

23   customers?

24     Q    We're talking about, just as an example,

25   something that you raised, which was to do a quick



```
 1     turn from, say, one seasonal display to another.
 2          But my question actually was targeted more
 3     generally.  And setting aside the example, I'll
 4     reask it this way.
 5        A    Okay.
 6        Q    As the store manager, as the person in
 7     charge of the store, part of your charge was to
 8     ensure that duties were delegated appropriately to
 9     employees so that they could be accomplished most
10     successfully.
11          Have I got that right?
12        A    Correct.
13        Q    And in terms of what you described -- I
14     don't know if you used the word "cross-training,"
15     but that's how I heard it anyway.
16          In those larger stores, for example, you
17     mentioned that one of the differences between the
18     larger store and the smaller store is that
19     employees in your larger store may not have as much
20     experience in performing different tasks.  They
21     might be dedicated to a particular task like
22     cashiering.
23          And so part of your charge in the larger
24     store which didn't necessarily exist in the smaller
25     store was to train and guide those particular
```



1    to try and work with the buyer, rebuyer and end up

2    getting an education on the company's -- I think

3    they called it Smart System and how it operated.

4            But that wasn't typical stuff that

5    occurred.

6        Q    So as far as you were told, at

7    Pico Rivera, volume and margin had both increased

8    eventually during your employment there as a result

9    of your efforts; correct?

10       A    Well, I saw the percentages.  I think

11   it -- yeah, over the months -- with the exception

12   of the first month, I think it ranged anywhere from

13   maybe a tad short of three percent and finished up

14   at a little bit over four.

15       Q    As a result of your efforts as manager

16   there?

17           MR. STAHLE:  Objection.  Lacks foundation.

18           THE WITNESS:  During the time I was there,

19   yes.  I think it was collective effort, being led

20   by me.

21   BY MR. MESSIHA:

22       Q    Under your guidance and supervision as the

23   store manager?

24       A    Yes.

25       Q    And you were bonused based on that volume



1   and margin because as the store manager you were

2   ultimately in charge of the store's profitability;

3   correct?

4        A    Myself and the assistant managers.  That

5   was the company's bonus.

6        Q    And the assistant manager or the assistant

7   managers at that time at Pico Rivera ultimately

8   reported to you; correct?

9        A    The one did, yes.  Uh-huh.

10       Q    And there was just the one?

11       A    Yeah, I don't know how they had him

12  categorized.  There was one I knew that got a

13  bonus.  I don't believe that they ever really

14  settled on the correct managers for that store.  It

15  was always influx.  But, once again, that was just

16  a kind of brief involvement during a visit from the

17  regional manager with my district manager being

18  present.

19            They didn't go into detail with me.

20  Obviously, I don't hire the managers.  It wasn't my

21  job.

22            But they didn't seem to think that they

23  had the correct person in place.

24       Q    During the time you were in Pico Rivera,

25  though, it was your understanding that the store



1    was performing measurably better than it had been

2    under the prior manager?

3         A    Looking at the -- from the years prior,

4    comparing new comparable sales, yes.

5         Q    Again, as a result of your leadership in

6    the store as the person ultimately responsible for

7    the store's profitability?

8         A    Yes.  I'd have to take it good or bad.

9         Q    With respect to the scheduling -- and I

10   know we talked about that quite a few minutes ago,

11   but getting back to it -- and we'll get into it in

12   more detail I think in the afternoon.

13        Did you also with respect to the

14   scheduling have to deal with particular requests

15   from employees regarding their availability?

16        For example, your student employees having

17   final exams or if you had moms or dads working

18   whether they had sick kids, for example, and had to

19   call out, was that something that you had to

20   address in making the schedules and keeping them

21   accurate?

22        A    Yeah.  I would put out an offer for -- I

23   had -- I was open to taking day off requests, where

24   I'd specifically let them know that they could put

25   those in two weeks in advance, and they were simply



1   say, "Hey, so-and-so -- we know we both work on

2   Saturdays.  You know, is it possible to get one

3   Saturday off a month?  This person will come in and

4   cover a day I don't work."

5         If I could do it and it created a little bit

6   better workplace and they had, you know, the same

7   assignments or could cover whatever work needed to be

8   done, not a problem.

9    Q   It would serve you well to exercise your

10  discretion to give somebody a day off if it would

11  keep them happy and ultimately reduce turnover;

12  right?

13   A   It would.  But I can tell you that most of

14  the folks that put these requests in, okay, were

15  more concerned about getting more hours.

16  Dollar Tree doesn't provide a lot of hours to

17  associates.  The attempts was to schedule 15.  And

18  if they were really good, maybe you get to 20 per

19  week.  So it wasn't a lot of hours.  And you get

20  some folks that would be willing to take a little

21  bit more than others.

22   Q   And it was ultimately up to you to decide

23  whether somebody would get a particular day off

24  that they requested or not; correct?

25   A   Yeah, I would make the final decision



 1    based on, you know, a few different things.  But,
 2    yes, it was up to me.
 3        Q    In terms of the increases in margin and
 4    volume that you effected at the Pico Rivera store,
 5    what did you bring from your prior extensive retail
 6    management experience there in your estimation that
 7    helped to bring about those improvements in
 8    profitability?
 9        A    I would say very little because different
10    nature of business.
11             But understanding the Dollar Tree culture,
12    I tried to make the best use of that.  And
13    volume-wise I can tell you I had an impact on
14    making sure the store was clean and organized.  I
15    had a customer base that I think was a little
16    finicky about that.
17             There were a little bit more planning on
18    end caps.  Obviously a larger volume store you have
19    more end caps.  I could have more impact there.
20             Flexibility on merchandise.  I had a
21    little bit more merchandise so that I could go
22    through and, you know, create ajacancies of what
23    people might buy in one stop.  So that made a
24    difference.
25             The days and understanding the nature of



```
 1              When I started out in the business, sales
 2    and operations meant two different things.  I think
 3    some of it today is mixed.  Or within the
 4    operational task.
 5              Some companies see operations as a portion
 6    of sales.  I grew up to define it -- sales and
 7    operations being two different things.
 8        Q    Ultimately, though, as we discussed
 9    previously, your job at Dollar Tree was targeted
10    towards increasing volume of sales and margin of
11    profit; correct?
12        A    Sales volume, margin, yes.
13        Q    Looking at this Exhibit 3 in its totality,
14    then I believe what you've told me is that it is
15    true and accurate as of the time that it was
16    provided, to the best of your knowledge; correct?
17        A    Yes.
18        Q    All right.  Let's set that one aside.
19              MR. MESSIHA:  Let's look at what we're
20    going to mark as Exhibit 4.
21              (Exhibit 4 was marked for
22              identification.)
23    BY MR. MESSIHA:
24        Q    And I'll represent to you that Exhibit 4
25    is a different version of your résumé that was
```



```
 1      A     I think the last one -- the most current
 2  one would have had Crossmark on it.  After I was
 3  employed with Advantage Sales & Marketing, I
 4  haven't looked for anything else.
 5      Q     What's your best estimate as to when this
 6  particular version of your résumé was created?
 7      A     You know what, I'd have to go back and
 8  take a look.  I create them in Word documents.
 9          But at one point I was applying for
10  different types of jobs which had retail-related or
11  my experience-related -- it's been all over the
12  map.  DSD route sales, account sales, customer
13  service aspect.  There was some store management.
14          So I tried to extract different
15  experiences out of those based on what the
16  companies were looking for.
17          Just typically trying to -- you know,
18  advise from a workforce counselor to modify the
19  e-mail to a company's set of qualifications and
20  requirements.  So -- but I'd have to -- the only
21  way I could tell would be to look at the dates on
22  the actual Word documents when they were created.
23      Q     To the best of your recall, is August 2014
24  approximately your last date of employment with
25  Dollar Tree?
```



1        A    No.   It was the 29th.   I was suspended,

2   okay.   I think there was a little snafu in terms of

3   it getting back to me.   And the -- August 29th was

4   the last day.

5        Q    Okay.   So this résumé, given that it

6   reflects your employment at Dollar Tree, would have

7   obviously been created at some point after August

8   2014.   That's the last date that's listed here for

9   your Dollar Tree employment.

10            Have I got that right?

11       A    Yes.

12       Q    Beyond that, can you estimate for me at

13  all the periods of time when this résumé would have

14  been prepared or would have been accurate?   Was it

15  immediately following the end of your employment?

16  Or a month later?   Two months later?

17       A    I couldn't tell you exactly.   I would --

18  well, to give you a time frame, I would probably

19  say between the time that I left Dollar Tree and

20  when I got employment with Crossmark.   So, what,

21  two months or so.

22            But to verify it, I'd have to take a look

23  at the date on it.

24       Q    Okay.   And versus the Exhibit 3 that we

25  just looked at.   The initial section on abilities



```
 1        A     Relative to more the past than -- yeah, it
 2   is.  More the Circuit City and CompUSA environments
 3   where I could hire a direct report and there was
 4   far more management tasks regarding HR and other
 5   functions.  I even participated at a district and
 6   regional level sometimes on panels to do kind of
 7   the round robin panel-type interviewing.  So --
 8        Q     And I'm sorry.  I'm starting to have a
 9   little bit more trouble hearing you.  If you could
10   keep your voice up, please.
11        A     Okay.
12        Q     With respect to those experiences and
13   abilities that we just mentioned, which one of
14   those did -- which ones of those -- one or ones of
15   those did you use at Dollar Tree as a store
16   manager?
17        A     I did have the ability to interview.  I
18   did have the ability to hire.  Some -- training --
19   staff training, a different variation of it.  This
20   was more -- Dollar Tree was different in terms of
21   the staff training than in the past.
22              Some supervision.  Performance evaluation.
23   Coaching, counseling.  Minimal -- human resource
24   out of -- minimal human resource functions.
25        Q     What were your interviewing
```



1    responsibilities at Dollar Tree at either of the

2    stores you worked at?

3         A    I was responsible for hiring or

4    interviewing hourly associates.

5         Q    Was that true both at Garden Grove and at

6    Pico Rivera?

7         A    Yes.  The only -- I did have an exception.

8    At Pico Rivera, the very last in.

9              I guess the guy that previously worked

10   there had come and applied.  I did a check to find

11   out that he was not rehirable.  He happened to walk

12   up in that short time frame that Dave Flores was

13   there.  Dave got on the phone and called somebody

14   and ended up hiring the guy.

15             Other than that, I pretty much was able to

16   interview in the criteria that we were hiring for,

17   make decisions.

18        Q    How many folks did you interview and/or

19   hire at Garden Grove while you were there?  And I

20   guess I'll break that up into two separate

21   questions.

22             How many folks did you interview at

23   Garden Grove while you were there?

24        A    I think I may have hired for a half dozen

25   positions.  Typically I would try and do interview



```
 1              After I, you know, kind of got through
 2    some of those things, most of the folks were pretty
 3    consistent.  I think I maybe had, you know, one or
 4    two that found a new job or an additional job and
 5    it was going to be difficult for them to work both.
 6              So --
 7         Q    At Garden Grove, how much attention would
 8    you say you had to pay to interviewing and hiring?
 9         A    Very little.  It's small staff.
10         Q    Did that change in Pico Rivera?
11         A    No.  Pico was even more stable than
12    Garden Grove.  There were employees that had been
13    around a little bit longer.  But also -- and there
14    was a larger number.  But I remember school, a
15    couple employees that were in school.  Were able to
16    work with them.
17              When I first came in, two or so that
18    didn't have a problem -- or had a problem getting
19    to work.  So I talked to them about availability,
20    and it turns out -- you know, one of them I think
21    only worked a day a week.  The other one had such a
22    long drive, it wasn't worth his while to continue
23    to come over.  But nothing dramatic or major.
24              So it wasn't -- I did far less hiring at
25    Pico Rivera.
```



```
 1      LOS ANGELES, CALIFORNIA; TUESDAY, OCTOBER 20, 2015

 2                        2:11 P.M.

 3

 4            THE VIDEOGRAPHER:  We're back on the

 5      record.  And the time now is 2:11.  Counsel.

 6      BY MR. MESSIHA:

 7         Q    Mr. Patton, do you understand that you're

 8      still under oath?

 9         A    Yes.

10         Q    Over the break, did you speak with anybody

11      other than your counsel regarding this case?

12         A    No, I have not.

13         Q    Prior to the break, you had mentioned red

14      flag audits and/or a red flag store being

15      Pico Rivera.  Do you recall that?

16         A    Yes.

17         Q    What does the red flag store as a term

18      mean to you?

19         A    That they're -- well, specifically this

20      store, it was because of inventory is my

21      understanding.  The store had -- the last time they

22      took the physical inventory, it was over its

23      allotted budget.

24            So it was deemed a store that needed some

25      extra focus.  So that's something that I had kind
```



1    of walked into.

2        Q    What did that mean as far as your role as

3    a manager there in Pico Rivera?

4        A    There were some additional audits.  It

5    appeared to be -- because they weren't scheduled or

6    no mention of schedule.  Maybe once a quarter from

7    the regional loss prevention manager, that he would

8    come in and go through certain audits.

9              There was a self-audit that I was to do

10   and then the store manager -- I mean, sorry, the

11   district manager would perform audits as well.

12       Q    Is the term "red flag" or "red flag store"

13   related to shrink?

14       A    That would be the inventory loss, yes.

15       Q    And when you say the store was over its

16   allotted budget for inventory, that would indicate

17   that there had been shrink occurring there?

18       A    I guess a greater loss than what the

19   company accounts for, yes.

20       Q    As a store manager, did you have a role in

21   addressing shrink?

22       A    Yes.

23       Q    What was that role?

24       A    Part of it was to -- Part of it I can go

25   through some of the operational plans that the --



1    in my experience, that the district manager and

2    myself would sit down and put together.

3            Relatively easy task for me.  The prior

4    store I was in, Garden Grove, was in the same

5    scenario.  And -- although I think I was there

6    maybe eight, nine of the months during which time

7    an inventory was taken, and I eventually left.

8    That store performed extremely well.  It was

9    awarded second best in the region for reducing its

10   inventory -- or reducing its inventory shrink.

11           The four core factors that I pay attention

12   to are vendor deliveries, shipments from the

13   distribution center, internal theft, and external

14   theft.

15      Q    I'm sorry.  You said core factors?

16      A    Those are four that I would really build a

17   plan around.

18      Q    And were those four factors ones that you

19   implemented in Pico Rivera when you arrived there?

20      A    Yes.

21      Q    Do you believe that the implementation of

22   those four factors were what resulted in the

23   reduction in shrink there?

24      A    Yes.

25      Q    And for those who aren't familiar with the



1    documented by you?

2        A    No.  That was done by the district

3    manager.

4        Q    The district manager would review the key

5    carriers?

6        A    As far as the inventory was concerned -- I

7    guess at the time the inventory was taken, it was

8    shortly before I got there.  Maybe, you know, a

9    couple weeks.  And it didn't turn out well from my

10   previous year's inventory.  So --

11       Q    And we're talking about Pico Rivera now or

12   Garden Grove?

13       A    Garden Grove.

14            Bear in mind I did not take an inventory

15   at Pico Rivera.  So I can't speak to the details

16   there.

17       Q    Did you do any performance reviews for the

18   assistant manager?

19       A    One -- actually I think two.  I think

20   Rivera, a gentleman by the name of Julio Hernandez.

21   And then in -- I'm sorry.  Garden Grove was Julio

22   and Racquel in the Pico Rivera store.

23       Q    Any other performance evaluations that you

24   completed for anybody while you were a store

25   manager at either Dollar Tree store?



1      A    No.  I don't believe so.

2           I kind of questioned the process a little

3   bit, but I never really got any feedback as to

4   whether or not the hourly associates would get

5   performance reviews.  I was never asked to do any,

6   so --

7      Q    So you're not sure whether the hourly

8   associates would get reviews or not?

9      A    If they did, it didn't occur by myself or,

10  to my knowledge, any other store managers.

11     Q    What did you do with respect to coaching

12  and counseling for both hourly associates and the

13  assistant managers at either Garden Grove or

14  Pico Rivera?

15     A    My first attempt is to approach things in

16  the moment to correct behaviors.  If it was

17  something that was kind of repeated, I would go

18  through and document.

19          I know one -- I know there may be two or

20  three at the most.  One was on a manager, and I

21  submitted it, and it was turned down.  But not a

22  tremendous amount of coaching counseling formal.

23  More of it was formal corrections.

24     Q    It was formal or informal, did you say?

25     A    I'm sorry.  Informal.



www.zahncourtreporting.com

```
 1        Q     Just in terms of speaking to associates
 2   whenever things came up?
 3        A     Yes.
 4        Q     How frequently would that happen?
 5        A     I'd say, you know, little curbside
 6   conversations.  Maybe three, four times a week.
 7             Part of that was entailed with, you know,
 8   maybe being a little bit more productive at
 9   whatever the assignment was.  You know, as well
10   as -- I would kind of couple that into the coaching
11   as well.
12             Typically -- I've tried to go through and
13   recognize good behaviors, praise them for those
14   things.  And, you know, when reprimands or little
15   coachings come along, I do those as well.  So it's
16   a pretty good balance.
17             As time goes on, I think in any retail
18   environment you have to kind of set the stage as a
19   manager.  And I pretty much take the company's
20   expectations and standards and policies, and that's
21   what we work on.  It's not, you know, Curtis'
22   Dollar Tree.  It's Dollar Tree and their practices.
23        Q     And that was an expectation that was
24   communicated to you as the store manager, that you
25   were to ensure that the company's expectations were
```



1     followed in your store?

2          A     Yes.

3          Q     That would have been true either in

4     Garden Grove or in Pico Rivera?

5          A     Correct.

6                Quite often that's the way that it was

7     phrased, is that you need to meet the company's

8     expectations.

9          Q     You mentioned earlier in a response that

10    Dollar Tree's staff training was a little bit

11    different than other retailers that you worked at.

12    Have I got that right?

13         A     Yes.

14         Q     How is it different?

15         A     A little bit less hands-on.  A little bit

16    more -- hands-on from the standpoint the

17    merchandising.  It's really two things you dealt

18    with concept-wise.  You either stripe something or

19    put it in a block.

20               When you start talking about using point

21    of purchase materials, signs, adjusting shelves,

22    tags, rebates, and other things that go on, that

23    takes a little bit more in-depth training.

24               Those are things that Dollar Tree doesn't

25    have, doesn't really -- other than maybe some



1      number candy, occasional item, you don't have price

2      changes or things -- prices over a dollar.  So

3      there's a whole set of things of that nature.

4      There's not a lot of vendor-driven promotions and

5      things of that nature that vendors are paying for.

6             You don't have to deal with those things.

7             So a little bit of hands-on would have

8      been typically showing somebody how to arrange some

9      product, to block it or put it in stripe, basic

10     retail stocking.

11            Cashier functions, most of the cashiers

12     that I've worked with and talked to, they typically

13     have things picked up in a shift.  They're pretty

14     good to go after a shift or two.  It doesn't

15     require a lot of oversight.

16     Q    So in terms of that basic retail training,

17     was that something that you provided at the store

18     level?

19     A    Yes.

20            There are some other aspects of it which I

21     think other companies share in, but it's the

22     computer based training.  And then, you know, once

23     a month corporate typically had a topic for safety.

24     Q    How much time would you typically spend

25     doing the basic retail training with employees?



ZAHN
COURT REPORTING
www.zahncourtreporting.com

1      **A**     When they were new within the first -- you

2    know, I can't even say days because sometimes you

3    would hire people to stock and you may not see them

4    for a week.  They may work one day a week, two days

5    a week, whatever.  I'd say in those cases maybe

6    the -- pay attention -- you know, really detailed

7    attention maybe two, three shifts.  Basic stuff.

8            The cashiers, a lot of them are ready to

9    go within a couple of shifts, two, three shifts.

10   So the registers are pretty basic.

11           Teaching them how to scan an item and put

12   it in a bag is pretty basic.

13           Certain functions they can't do, if they

14   needed -- at one point to have a return approved.

15   I think before I left, the company changed that to

16   allow some of the returns to go through.

17           You know, the sign pops up on the screen

18   and says you've got, you know, enough money in the

19   register to have some taken out.  It's a visual.

20           So pretty basic systems.

21           Not as much the regulatory stuff that you

22   see in some other environments like the pharmacies

23   and tobaccos and alcohols.  You don't see as many

24   of the fraudulent purchase -- you know, things that

25   kind of make your ears point up regarding



ZAHN
COURT REPORTING
www.zahncourtreporting.com

1    fraudulent purchases.  This environment, very low

2    ticket.  Basic stuff.  It's not like somebody's

3    buying 20 bottles of $30 shampoo or something.

4            So very basic -- basic training.  A lot of

5    scanning and bagging.

6            And that was primarily one of the things,

7    to make sure that the inventory was kept accurate

8    and customer orders were accurate.

9    Q    And those were all things that you trained

10   various employees on at different points in time?

11   A    Some knew it.  Those that have been around

12   for a while you would observe, and, you know, if

13   they were doing a good job with it, it was just a

14   quick, "Thank you.  Good job."

15           If somebody happened to forget, you know, just

16   a quick "hey" reminder.

17           And probably the biggest thing that the

18   company -- even I think the core video that everybody

19   remembered is -- you know, it's a little comedian-type

20   video where a lady is talking at the cash counter and

21   loses track of scanning items.

22           So as long as we're scanning and bagging --

23   scan an item and put it in a bag, scan and put it in a

24   bag -- and you didn't have a multiple quantity function,

25   so you couldn't do that.



ZAHN
COURT REPORTING
www.zahncourtreporting.com

1        Q     Reinforcing good behaviors and correcting

2   or counseling on less good behaviors; right?

3        A     That and also development.  You know,

4   there were some people that would go the extra mile

5   to, you know, run and open a door for an elderly

6   customer.  Somebody that -- you know, folks got

7   into the habit of handing a basket out, okay, when

8   they saw somebody, things like that.

9              You mentioned it.  Sometimes you're in a

10  position to do it, sometimes they aren't.  You

11  know, but when you see people going out of their

12  way to try and, you know, help make it a great

13  shopping experience, of course I'm going to

14  reinforce that behavior.  I believe it brings, you

15  know, not only good experience, but it's going to

16  bring me a repeat customer.

17       Q     Ultimately contributes to the success of

18  the store; right?

19       A     Yes.  That's -- exactly.

20       Q     With respect to the development aspect,

21  did you assist any hourly employees to progress

22  within Dollar Tree while you were there?

23       A     One, yes.

24       Q     Who was that?

25       A     Garden Grove.  Her name was Michelle Lono.



```
 1        Q      And how did minimizing or reducing the
 2    questioning help you in doing your job as the store
 3    manager?
 4        A      The quicker I needed to develop people --
 5    one, it made sure that we were on the same page;
 6    okay.
 7               Expectation-wise we were all headed the
 8    same direction to meet those same expectations.
 9               The other thing it would do is time-wise,
10    you know, allow more efficient use of time to do
11    some other activities.
12               There's never a shortage of activities in
13    these retail stores.  So --
14        Q      So, for example, having a proficient
15    assistant manager would be preferable to you as a
16    store manager as opposed to having a less
17    proficient assistant manager who you would have to
18    provide more on-the-job guidance and training to?
19        A      Preferred.  But you have -- my experience,
20    okay -- and I think also it parallels the company.
21               A lot of the documentation speaks of store
22    manager responsibility and it not being delegated
23    unless the assistant manager is fully trained.
24               So it's to the store manager's benefit I
25    think in two ways.
```



www.zahncourtreporting.com

1    do.

2              But, you know, a kid walks through and,

3    you know, knocks down a display, obviously for

4    safety reasons that becomes a priority, as opposed

5    to, you know, putting another few pieces of

6    something on a shelf.

7              That's just an example.

8         Q    And those were all things that -- with

9    respect to the observation and training, the

10   guidance and the development, those were things

11   that you did on a weekly basis; right?

12        A    As needed, yeah.

13        Q    Were there also things you did on a daily

14   basis as needed?

15        A    Observation?  Yeah, that's part -- I mean,

16   anytime in the building.

17        Q    And the training, as needed?

18        A    As needed, yeah.

19              As I mentioned, when you had a new

20   associate, you put a little bit more time into

21   them.

22              The other thing you keep in mind as well

23   is that, you know, the other key carriers would

24   participate in these things as well.  The assistant

25   manager, they had more focus on merchandising.  So,



ZAHN
COURT REPORTING
www.zahncourtreporting.com

1    you know, some of them were just as or more

2    involved in that training.

3          Pico Rivera's a little bit different.  I

4    had a part-time kind of front-end manager that was

5    -- you know, would pay attention to some of that

6    stuff as well.  So -- some of it's on my shoulders,

7    some was on theirs.

8    Q    Was that another area where it would be

9    beneficial to you as the store manager to have the

10   assistant manager take up the oar on some of those

11   things so that you could be freed up to do other

12   things?

13   A    Yes and no.  If it was additional work on

14   top of what they were assigned and it would keep

15   them from getting something that was critically

16   important that's on their task list done, I would

17   not put it on their shoulders.

18         But I have to reiterate the simplicity of

19   the systems and the training that's really needed

20   to get in gear.  I think it's a very low area of

21   entry to get up to speed in the Dollar Tree

22   environment.

23         And keep in mind the concept of -- as

24   Dollar Tree mentioned -- it's the first time I had

25   ever heard of it.  Less is more.



1    of it was going to be reemphasized, with the

2    exception of the end caps and the weekly -- weekly

3    communication as well.

4           So the primary use of it I think for most

5    stores was to get the visual of what seasonal would

6    look like.

7           So you set a season, and it could last

8    several weeks.  Maybe month, month and a half, two

9    months.

10    Q    Who was responsible in the store for

11   seeing that the monthly planner was implemented or

12   that the plan in the monthly planner was

13   implemented in the store?

14    A    I would -- the store manager.  And then it

15   could be delegated if you had an assistant.  So --

16    Q    Same in the weekly planner?

17    A    Weekly planner was a little -- yeah, same.

18           But the assistant managers -- more the

19   merchandise planners.  I mean, knew the routine.

20   It varied a bit, like I said, depending on seasonal

21   sales, seasonal footage.  When you get down to the

22   weekly stuff, Dollar Tree has a couple tables

23   usually as you walk in the store.  Like a wow table

24   and a speed table.  The speed table is subject to

25   change every week.



1    designed to help drive sales in one spot, anywhere

2    between three to five stars depending on

3    merchandise you had.

4            So those were -- I mean, that's one of the

5    differences that I saw in the short period of time.

6    And I already kind of known -- with Jason as the

7    district manager, he was very adamant about making

8    sure that he adhered to those APs.

9            I used to wonder sometimes -- there were

10   other stores I went into at other districts.

11           Part of it was -- if I was in the area, I

12   would stop by to kind of get ideas.

13           And there were some things I saw sometimes

14   which I think lacked the APs and maybe focused more

15   on just getting boxes on the floor, stuff stacked

16   in manners that -- I guess the DM said it was okay,

17   but it wasn't in line with the profitability goods.

18       Q    Pico Rivera was a bigger store than

19   Garden Grove; yes?

20       A    Physically bigger, yes.  More volume, yes.

21       Q    More employees?

22       A    Yes.

23       Q    How many more employees than Garden Grove?

24       A    Depending on the time, two, two and a

25   half.  And the reason I say that is that I had



1    times where there were employees that could only

2    work ten hours a week.  And instead of hiring one,

3    maybe there were two.

4              So about twice.  I'd generally average,

5    without looking at the schedule or store roster,

6    it's about twice.  Twice the amount of employees.

7        Q    How would you compare the physical retail

8    space in the two stores in terms of size?  I'm

9    talking about the sales floor area, to be clear.

10       A    8,000 square feet to maybe 15- to 20,000.

11   So it's about double.

12       Q    Pico Rivera is about double the size of

13   Garden Grove when you were there?

14       A    I believe -- I never saw the numbers, but

15   based on my estimates of working in stores that

16   there was probably 18- to 20,000 square feet of

17   retail space.  There were definitely more end caps

18   in Pico Rivera.  The other store was smaller

19   format, the strip mall, which is probably about 83-

20   to 8500 square feet.

21       Q    Would the number of end caps in

22   Pico Rivera be proportionately greater than

23   Garden Grove?  About double?

24       A    Yes, they would.  But they were more what

25   we called permanent end caps.  So that's part of



1    the racetrack concept.

2          The end caps in the racetrack stores --

3    there are certain ones that are going to continue

4    to get the same product over and over and over.

5    You don't have to change those; you just have to

6    fill them.

7          Some sold well, some didn't.

8      Q    And for someone who's not familiar with

9    retail, how would you describe end caps?

10     A    It is the fixture at the -- typically the

11   beginning and end of an aisle.  You've got in-line

12   shelving sections.  The stores could be laid out

13   differently.

14          But at the beginning or front of it or

15   back -- however you want to look at it -- the end

16   cap is that section.

17     Q    So as you were walking into an aisle, for

18   example, the end cap product would be facing you

19   instead of in an aisle where the product faces each

20   other?

21     A    Yes.  It would face you as opposed to

22   being to your side.

23     Q    With the additional number of end caps in

24   Pico Rivera, how would you as the store manager

25   know or decide what to put on those end caps?


www.zahncourtreporting.com

1      A    Initially it started out -- I went through

2   an exercise of end cap planning.  I think I did it

3   one time where I had to write it down.  It was a

4   request of Jason.  Once he knew I understood it, I

5   had to pick out what would be permanent end caps

6   and the ones that were going to change.

7           So we marked them as to what was permanent

8   and what was going to change.

9      Q    Who decided what went in the permanent end

10  caps?

11     A    That's a good question.  I have no idea.

12          When we initially walked through, I think

13  it was maybe -- depending upon the district

14  manager, they may have decided stores like that.

15          I remember seeing some other locations

16  that had signage that I didn't have in my store

17  that called out certain areas, like home goods.

18  Maybe that was a corporate decision.

19          So a couple different variations on the

20  racetrack stores.

21     Q    Who would decide what to put in the

22  temporary end caps?

23     A    Typically the store.  I would, yeah.

24     Q    How would you know what to put in there?

25  How would you select it?



1      A      The first thing to do would be to take a

2    look at the monthly planner and see what it called

3    for.  As long as that product was available, it

4    would go in the planner.

5            The small stores, sometimes, depending on

6    the store, there could be more end caps in the

7    planner than you would physically have in the

8    store.  So it's usually based on the inventory that

9    you had.

10           Like I said, bear in mind sometimes the

11   stuff that goes on a planner gets sold well before

12   it's theoretically designed to go up.  There wasn't

13   a holding back of merchandise.

14           So if not -- I've had this discussion,

15   talked to -- you know, especially at Pico Rivera.

16   A couple short calls.  Store managers that were

17   in -- I was usually ranked between five and seven

18   in the district.

19           Five I think was the best ranking I had

20   out of any of the months.  But I'd call up another

21   store manager and ask them what they were doing.

22           And it was a balance between the stores

23   that were focused on volume, stores that needed

24   margin.

25           I remember a couple conversations with the



www.zahncourtreporting.com

1    top volume store that we had.  He was in an area

2    where -- I guess he assumed that he wasn't going to

3    get the same margins as everybody else, so he was

4    just heavily focused on volume.

5            That store was maybe an aisle larger than

6    the Pico Rivera location.  He just had a lot of

7    customers coming in and a lot of merchandise going

8    through.

9        Q    How many stores in the district at the

10   time that you were ranked fifth?

11       A    Well, this was a regional deal.  All I saw

12   was the top ten.  But I think at that time he had

13   about 140, 145 stores.

14       Q    And the number five ranking was based on

15   what?

16       A    Volume.

17       Q    Sales volume was one of the things that we

18   talked about earlier that you were bonused on as

19   the store manager; correct?

20       A    Uh-huh.

21       Q    That's a yes?

22       A    Yes.

23       Q    If you got a monthly planner that asked

24   you to put something on an end cap that was sold

25   out or wasn't available, what did you do in that



www.zahncourtreporting.com

1    situation?

2        A       I would go through and try and find a

3    similar-type item out of the department.

4             So, you know, for instance, if it's pots

5    and soil for spring, okay, I'm sold out of soil.  I

6    may expand on the pots.  I may expand on garden

7    tools.  Try and keep something related that you had

8    a quantity of to support.

9             There were opportunities sometimes -- and

10   it's hit and miss with being able to order

11   merchandise for end caps.  There were times when

12   the corporate office would make buys that were a

13   little bit heavier than what would go on the

14   shelves.

15            So -- try and get as close to the, I

16   think, core concept of what may have been in demand

17   for a theme or a season.  If that wasn't available,

18   default was, you know, there's always tons of

19   water.  There's just a lot of stuff that didn't

20   make sense.

21            A portion of the end cap, depending on how

22   it was set up.  And the star concept, you know,

23   that varied.  Some may be for volume, some may be

24   to offset margin.

25       Q       Was that up to you to figure out what to



1    substitute in if a product wasn't available?

2        A    I would make the adjustments.  If the

3    district manager disagreed on it during a walk,

4    he'd let me know.

5        Q    In the scenario where you have less end

6    caps in the store than you are given end cap

7    settings for in the planner, what do you do?

8        A    I would take -- the concept of building an

9    end cap -- it depends on how it's set up.  But you

10   typically want to get as good a balance between

11   volume and margin.

12            So if there is some discretion, one is the

13   relevance of maybe a season or time frame that

14   you're in.  Number two is the quantity of product.

15            But I don't think there's a

16   straightforward method to that.  And the reason I

17   say that is the store that I trained in, the

18   district store trainer there had probably a half

19   dozen end caps that could change every other day.

20            At some point in her tenure, she was told

21   that that was a great way to create excitement for

22   the customer.

23            Other stores had far more merchandise.

24   The number one store, that guy would probably get

25   more water to sell than some stores -- in a week



1    that some stores got in a month.  Maybe it was room

2    for him.

3            So I think some of this came down to, you

4    know, discretion as to what you had in stock and

5    theme-wise.  It was okay -- you know, and district

6    manager is okay.  If he thought you should change

7    it, then change it.

8        Q    What was the STAR concept?

9        A    Typically five shelves.  If you had the

10   higher -- the taller end caps, three of the shelves

11   would have the same item.

12           A fourth shelf, different item; fifth

13   shelf, different item.  But they were all related.

14   A clip strip that hung off the end -- one end of

15   it.  And then a side stack if you had something

16   that was related.

17           The whole idea would be to, you know,

18   invite a customer to walk up to one end cap and be

19   able to pick up multiple items as opposed to one,

20   balancing out sales volume as well as margin.  But

21   it was all related.  Related-type product.

22       Q    Why was it significant to balance out

23   sales volume and margin?

24       A    It depends on the store.  I know there's

25   some stores that did extremely well with party



1    goods; okay.  Things like paper and plastic, really

2    high margins.  It's great to get a ton of margin,

3    but if you don't have the volume to support it,

4    then you have to balance it out.

5           There were other stores that didn't do as

6    well in some of those areas, the high-margin areas.

7           But if, you know, you had the customer,

8    you would try and make sure that you balanced

9    profitable sales -- or profitable selling items

10   with items that maybe were a little bit more

11   attractive price-wise but didn't have -- you know,

12   would move volume-wise but didn't have the margins.

13   So --

14       Q    Did the STAR concept refer to an acronym?

15   Or did it refer to the shape or layout of the

16   shelves?  Or do you know?

17       A    My understanding -- I don't know if there

18   was a definition for STAR, okay.  It never really

19   was explained that way.

20           But each physical -- each shelf or

21   position represented a STAR.  So potentially three

22   stars on the end cap itself, a fourth one with a

23   clip strip that could hang.  And the fifth one

24   being a stack of product next to the side.  So I

25   guess those were each stars.



1   where -- it's kind of like the 80/20 rule.  It's

2   probably about 20 percent making up 80 percent of

3   the sales.  So, once again, simple concept.

4           Store's parked right next to a florist.

5   There were vases.  They may order 700, 800 vases

6   knowing that the person next door would buy them.

7   Another store wouldn't touch them.

8           Some stores were more consumer driven.

9   You know, $5 bag of beef jerky for a buck.  I get a

10  lot of, you know, people that buy salty snacks.

11  That's a good department.  Buy them.

12          But the departments -- you get a printout,

13  and it lets you know what your top departments are.

14  And some of it would even go into the

15  subdepartments within that department.

16          So reviewing these things after a couple

17  weeks, you kind of see where you are and pretty

18  much know what the focus areas are.

19  Q     And I suspect I know the answer to this

20  question, but why are you more interested in

21  ordering product that is a top seller versus

22  ordering a product that is not?

23  A     Obviously you want to make the most of

24  your sales and the square footage that you have in

25  your building.


www.zahncourtreporting.com

1    I worked there they went to a banner concept where

2    they printed banners that would hang over the grid.

3    Those just clipped on.

4        Q    At either store, did you ever have to

5    decide what was going into the front window or in

6    what arrangement?

7        A    No.

8        Q    Let's turn back to Exhibit 4, which was

9    the more recent but not necessarily most recent

10   version of your résumé.  We had, I think, last

11   discussed this before the lunch break.

12           And before we broke off, I believe you had

13   told me -- and correct me if I'm wrong -- is that

14   all the information within this résumé document was

15   truthful and accurate at least as of the time the

16   résumé was completed; correct?

17       A    Yes.

18       Q    The second-to-last bullet under

19   "abilities" states in part that you have a proven

20   track record of increasing revenues.  Do you see

21   that?

22       A    Uh-huh.

23       Q    And that's a yes?

24       A    Yes.

25       Q    Did you apply any of your experience in



1    <u>increasing revenues in your work at Dollar Tree?</u>

2    <u>     A     Yes.</u>

3         Q     And how so?

4         A     Within Dollar Tree's realm looking at

5    making the most use of space while maintaining the

6    merchandising practices that the company had in

7    place.

8              Trying to take a look at opportunities on

9    sales trends to capitalize and ride those, you

10   know, if I needed merchandise through ordering.

11             Not a whole -- there's no discretion on

12   really -- there's a little bit of discretion on

13   product placement on end caps but nothing you can

14   do to rearrange stores, things of that nature.

15             So the two primary things -- or the

16   biggest things is the shelves have to stay full.

17   You need discretion on balancing the end caps out.

18   And then the last would be ordering.

19        Q     Did you implement at Dollar Tree any of

20   your experience in cost containment?

21        A     No.

22             Once again, I did not have -- did not have

23   any responsibility, did not see the profit and loss

24   statement.  Cost-wise the closest you would come

25   would be supplies, but there were limitations on



1  planning and execution at Dollar Tree?

2      A    The big focus is on the merchandise

3  movement.  But there is something they have that's

4  called Apple Seed, which is pretty much dictated

5  for you.  It's a daily worksheet.  It's got a

6  couple sections on it, some that are routine day to

7  day.

8          For general admin tasks, maybe security

9  safety tasks that need to be checked off.

10          There's an area for your discretion for

11  tasks that need to be listed from the store walk.

12          And then the other piece of it is an area

13  of discretion for what they call recovery.

14      Q    And describe recovery for somebody who's

15  not familiar with retail.

16      A    Recovery is typically taking a store

17  that's been open, product has become disorganized

18  on the shelves, it needs to be pulled to the front,

19  faced, organized so that it's shoppable.  Things

20  need to be cleaned.

21          And the other portion of that for

22  typically the sales floor presentation would be to

23  take items that customers decided not to purchase

24  and put them back on the floor.

25      Q    Go backs?



www.zahncourtreporting.com

1       A    Go backs, yes.

2            On the -- Dollar Tree kind of defined it

3    as well.  They had something called kind of a flex

4    recovery, and that varied a bit.

5            The things that were a little bit closer

6    to the cashier.  Battery end cap, sunglasses,

7    reading glasses, soda cooler.  Gum, candy.  The

8    check lanes.  It could vary.

9            One store -- I mean, it was an hour and a

10   half every day.  The other store every three or

11   four days -- or every two or three days maybe.  It

12   depends on the volume.

13       Q   So the volume would dictate how much time

14   is spent on recovery and how often it happens?

15       A   On the flex recovery.  The evening

16   recovery just of the store itself.

17           That also, keep in mind -- I didn't

18   mention this.

19           That includes, typically, cleaning of

20   restroom, sweeping -- what they call floor care.

21   Whether they've got to vacuum, mop, sweep, clean

22   windows off -- that's in the recovery as well.  So

23   that has to be taken into account.

24       Q   Who decides within the Apple Seed

25   parameters how much time to spend on recovery in


www.zahncourtreporting.com

**Curtis Patton - October 20, 2015**                              192

```
 1    the store?

 2        A    Which recovery?  The just maintenance of

 3    the store?  Store presentation?  Or the flex, which

 4    is more the stocking stuff.

 5        Q    Let's start with the store presentation

 6    recovery, the daily.

 7        A    Typical allocation.  And I know that it

 8    varies with district managers.

 9             I've heard district managers in meetings

10    say that they absolutely think it's a waste of

11    money.  Don't schedule anybody.  Store presentation

12    goes to hell, but they're okay with it.

13             There's others that would die without it

14    and typically will spend anywhere from maybe one

15    person working three to four hours per day, usually

16    in the evening, to some having more.

17             So I think that's kind of a district

18    issue.

19        Q    Is there somebody who has the call to make

20    at the store level in terms of --

21        A    If the DM tells you he doesn't believe in

22    spending money on recovery, then, you know, he must

23    think it's worthwhile to spend somewhere else.

24        Q    So in that circumstance, you wouldn't

25    schedule somebody to do a daily recovery?
```



1          You know, they're focused on stocking the

2    floor.  They could care less about getting the

3    customer served quickly.

4          But I think a lot of that is part of

5    the -- you know, what the DM accepts or

6    expectations that they have.

7     Q    Was the case different with the flex

8    recovery?

9     A    Flex recovery -- once again, it's about

10   keeping things full and organized.

11          Pico Rivera, it was roughly -- sold so

12   much volume, hour and a half a day.  Small store

13   like Garden Grove, I mean, you're probably touching

14   three times a week, you know, for maybe half hour,

15   45 minutes.

16    Q    Store manager makes that call?

17    A    I would say yes, based on their direction

18   from their district managers.

19          And I don't mean to evade your question,

20   but I've -- you've got policy and procedure, okay.

21   You've got merchandise presentation.  You've got

22   guys that have different directions -- it's pretty

23   clear.

24          The one -- it seems like it's a single

25   common denominator, okay, is getting as much



1    merchandise on the floor as you can.

2           And it's very clear in the Dollar Tree

3    environment the more you have on the floor, the

4    needle goes up, and you sell more.

5           So I think that's where a lot of the focus

6    and the attention is paid, if there is discretion

7    with labor.

8           But it starts with the district manager

9    and what they're willing to let go of or what

10   their, you know, pet peeves are and what they want

11   to focus on.

12      Q    And we want to get merchandise out on the

13   floor because merchandise that's in the stockroom

14   can't be sold?

15      A    Exactly.

16           And you got to keep in mind.  I mean,

17   you're selling stuff for a buck.  So it's not like

18   somebody walking to pick up one item.  You know,

19   it's very difficult -- with an average transaction

20   usually between, you know, 7 and $8, it's very

21   difficult for customers to come in and get one

22   item.

23           You know, I may go in to get laundry

24   detergent, but by the time I walk through the

25   store, it's seven or eight items.



www.zahncourtreporting.com

1      Q      Were there store managers that didn't do

2   anything about the condition of the stockroom and

3   leave it be and leave shelves empty?  At least some

4   of them did, given the condition of particular

5   stores that you've described.

6      A      I think some were better than others, more

7   efficient with themselves and their teams.

8             But to blatantly disregard it, I think

9   that's probably why I got a job.  Somebody just

10  took their eyes off of it and, you know, didn't

11  move at a pace or wasn't too concerned about it.

12     Q      And what did you do to remedy the

13  situation?  Which approach did you take?

14     A      Well, there's only one approach when

15  you've got a stockroom where you can't open a door.

16            You just start taking case by case, and

17  trying to hold the store up.  Spend obviously far

18  more time than you would if things were -- I guess

19  on what you might call a more normal basis where

20  you can take a truck and digest it.

21            And -- unless it's some of the overstock

22  you have.  You might have a day or two during the

23  week outside of the normal stocking days where you

24  can get a little bit out.

25            But it's just -- it's roll up your sleeves


www.zahncourtreporting.com

1    A large part of it is, yeah.

2            Those things pop up.

3            There was always shuffling within not only

4    the district I was in but other districts to get

5    assistant managers and supervisors to go cover

6    other stores, you know.  Key swapping going on like

7    crazy.

8            So -- as a store manager, I mean, I've

9    even went and covered some shifts for other store

10   managers because of their shortages.  You know,

11   it's just kind of the environment.

12       Q    Which days of the week were you working at

13   that point?  Or did you have a set schedule?

14       A    No.  I think if I could take a day off, I

15   would usually try and take like a Wednesday --

16   Wednesday off.

17       Q    During that initial time period when you

18   were working seven days a week, how much time were

19   you spending physically stocking yourself?

20       A    I'd probably say 85, 90 percent.  You

21   know, they're -- took care of several departments

22   including frozen.  And there's a tremendous amount

23   of waste that was in the frozen area.  So I had to

24   get that together and get it cleaned up and get

25   that on track.



1    and we're off the record.

2              (Recess.)

3              THE VIDEOGRAPHER:  We're back on the

4    record.  And the time now is 4:37.  Counsel.

5    BY MR. MESSIHA:

6         Q    Mr. Patton, do you understand that you're

7    still under oath this afternoon?

8         A    Yes.

9         Q    What was the most number of employees you

10   had staffed in the store with you at any given time

11   in Garden Grove?  "Staffed" meaning actually

12   working and physically present.

13        A    Probably five, and that would have been on

14   a load day.  Five to six.

15        Q    Is that low day or load?

16        A    Load, l-o-a-d.

17        Q    L-o-a-d.

18        A    Truck delivery day.

19        Q    So during the load day when you had five

20   or six folks staffed with you, what would those

21   people be doing?

22        A    Someone's cashiering, and the remainder

23   are unloading the truck or either putting product

24   on the floor as it comes off the truck.

25        Q    Stocking, in other words?



1    that could be -- probably save you a half hour to

2    an hour and a half.  Some of the drivers, based on

3    the time of delivery, are mandated to take breaks

4    or lunches.  So you have to stop when they stop.

5        Q    Do you know if Dollar Tree allocated hours

6    for unloading the truck based on that matrix?

7        A    If it was built into the -- I never saw

8    anything where it was specifically built into a

9    budget.  It was just part of a best practice guide

10   that they had for processing freight in 48 hours.

11       Q    Would the amount of freight coming in to a

12   store depend on the sales volume for that store?

13       A    I would say so, yes.

14       Q    And obviously the amount of freight coming

15   in impacts the amount of time necessary to unload

16   the truck and to bring product to the floor;

17   correct?

18       A    Correct.

19       Q    At Pico Rivera, did it take longer to

20   unload the truck than it did in Garden Grove?

21       A    Yes.

22       Q    And at Pico Rivera, you had more personnel

23   to help you unload the truck than you did at

24   Garden Grove?

25       A    Yes.



1          Getting the carts ready or what they

2     called U-boats lined up by department so that we

3     could take items -- instead of putting them on a

4     pallet and touching them a second time, we threw

5     them on the U-boats and be ready to wheel them out

6     the following morning after the delivery came in.

7          Q    Was the stockroom in Pico Rivera bigger

8     than the one in Garden Grove?

9          A    Yes.

10         Q    Did that impact planning for the delivery?

11         A    Different configuration in Pico Rivera

12    with the amount of merchandise.   Relatively same

13    impact.   There was more merchandise in Pico Rivera.

14         Q    Did it take you more time to plan for the

15    delivery in Pico Rivera than it did in

16    Garden Grove?

17         A    You're talking 20 pages more.   30 pages on

18    one store, you know, 45 to 50 on the other.

19         Q    So about a third longer?

20         A    Yeah.   A half to -- I mean half hour,

21    hour.   The ones in Pico Rivera, 45 minutes, hour at

22    the most.   To whip through 30 pages of

23    Garden Grove, that was much smaller.

24              There's also less variety in Garden Grove.

25              As I mentioned earlier, the higher the



1   volume store -- and it rates in certain

2   departments -- there's greater variety as well.  So

3   the racetrack stores typically had a little bit

4   more variety.

5       Q    So Pico Rivera actually would have had

6   more variety than Garden Grove?

7       A    Yeah.  More space.  And then based on the

8   categories and what was sold, I think a teeny bit

9   more variety.

10      Q    Overall in Garden Grove, how much time did

11  you spend preparing for the truck every week?

12      A    Well, if you want to count the -- take

13  the -- you want to include the order or not order?

14      Q    Well, let's include the order.

15      A    Okay.

16           Let's see.  20 -- you're probably talking

17  about -- without the consolidating and prepping,

18  about an hour and a half at the most.

19      Q    How about including the consolidating and

20  prepping?

21      A    That was usually done by a stock guy or

22  merchant.  It could be anywhere -- an hour and a

23  half to three hours.

24      Q    Did you have a typical schedule as a store

25  manager in Garden Grove?


www.zahncourtreporting.com

```
 1    a car.  And loss prevention didn't want them
 2    walking across the parking lot with deposits.
 3              So I had to go get in my car and, you
 4    know, go over there and take deposits to the bank
 5    and bring the paperwork back and change if needed.
 6        Q    And so I'd asked you about hours per week,
 7    and I think you answered in terms of hours per day
 8    with 10 or 11 for Pico Rivera.
 9              Average weekly hours there, what was the
10    tally for you?
11        A    I'd say minimum between 60, 65.  Sometimes
12    there was a little bit more.  And I wasn't even
13    calculating, like I said, going over on a day to
14    make a deposit.
15        Q    Was that working five days a week or six
16    days a week or seven days a week?
17        A    In that store, I tried to take Sunday off.
18    So that would be usually the six.
19              By the time I went over on Wednesday -- a
20    lot of times on the schedule I'd have two days off.
21    It always worked that the Wednesday -- it's just
22    kind of the given.
23        Q    In terms of the hours that you put
24    yourself on the schedule, did those correlate to
25    the hours you actually worked?
```



1      A     No.

2            That's something I kind of thought was

3      interesting from day one and never really found any

4      policy or, you know, clear direction on it.

5            As I was going through training, the store

6      manager just put in 50 hours.  Okay.  That was it.

7      Q     And so beyond that, you didn't pay any

8      more attention to the schedule other than putting

9      in 50 hours and --

10     A     Well, yeah.  I mean, I couldn't find

11     anything in the portal.  I asked about it, and it

12     didn't seem to be an issue.

13           I know that there were -- there's a store

14     manager that transferred from one other district to

15     the district I was in.

16           And he went through, and whatever he

17     worked, he used to go back and change it to

18     reflect -- to him it was kind of like timekeeping.

19     He was the only one that didn't just throw 50 hours

20     in.  But it didn't seem to -- you know, nobody was

21     asking for -- you know, really what are you going

22     to work?  I don't think anybody knew ahead of time.

23           But some of the changes came up with

24     cutting hours back, people maybe not showing up to

25     work, and you had to go in and cover shifts or stay



1    longer, you know.  It wasn't typical for managers
2    to go back and make adjustments afterwards.
3        Q    So other than that one person, as far as
4    you know, managers would put in the 50 hours on the
5    schedule, but that wouldn't be an accurate
6    reflection of the time they actually worked?
7        A    Yeah.  I think it's -- my take is because
8    they weren't calculated as part of the payroll
9    budget.  That was just the number to put in, 50.
10       Q    You didn't punch a clock as a store
11   manager; right?
12       A    No.
13       Q    Is there any record that you're aware of
14   that would show how many hours you worked while you
15   were at Dollar Tree?
16       A    No.  No -- I mean, you don't punch.  So
17   the only thing that shows up on a weekly payroll --
18   when you go to approve the weekly payroll, it's
19   already pre-populated.  The same 45 hours.  And it
20   just has a note next to it.  It says "for tracking
21   purposes only," you know.
22            But I was told that -- you know, initially
23   when I started training, when I was a trainee and
24   being paid on the hour, yes, we punched in.  But
25   under no circumstances were we able to punch once



www.zahncourtreporting.com

1    we started in our regular stores.

2        Q    Any other records you're aware of that

3    might reflect the amount of time you worked, such

4    as personal diaries or logs or computer entries,

5    anything like that?

6        A    I mean, I'm pretty sure you take a look at

7    the log-ins to systems; okay.

8            The store manager was specific; you could

9    see times of that.  Starting, ending.  You could

10   see cashier records.  That goes down to the

11   transaction, okay, the reports in that same system.

12           So if somebody really wanted to go through

13   and kind of research a day between a couple of

14   options, you could tell how long someone was there.

15       Q    Those might tell me some of the times that

16   a manager was in the store, but they wouldn't tell

17   me all of the times; right?

18       A    No, it's not -- if you're asking is there

19   a particular report or a punch or something that

20   gauges the manager's time, absolutely not.

21           If you wanted to get a pretty good idea, I

22   think, between their use of the systems and the

23   log-ins that they use and the time stamps of those

24   log-ins, you can get an idea of when somebody

25   worked.



      1    reflected in Dollar Tree's cashier records, would

      2    you credit that number versus your estimate?

      3        A    Yeah.

      4            The only thing that -- like I said, keep

      5    in mind you've got to go back to the time frames as

      6    well.  You can -- you guys can go through and take

      7    a look and investigate or whatever.

      8            But if you take a look at the time frames,

      9    it should be right around the same as the estimate.

     10    But I don't have the records in front of me.

     11            I just know time frames when people came

     12    in -- I think what you'll find if you take a look

     13    at it, log-in times, spurts, another break, spurts

     14    again.  Sometimes it was all day long, just

     15    consistent depending on the periods of time.

     16        Q    Would you have any reason to disbelieve

     17    what was reflected in Dollar Tree's cashier records

     18    in terms of showing the amount of time you spent on

     19    register at Pico?

     20        A    Have any disbelief?

     21        Q    Do you have any reason to doubt that those

     22    are accurate?

     23            MR. STAHLE:  Objection.  Lacks foundation.

     24    BY MR. MESSIHA:

     25        Q    You can answer.



1      A     There is a -- would I have disbelief.  I

2    would probably say yes.

3      Q     And why so?

4      A     There are situations -- and I don't know

5    if you guys are aware of this.  The system reboots.

6    When the systems freeze up and you would have to

7    turn them on and off again, some of those records

8    are -- that are reflected that I saw in the cashier

9    comparison report not only for myself but for other

10   folks were not accurate.

11           It's more of a technology issue.

12           Times on registers were different, which

13   occasionally created punch-in, punch-out problems.

14   So from a tech standpoint, I would say, yeah, maybe

15   there's some issues.  Because I don't think they

16   have the best technology on earth.

17      Q     Did you ever know a cash register to

18   automatically log you off if you didn't use it for

19   a particular period of time?

20      A     No.

21           Well, you know what, I don't remember.

22   Does it log you out or not?  It's been a while

23   since I've used one.  I don't remember.

24      Q     Other than what you described as the

25   system reboots, is there any other reason that you



1    I ended up leaving that day early because they

2    couldn't get all the paperwork processed through

3    the hiring system.

4            I was told to go back the next day.  I

5    went back the next day and pretty much started.

6            So I didn't get anything.  It wasn't a big

7    issue at that point.  It wasn't until I hired

8    someone that I realized that there are probably at

9    least a couple of things that should have

10   printed -- that I should have gotten.

11           So -- but, no, I've never seen this.

12       Q    Was there any point during your employment

13   when you requested a job description?

14       A    No, I didn't.

15           I relied on what I had seen posted on the

16   internet, you know.  I don't know if it's -- I

17   think it's on the company's career website.  Or

18   today even -- you know, most large companies go in

19   and type in a position and, you know, the job

20   responsibilities are -- shows up.  So --

21       Q    Let's take a moment to talk about what's

22   listed here and see if it's consistent with your

23   experience.

24       A    Okay.

25       Q    So the summary of this position or job



1    purpose that's listed near the top of the page is

2    succinctly put "management of a retail variety

3    store."

4         Do you see that part of it?

5    A    Yes.

6    Q    "Responsible for efficient, profitable,

7    and safe operations."

8         Was that something that was communicated

9    to you at any time during your employment?

10   A    Safe, profitable, efficient, I've never

11   heard too much of that.

12   Q    Is that inconsistent with anything you

13   were told during your employment?

14   A    The word "efficient" wasn't used.

15   Q    Other than that, with respect to

16   profitable and safe operations, is that --

17   A    Yes.

18   Q    -- consistent with your understanding?

19   A    Yes.

20   Q    Did you understand that it was part of

21   your job duties to recruit, employ, supervise,

22   train, and develop store personnel?

23   A    The term "recruit," "employ" were never

24   used.  It was more "hire" or "interview and hire."

25   Q    How about supervise, train, and develop?



www.zahncourtreporting.com

1      **A      Supervise, train, and develop, yes.**

2      Q      Was it ever communicated to you at

3   Dollar Tree the expectation that you spend a

4   certain amount of time performing managerial duties

5   versus other types of duties that might be

6   nonmanagerial?

7      A      I'd have to look on the web-based

8   description.  But was there anything that

9   specifically mentioned 50 percent of the time?  No.

10          I don't remember being an issue.

11     Q      That expectation was never communicated to

12  you?

13     A      No.  I don't -- even through an interview

14  with Reid Balderas, no.  Jason, no.  Desiree

15  Cortez, a DSD trainer, no.  Deb San Dean

16  [phonetic], regional trainer in our meeting, no.

17          I don't know if it's kind of an

18  assumption, but it may have been on -- the only

19  other place that -- am I aware of it, that it's

20  typical in California?  Yes.  Communicated and --

21  or expressly communicated at Dollar Tree, no.

22     Q      It was your understanding from your prior

23  managerial positions that, generally speaking,

24  managers were expected to spend more than 50

25  percent of their time managing?



1       A      Probably two to three weeks.

2       Q      Let's turn your attention back to

3   Exhibit 8, which was the position description and

4   responsibilities.

5              And I know we've talked about a lot of

6   these responsibilities already, but I want to go

7   through them in order.

8              With respect to the first duty that's

9   listed there under Principal Duties and

10  Responsibilities, it states "supervision of

11  associates."

12             Do you see that?

13      A      Yes.

14      Q      Do you agree that that was a principal

15  duty and responsibility of the store manager

16  position at Dollar Tree?

17      A      Yes.

18      Q      Number 2 is oversee daily store activities

19  including opening and closing of store.

20             Do you agree that that is a principal duty

21  and responsibility of a Dollar Tree store manager?

22      A      I believe it's a shared responsibility.

23  Not full.

24      Q      Shared with assistant managers?

25      A      Assistant manager supervisors.



www.zahncourtreporting.com

```
 1    work and -- I would agree with.
 2        Q    How about providing leadership and
 3    direction to store personnel?
 4        A    Yes.
 5        Q    Communicate company policies to sales
 6    associates?
 7        A    I would say to all associates, yes.
 8        Q    10 is fairly lengthy.  Analyze sales,
 9    expenses, and profit.  Is that something that you
10    did as a store manager?
11        A    The information's pushed out.  As I
12    mentioned, the Monday playbook, very little
13    analysis.  I mean, it's pushed to you.
14             You can see what your top departments are,
15    and there's one other report, the top ten SKUs.
16    That's pushed to you.  So it's just a comparison.
17    There's really no analytical activity going on.
18        Q    Was there an expectation that you do
19    something with that information?
20        A    Review it.  I mean, to me, it was never
21    discussed.  During visits, never discussed, you
22    know, with the regional manager or district
23    manager.  I think it was more of an awareness
24    issue.
25        Q    And that was information that you used in
```



1     Q    And you did, in fact, receive an increase
2    in pay; correct?
3     A    Yes.  I was thinking about that.  I think
4    that I got approval to take it up to whatever the
5    max was, like 49,99- from Richard Lackey, the
6    regional manager.
7          And then based on the annual review there
8    was another 11-, 1,200 bucks, and that's how we got
9    to the 51,2-.
10    Q    During your employment with Dollar Tree,
11   did you receive your pay by direct deposit?
12    A    I believe it was a check.
13    Q    With that check, do you remember receiving
14   a pay stub with the check?
15    A    Yeah.  Just generic check.  Generic
16   paycheck stub, yes.
17    Q    Did you ever request to receive direct
18   deposit at any time during your employment?
19    A    No, I don't believe I did.
20    Q    And you never actually received a direct
21   deposit during your employment; correct?
22    A    No.
23    Q    Did you have any understanding during your
24   employment as to how employees who did receive
25   direct deposit would have access to a pay stub?



1        A      It was printable through the register.

2        Q      Did you ever witness employees printing

3   their pay stubs from the register?

4        A      A time or two, yes.

5        Q      On those occasions when you witnessed it,

6   did it appear to operate the way it was intended?

7        A      I guess they got the printout sheet.  No

8   one ever really asked me about what was on their

9   printout sheet, so I would assume that what was

10  supposed to be there was there or satisfactory.

11       Q      As far as you understood during your

12  employment at Dollar Tree, was it optional that

13  employees participate in direct deposit?  I mean,

14  you certainly weren't required to do it; correct?

15       A      In the initial setup, it defaults to

16  direct deposit, so there's -- when you're going

17  through in hiring, you've got to go through and

18  click out of that.

19              A lot of people will -- it's kind of

20  50/50.  Some wanted checks, some wanted, you know,

21  direct deposit.  Some of these folks, you know,

22  didn't even have accounts, some of the employees I

23  work with.  So --

24       Q      As far as you understood, it wasn't

25  compulsory to participate in direct deposit at


www.zahncourtreporting.com

1    Dollar Tree?

2        A    No.  But that was the preferred default.

3            So I'd say -- when I'm hiring somebody, if

4    I told them that they can have a choice, you know,

5    they probably would have been under the impression

6    they had to have direct deposit or either take one

7    of the company's payment cards.

8        Q    You didn't tell them that, though, during

9    hiring; right?

10       A    No.  No, but those were the things that

11   were being pushed.  And I understand why they --

12   you know, it's less paper, less processing.  I

13   understand the cost savings.

14           But to go into detail about what the

15   options are, it's never really -- you know, unless

16   a manager said something to them, no, I don't think

17   they'd know that they could get paper.

18       Q    Was there ever anybody you knew of who

19   told new-hires that they had no choice and that

20   they had to have direct deposit?

21       A    No.  Not that I'm aware of.

22       Q    We discussed earlier that your termination

23   of employment from Dollar Tree happened in about

24   August of 2014; is that correct?

25       A    Yes.





**Curtis Patton**
1918 S. Garfield Ave # C
Monterey Park, CA 91754
Phone: 626-627-0414
curtis.patton@gmail.com

### *Objective*

Seeking assignment in retail management that will allow me to utilize my skills, knowledge and experience to make a contribution to the success of a solid organization.

### *Abilities*

- Seasoned, highly committed and results oriented retail professional with 27 years of management experience in various retail formats, markets, store sizes and sales volumes.
- Able to deliver high level of customer service. Experienced in multi-cultural environments, in diverse markets and leading diverse teams.
- Experienced in planning, coordinating and execution of staff assignments to ensure completion of daily, weekly, monthly store task.
- Able to conduct and/or participate in compliance audits and develop action plan for improvement.
- Highly skilled, knowledgeable and experienced in managing key performance indicators, stocking, merchandising, pricing strategies, competitor and market analysis, regulatory compliance, vendor relations, execution of organizational policies, marketing strategy and promotional activity.
- Expertise in driving retail and B2B sales via merchandising and/or sales teams.
- Plan, execute and monitor operational budgets and initiatives to contain cost and, ensure safety and maximize profit. Able to take full P& L responsibility.
- Experienced in interviewing, hiring, staff training, supervision, performance evaluation, coaching and counseling and other human resource functions.
- Experienced in inventory management including,purchasing, product ordering, freight flow, damage and shrink controls.
- Experienced leader with solid oral/written communication, interpersonal, intuitive, and analysis of management reports. Able to thrive in both independent and collaborative work environments.
- Proven track record of increasing revenues, cost containment, work flow planning and execution, creating a team environment to increase productivity and history of physical inventory results below budget.
- Quick study with an ability to rapidly achieve organizational integration, easily assimilate job requirements and aggressively employ new methodologies. Energetic and self-motivated team player/builder. At ease in high stress, fast-paced and chaotic environments with emerging and multiple responsibilities.

### *Employment History*

**Store Manager**
03/2013 - 08/2014 Dollar Tree Pico Rivera, CA

Responsible for successfully operating a store variety store at fixed price point. Created schedules and monitored payroll in accordance with daily and weekly budgets. Planned and ensured execution of daily and weekly freight flow, merchandise presentation and inventory management. Conducted audits and ensured adherence to company policy and safety standards. Hired, trained, coached ,counseled and evaluated staff. Managed sales forecast, payroll and productivity. Implemented district and company directives. Conducted staff meeting and training meeting. Processed reports, documents, and communications. Maintain a recovered organized store. Was responsible for physical inventory results and cash office operations.

**Store Manager**
04/2011 - 03/2013 Rite Aid Los Angeles, CA

Managed the operation of an individual store to maximize sales, margins and profit. Enforced company policies and procedures while ensuring directives and all daily activities were delivered against the expected store and pharmacy operating standards, merchandising standards, and budgeted financial targets. Drove

and promoted superior customer service and retention. Maintained merchandising standards, hired, trained, directed, evaluated and counseled associates. Audited, communicated and adhered to company and government compliance standards and laws. Full profit and loss responsibility.

**Event Specialist, Demonstrators and Product Promoters**
3/2011 - 4/2011 - Crossmark Inc 5100 Legacy Dr, Plano, TX

Conducted short term pilot product demonstration program at large home improvement retailer for professional sales and marketing company. Built rapport with store personnel. Setup and merchandised table/kiosk merchandise for demo. Proactively intercepted, engaged and sold products to customers. Prepared and submitted reports on-line to company.

**Store Manager**
06/2009 - 11/2010  - CVS Pharmacy Rosemead, CA

Responsible for the total leadership and strategic operation of retail store, pharmacy, and photo processing. Supervised staff engaged operations, sales, merchandising, inventory management and customer service. Full P &L responsibility.

**Director of Retail Operations**
06/2007 - 9/2008  - Quartermaster, Inc Cerritos, CA

Managed day-to-day sales and operations functions of multiple retail locations for an established company engaged in the sale of law enforcement and public safety uniforms, footwear and equipment. Worked with executive leadership team to establish strategic direction and developed action plans to improve operational efficiency and expand retail services. Coordinated store operations with vendors and all internal departments. Recruited, trained, and developed staff to achieve their objectives.

**General Manager**
10/1997 - 5/2007 – CompUSA, Burbank, CA

Managed a Technology Superstore, Technical Service Center, Training & Testing Center, E commerce and Business Sales Team engaged in selling computers, audio, video, software, digital subscription services, technology training, related merchandise accessories, and technical support and services. Drive total location sales, profitability, and ensured a great customer experience. Overall responsibility for merchandising and operational compliance of five profit centers. Recruited, hired, trained and motivated. Managed inventory. Full P & L responsibility.

**General Manager**
3/1996 - 10/1998 - Computer City Pleasant Hill, CA

Managed all facets of $30 MIL retail & B2B for national chain store engaged in sales of computer technology and related services. Recruited, trained and developed staff of direct management reports, supervisors and hourly associates. Coordinated and oversaw all aspects of day-to-day management activities of retail and business sales, Technical Services, Technology Training, operations and customer service. Ensured execution of customer service programs, merchandising plans, inventory management, asset protection, promotional strategies, competitive shops, performance reviews, and operational standards. Developed and executed staffing plans. Full P&L responsibility for multiple profit centers. Recruited, trained and mentored staff of 75. Was responsible for regional advertising, marketing events, vendor relations and other special projects. Grand opened and closed poor performing location. Created budgets and forecast.

**Regional Manager**
10/1993 - 03/1996  - Affordable Portables, Inc. El Toro, CA

Managed 10 retail locations for a regional electronics chain specializing in the sale of wireless phones, highend portable electronics and service plans. Core responsibility included $15 MIL sales responsibility, customer service, operations, staffing, scheduling, advertising/marketing, and merchandising, human resources, purchasing and inventory management, budgeting and performance management. Conducted store visits and audits. Collaborated and contributed on strategic business plans with owner and leadership

team. Grand opened new locations. Revised and implemented retail policy and procedure. Collaborated with President, buyers and vendors to develop and implement strategic business initiatives and marketing plans.

**Sales Manager**
09/1988 - 10/1993 - Circuit City , Torrance, CA

Managed Video and Audio departments with $25 MIL sales responsibility. Hired, trained, developed and motivated sales staff. Extensively trained associates in sales skills, customer service skills and operational procedures. Coached associates relative to performance and developed improvement plans. Executed merchandising plans and competitive selling strategies. Full responsibility for purchasing and managing department inventory. Assisted with all other facets of day-to-day store operations, customer service and inventory management.

**Sales Manager – Big Tickets**
10/1977 - 09/1988 - The Broadway Department Store,  Culver City, CA

Managed Electronics, Appliances, Furniture, Carpet and Drapery departments. Hired, trained, and supervised sales staff. Was responsible for achieving sales plan, profitability, merchandising, customer satisfaction, product procurement, inventory management, and coordination of delivery and installation services. Executed promotional activities and merchandising plans.

**Education History**

Cal State University Long Beach, Long Beach, CA
1978 to 1981 - Electrical Engineering / Business Administration

**Messiha, Dominic J.**

| | |
|---|---|
| From: | Mikael H. Stahle <mikael@asstlawyers.com> |
| t: | Friday, September 25, 2015 4:29 PM |
| To: | Walsh, Mary D. |
| Subject: | Patton v. Dollar Tree -- Supplemental Document Production |

---------- Forwarded message ----------
From: **Curtis Patton** <curtis.patton@gmail.com>
Date: Sat, Apr 25, 2015 at 7:53 AM
Subject: Thank you for the interview
To: martin.guzman@lcecorp.com

Martin,

Thank you much for your time and consideration yesterday to interview me for the position of Store Manager. It was a pleasure to meet you and to learn more about the position and Little Caesar's.

As we discussed, I believe my experience and skills mirror the requirements of the position and would allow me to make a strong contribution in a relatively short period of time.

Customer Service, team member training and development, sales increases, compliance to operational and safety standards, profit contribution and containing labor and supply cost are all areas of I believe I can deliver excellent results.

Again, traveling would not be a problem and the compensation package is very acceptable. If given the opportunity, rest assured you my commitment to long term employment and working hard to be a top producer!

I am really excited about this opportunity to join the Little Caesar's team. Please do not hesitate to email or call me if you have any questions or need any additional information.

I look forward to hearing from you next week.

Best regards,

Curtis Patton
Store Manager candidate
(626) 627-0414



# DOLLAR TREE STORES, INC.®

CONFIDENTIAL

### Position Description & Responsibilities

| Job Title:<br>Store Manager – California Only | Department:<br>Field | Division:<br>Operations |
|---|---|---|
| Reports To (Title):<br>District Manager | Date Written: | Date Revised:<br><br>April 19, 2005 |
| Exempt / Non-exempt<br>• **Exempt** | Direct Reports:<br>Store Associates | |

**Summary of Position (Job Purpose)** - *Major purpose and functions of the position.*

Management of a retail variety store. Responsible for efficient, profitable and safe operations. Recruit, employ, supervise, train and develop store personnel. From an individual standpoint, the Store Manager must comply with the percentage limitations on the actual work s/he performs as set forth below.

**Principal Duties and Responsibilities**

Store Manager is to spend the majority (more than 50%) of his/her actual work time each work week performing the following duties and responsibilities:

1.  Supervision of associates.
2.  Oversee daily store activities, including opening and closing of store.
3.  Ensure customer and associate safety.
4.  Protect all company assets, including store cash, merchandise and equipment.
5.  Maintain proper sales, banking, inventory, accounting, productivity, payroll and time records.
6.  Responsible for adequate staffing of store. Recruit, interview, hire, employ, and train sales associates. Train associates to properly use all equipment and technology as well as provide thorough merchandise display training.
7.  Schedule and assign work to store personnel. Evaluate, motivate, counsel, develop, discipline and discharge sales associates appropriately. Maintain production reports to evaluate job performance of sales associates.
8.  Provide leadership and direction to store personnel.
9.  Communicate company policies to sales associates. Ensure associates comply with company policies and procedures, including safety guidelines and human resources policies.
10.  Analyze sales, expenses and profit, review reports, analyze competition, determine customer preferences, manage sales forecasting, meet sales and profit objectives and goals, determine product mix, determine most effective placement of product and ensure standards of merchandise presentation, displays and signage to maximize sales. Assist in developing promotions and advertisements as appropriate.
11.  Control inventory. Supervise ordering, receiving, stocking and pricing of goods. Ensure goods are properly marked and mark downs are properly recorded.
12.  Responsible for overall cleanliness and appearance of store.
13.  Ensure highest level of customer service. Handle customer complaints and problems.
14.  Ensure accident reports and damage reports are completed in timely and accurate manner.
15.  Complete management reports in a timely and accurate manner.
16.  Ensure compliance with applicable laws and regulations.
17.  Communicate professionally and effectively with customers, subordinates and supervisors

Store Manager may not spend more than a total of 35% of his/her actual work time each week receiving product, distributing and storing product, stocking product and cashiering.

Store Managers in California must comply with the percentage limitations on actual work time as set forth in this job description and verify compliance each week. If for any reason the store manager has not complied, s/he must immediately provide an explanation to both Payroll and Human Resources. No salary or wage will be withheld because of non-compliance.

Printed: 9/5/2006
Page - 1

# DOLLAR TREE STORES, INC.® CONFIDENTIAL

**Minimum Requirements/Qualifications** - *Summary of knowledge, experience and education required.*

- Must possess prior retail and management experience;
- Background in dealing with hard lines / variety merchandise;
- Strong communication, interpersonal, and written skills;
- Ability to work in a high-energy team environment.
- Must be proficient in financial and inventory management
- Must relate positively with employees, customers and company management.

Printed: 9/5/2006
Page - 2

**2013/2014 Performance Appraisal for Store Managers [Employee: / Fiscal Year: 2013/2014]**

## General Information

### Associate Information

| | | | |
|---|---|---|---|
| Last Name | PATTON | First Name | CURTIS |
| Middle | A | Position Title | MANAGER |
| Department | MGR | Location | MONTEREY PARK, CA |

## Workflow Graphics



|  | Annual Review | | | |
|---|---|---|---|---|
| 1 | 2 | 3 | 4 | 5 |
| DM Scores Metrics and Performance | RD/MM Review and Approval | Compensation | SM Enters Comments, Signs Appraisal | DM Reviews Final Comments |

## Overview

The purpose of Dollar Tree's Performance Appraisal Process is to provide a structure for mangers to **communicate** their performance expectations and development plans for their direct reports, provide ongoing **feedback** on how well their direct reports meet those expectations, and formally **assess** performance for each fiscal year.

Performance is evaluated on:  1) What was accomplished during the year (Metrics) and 2) How those metrics were accomplished (Competencies).

EXHIBIT
9
10/20 Patton

PENGAD 800-831-6989

## Metrics Section

In performance appraisals, metrics are the "What" of performance.  Store Managers are assigned a set of metrics with specific performance targets.  The metrics are weighted to reflect the importance and contribution of each metric in meeting Dollar Tree performance goals.  Metrics represent the results achieved for each Store Manager's area of responsibility.

***Refer to the "District Manager Guide for Evaluating Store Manager Performance."***
**Weighting of the Metrics Section: 60%**

Case 2:15-cv-03813-MWF-PJW   Document 46-2   Filed 01/09/17   Page 133 of 259   Page ID
#:1311

**Metrics Section: 1 of 5**

| Metric | Weight |
|---|---|
| Shrink | 20% |

**Target**

Acheive Store Inventory Shrink Goal

**Manager's Year-end Comments**

Store Goal -1.4600%   Actual Store Result-2.6564%.
Curtis was assigned this store in May of 2013 and is not
the owner of the shrink in this location.  However, Curtis
has shown that he is very proactive at attacking shrink
signals and has performed very well at holding crucial
conversations with his team to both raise awareness of
shrink in his store and to keep it under control.

| | 0% | 10% | 20% | 30% | 35% | 40% | 45% | 50% | 55% | 60% | 65% | 70% | 75% | 80% | 85% | 90% | 95% | 100% |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Manager | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ⊙ | ○ | ○ | ○ | ○ | ○ |

**Metrics Section: 2 of 5**

| Metric | Weight |
|---|---|
| Sales | 20% |

**Target**

Increase Comp Sales by 3.5%

**Manager's Year-end Comments**

Curtis was able to achieve a 3% increase over prior year
with an average transaction of $6.66 which was 2.31%
below prior year which was a strong result considering the
store opened the year prior and had the best variety a
store could ever have.

| | 0% | 10% | 20% | 30% | 35% | 40% | 45% | 50% | 55% | 60% | 65% | 70% | 75% | 80% | 85% | 90% | 95% | 100% |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Manager | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ⊙ |

2013/2014 Performance Appraisal for Store Managers    Page 4 of 14
Case 2:15-cv-03813-MWF-PJW   Document 46-2   Filed 01/09/17   Page 134 of 259   Page ID
#:1312

**Metrics Section: 3 of 5**

| Metric | Weight |
|---|---|
| Scan Margin | 20% |

**Target**

Achieve a .10 bps increase in Scan Margin % over LY

**Manager's Year-end Comments**

0.34% increase with a store actual margin performance of 50.26% vs a prior year margin performance of 49.92%. Curtis did a great job of executing on company directives such as the monthly planner and was very methodical in his planning for seasonal conversions.

| | 0% | 10% | 20% | 30% | 35% | 40% | 45% | 50% | 55% | 60% | 65% | 70% | 75% | 80% | 85% | 90% | 95% | 100% |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Manager | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ⊙ |

**Metrics Section: 4 of 5**

| Metric | Weight |
|---|---|
| Payroll | 20% |

**Target**

Achieve SPEH Each Period

**Manager's Year-end Comments**

$109 vs $113 a miss of 3.5% on an annual level.  Curtis only owned the store for nine months of the fiscal year and missed his SPEH on seven of those months, however, five of the months I gave his store more hours to use for the purpose of recovery and team development leaving the store missing it's SPEH under Curtis for only two months.

| | 0% | 10% | 20% | 30% | 35% | 40% | 45% | 50% | 55% | 60% | 65% | 70% | 75% | 80% | 85% | 90% | 95% | 100% |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Manager | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ⊙ | ○ | ○ | ○ | ○ |

2013/2014 Performance Appraisal for Store Managers                    Page 5 of 14
Case 2:15-cv-03813-MWF-PJW   Document 46-2   Filed 01/09/17   Page 135 of 259   Page ID
#:1313

**Metrics Section: 5 of 5**

| Metric | Weight |
|---|---|
| Markdowns | 20% |

**Target**

Achieve Markdown Goal

**Manager's Year-end Comments**

Store Markdown goal was 0.6150% and the store achieved an Actual Result 0.8596%. This store is an inner city store which is shopped hard by it's customers whom is a family of 4 all shopping the store simultaneously with only Mom or Dad spending money while the little ones are sometimes out of control. Curtis has done a great job of managing and salvaging the damages caused by the day to day operation. This year with an enhanced focus on the recovery and damage process of the store I know better results can be achieved.

|  | 0% | 10% | 20% | 30% | 35% | 40% | 45% | 50% | 55% | 60% | 65% | 70% | 75% | 80% | 85% | 90% | 95% | 100% |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Manager | ⊙ | ⊙ | ⊙ | ⊙ | ⊙ | ⊙ | ⊙ | ⊙ | ⊙ | ⊙ | ⊙ | ⊙ | ⊙ | ⊙ | ⊙ | ⊙ | ⊙ | ⊙ |

## Competencies Section

Competencies are the skills, behaviors, and abilities that lead to high performance. In performance appraisals, competencies are the "HOW" of performance.  Competencies reflect the process Store Managers use to achieve their job results.

***Refer to the "District Manager Guide for Evaluating Store Manager Performance."***

Weighting of the Competencies Section: 40%

Competencies Section

DTP 000060

**Competency # 1**

- **Action Oriented (Store Managers)**

Enjoys working hard; is action oriented and full of energy for all assignments and responsibilities; seizes more opportunities than others.

**Behaviors**

- **Demonstrates a sense of urgency in completing pull and holds; cycle counts; company directives, Sales Planner execution, etc.**

- **Correctly utilizes Career Launch Countdown to hire Associates.**

- **Consistently performs store walks at least twice daily; uses Daily / Weekly Action Plans to plan for and follow-up on issues.**

- **Plans for, schedules, and ensures that freight is processed within 48 hours of receipt.**

- **Demonstrates a sense of urgency regarding staffing / scheduling.**

- **Understands and complies with all legal and regulatory issues.**

**Manager's Year-End Comments**

Curtis plans for and schedules an effective schedule to ensure freight process in 48. He has demonstrated a sense of urgency regarding staffing and scheduling and understands and complies with all legal and regulatory issues. Curtis coaches his managers to perform the twice a day floor walks to help build ownership and the understanding of the Brand Standard concept with his managers.

| | Not Acceptable | UN | NI | ME | EE | O |
|---|---|---|---|---|---|---|
| Manager | ⊙ | ⊙ | ⊙ | ⊙ | ⊛ | ⊙ |

DTP 000061

**Competency # 2**

- **Building Effective Teams (Store Managers)**

Creates strong morale and spirit in his/her team; shares wins and successes; fosters open communication; lets people finish and be responsible for their work; defines success in terms of the whole team; creates a feeling of belonging in the team.

**Behaviors**

- **Observes Associate behavior and task execution; provides balanced (positive and constructive) specific feedback in a timely manner.**

- **Develops Assistant Store Managers in store practices and role-specific tasks.**

- **Understands and complies with all Human Resource policies.**

- **Treats all Associates fairly and with respect.**

- **Clearly communicates expectations; teaches and coaches to expectations; follows-up accordingly.**

- **Proactively identifies teaching and coaching opportunities to develop Associates.**

- **Plans for and performs all Associate reviews in a timely manner.**

- **Executes all company training tools and programs (Learning Guides, iLearn).**

- **Effectively hires to achieve the best possible customer experience, i.e. friendly cashiers.**

**Manager's Year-End Comments**

Curtis performs all associate reviews in a timely manner and executes all company training tools and programs. Curtis effectively hires to achieve the best possible customer experience and he proactively identifies teaching and coaching opportunities to develop the Associates with an understanding of all HR policies. Curtis you have done well with your team building activities this year with the addition of new ASM to the team whom is very strong, I look forward to seeing where you will be taking your team development to in 2014.

| | Not Acceptable | UN | NI | ME | EE | O |
|---|---|---|---|---|---|---|
| Manager | ⊙ | ◯ | ⊙ | ◯ | ⊛ | ◯ |

**Competency # 3**

- **Customer Focus (Store Managers)**

Is dedicated to meeting the expectations and requirements of internal and external customers; gets first-hand customer information and uses it for improvements in products and services; acts with customers in mind; establishes and maintains effective relationships with customers and gains their trust and respect.

**Behaviors**

- **Role-models GET (Greet, Exceed, Thank) with all internal and external customers.**

- **Ensures a clean, safe and positive environment for internal and external customers.**

- **Analyzes Key Performance Reports and Customer Survey data to improve the external customer experience.**

- **Communicates, teaches, coaches and follows-up on customer experience expectations, i.e. greetings, suggestive selling, speed of checkout, rest room cleanliness, etc.**

**Manager's Year-End Comments**

Curtis has always been observed Role-modeling GET with both internal and external customers.  Curtis understands and analyzes KPR reports to improve the experience being provided by his store.  Curtis communicates and teaches the customer expectation and the need for the consistent execution of the drive item ask by every associate with every customer.

| | Not Acceptable | UN | NI | ME | EE | O |
|---|---|---|---|---|---|---|
| Manager | ☉ | ☉ | ☉ | ☉ | ◉ | ☉ |

**Competency # 4**

- **Directing Others (Store Managers)**

Is good at establishing clear directions; distributes the workload appropriately; lays out the work in a well-planned and organized manner; maintains two-way communication with others on work and results; brings out the best in people; is a clear communicator.

**Behaviors**

- **Uses Daily / Weekly Action Plans and one on one interaction to communicate tasks.**

- **Follows-up through out the shift on assigned tasks. Provides balanced feedback regarding task progress / completion.**

- **Clearly communicates expectations from a SMART perspective; teaches and coaches to expectations.**

**Manager's Year-End Comments**

Curtis uses the daily and weekly action plans to improve the interaction and communication of tasks with his team; he clearly communicates his expectation from the SMART perspective and is always striving to achieve a specific SMART goal.

| | Not Acceptable | UN | NI | ME | EE | O |
|---|---|---|---|---|---|---|
| Manager | ☉ | ☉ | ☉ | ◉ | ☉ | ☉ |

DTP 000063

## Competency # 5

- **Drive for Results (Store Managers)**

Can be counted on to exceed goals successfully; is constantly and consistently one of the top performers; very bottom-line oriented; consistently pushes self and others for results; works through and around barriers - doesn't use them as excuses.

**Behaviors**

- **Uses Key Performance Reports to analyze results; makes necessary adjustments to achieve targets.**

- **Plans for and schedules task completion within SPEH.**

- **Proactively identifies and responds to merchandising opportunities to drive profitable sales.**

- **Achieves financial targets.**

- **Holds Associates responsible to productivity expectations.**

**Manager's Year-End Comments**

Curtis uses KPR's to analyze results and make adjustments to achieve targets through planing and scheduling to meet his stores SPEH. Curtis holds associates responsible to productivity expectations both stockers and cashiers.

| | Not Acceptable | UN | NI | ME | EE | O |
|---|---|---|---|---|---|---|
| Manager | ⊙ | ⊙ | ⊙ | ⊚ | ⊙ | ⊙ |

## Competency # 6

- **Managerial Courage (Store Managers)**

Doesn't hold back anything that needs to be said; provides timely, direct, complete, and "actionable" positive and corrective feedback to others; lets people know where they stand; faces up to people problems on any person or situation (even those who are not direct reports) quickly and directly; is not afraid to take adverse action when necessary.

**Behaviors**

- **Addresses performance issues and difficult situations appropriately and in a timely manner.**

- **Demonstrates personal responsibility.**

- **Provides honest feedback in a timely manner to all levels of the organization.**

**Manager's Year-End Comments**

Curtis has demonstrated a clear understanding of his responsibility while providing honest feedback in a timely manner. Curtis is very articulate and can communicate with anyone from any background. Curtis routinely shares his views and understandings of current events affecting his store and the district he works in with myself.

| | Not Acceptable | UN | NI | ME | EE | O |
|---|---|---|---|---|---|---|
| Manager | ⊙ | ⊙ | ⊙ | ⊙ | ⊚ | ⊙ |

DTP 000064

## Competency # 7

- **Perseverance (Store Managers)**

Pursues everything with energy, drive and a need to finish; seldom gives up before finishing, especially in the face of resistance or setbacks.

**Behaviors**

- **Sets personal goals and follows-through.**

- **Maintains a positive attitude, regardless of the circumstances.**

- **Demonstrates resilience and an ability to overcome obstacles.**

**Manager's Year-End Comments**

Curtis maintains a positive attitude at all times and demonstrates resilience and an ability to overcome obstacles through the use of personal goals and follow-though. Curtis has had some challenging moments and through them all Curtis persevered with a smile on his face while winning the hearts of his associates with his positive demeanor. Curtis will make a great DST followed by a great District Manager as a result of his strength in this and other areas of the competencies.

| | Not Acceptable | UN | NI | ME | EE | O |
|---|---|---|---|---|---|---|
| Manager | ☉ | ☉ | ☉ | ☉ | ☉ | ⊙ |

## Competency # 8

- **Planning (Store Managers)**

Accurately scopes out length and difficulty of tasks and projects; sets objectives and goals; breaks down work into the process steps; develops schedules and task/people assignments; anticipates and adjusts for problems and roadblocks; measures performance against goals; evaluates results; uses store planning tools consistently.

**Behaviors**

- **Effectively uses Daily / Weekly Action Plans from a SMART perspective to plan for and delegate task completion.**

- **Uses company tools, reports and communication, i.e. KPRs, to effectively plan for business needs.**

- **Writes a schedule that ensures task completion, customer experience expectations and SPEH management.**

**Manager's Year-End Comments**

Curtis is great at the use of Appleseed his ability to break down the week to the smallest detail helps him understand how all the pieces come together through the effective scheduling of his store.

| | Not Acceptable | UN | NI | ME | EE | O |
|---|---|---|---|---|---|---|
| Manager | ☉ | ☉ | ☉ | ☉ | ⊙ | ☉ |

## Competency # 9

- **Problem Solving (Store Managers)**

Uses sound logic and methods to solve difficult problems with effective solutions; probes all relevant sources for answers; can see hidden problems; is excellent at analysis; looks beyond the obvious and doesn't stop at the first answer.

**Behaviors**

- Uses data / resources to problem solve.

- Seeks input from others as part of defining the problem; isn't afraid to ask for help.

- Understands impact of decisions on not only the store, but the Brand.

- Asks open ended questions to determine root causes.

**Manager's Year-End Comments**

Curtis is a great problem solver, he is often sought out by his colleagues to help in the problem solving process as he understands the impact of his decisions on the store and the Brand. Curtis has demonstrated his problem solving strength throughout the course of year when partnered with about specific operational issues within his store and on occasions with other stores he has worked in.

| | Not Acceptable | UN | NI | ME | EE | O |
|---|---|---|---|---|---|---|
| Manager | ◎ | ◎ | ◎ | ◎ | ◉ | ◎ |

DTP 000066

2013/2014 Performance Appraisal for Store Managers                    Page 12 of 14
Case 2:15-cv-05813-MWF-PJW   Document 46-2   Filed 01/09/17   Page 142 of 259   Page ID
#:1320

**Competency # 10**

- **Time Management (Store Managers)**

Uses his/her time effectively and efficiently; concentrates his/her efforts on the more important priorities; gets more done in less time than others; can attend to a broader range of activities.

**Behaviors**

- **Schedules time to plan for the needs of the business.**

- **Establishes realistic timeframes for completion of tasks based on difficulty and Associate knowledge.**

**Manager's Year-End Comments**

Curtis is an effective time manager, he schedules time to plan for the needs of the business and establishes realistic timeframes for completion of tasks based on the difficulty and associate ability.

| | Not Acceptable | UN | NI | ME | EE | O |
|---|---|---|---|---|---|---|
| **Manager** | ⊙ | ⊙ | ⊙ | ⊙ | ⊙ | ⊙ |

**Development Plan Section**

The Development Plan outlines associate activities that will enhance job knowledge, skills and abilities to maintain or increase performance.  Development plans should be created based on the ratings in the Performance Appraisal.

Effective Development Plans:

- Close performance gaps for job responsibilities

- Enhance job-related skills

- Provide opportunities for professional growth

Write at least one developmental plan for this associate.

DTP 000067

---

**Development Plan Section: Item 1 of 1**

**Development Plan**

Time Management:

Uses his/her time effectively and efficiently; concentrates his/her efforts on the more important priorities; gets more done in less time than others; can attend to a broader range of activities.
Specifically Curtis will be building on his current mastery level of the skilled behaviors of:
     Establishes realistic timeframes for completion of tasks based on difficulty and Associate knowledge.
     Schedules time to plan for the needs of the business.

Identify the amount of time needed to plan for a week by having coverage available for the entire Friday and Monday shift.
Schedule uninterrupted time to plan for the following week on every Friday and Monday.
Prioritize all store activities with A or B.
Call Jason at 8am Mondays and Fridays to discuss prelim plan
Partner with neighboring district store to arrange for backup coverage for critical days IE Delivery, FTF Setup
Record time usage for two weeks and share findings with DM
Interview every associate in store to gain knowledge of both the person and ability
Delegate any and all activities which can be delegated and only followup as a directing leader
If disciplin lost partner with DM immediately to assess situation and to implement damage control

---

## Overall Performance Summary

### Please review this calculated information to ensure it accurately reflects the Store Manager's overall performance for the previous year.

Overall Comments

**Overall Manager Comments**

Curtis your solid performance and advanced communication ability has earned you a promotion to one of the regional flagship stores. You have had an amazing year and I look forward to being of service to you in your further development in 2014.

Overall Calculated Rating

| Overall Rating | 82.0 / 100.0 Exceeds Expectations | |
|---|---|---|
| **Metrics Section** | **86.0 / 100.0** | **60.0%** |
| Shrink | 75.0 / 100.0 | 20.0% |
| Sales | 100.0 / 100.0 | 20.0% |
| Scan Margin | 100.0 / 100.0 | 20.0% |
| Payroll | 80.0 / 100.0 | 20.0% |
| Markdowns | 75.0 / 100.0 | 20.0% |
| | | |
| **Competencies Section** | **76.0 / 100.0** | **40.0%** |
| Action Oriented (Store Managers) | 80.0 / 100.0 | |
| Building Effective Teams (Store Managers) | 80.0 / 100.0 | |

DTP 000068

2013/2014 Performance Appraisal for Store Managers    Page 14 of 14
Case 2:15-cv-03813-MWF-PJW   Document 46-2   Filed 01/09/17   Page 144 of 259   Page ID
#:1322

| | |
|---|---|
| Customer Focus (Store Managers) | 80.0 / 100.0 |
| Directing Others (Store Managers) | 60.0 / 100.0 |
| Drive for Results (Store Managers) | 60.0 / 100.0 |
| Managerial Courage (Store Managers) | 80.0 / 100.0 |
| Perseverance (Store Managers) | 100.0 / 100.0 |
| Planning (Store Managers) | 80.0 / 100.0 |
| Problem Solving (Store Managers) | 80.0 / 100.0 |
| Time Management (Store Managers) | 60.0 / 100.0 |

## Approvals

As the manager who completed this Performance Appraisal, I have reflected on the performance of the associate and completed the appraisal as accurately and fairly as possible.  I will review the appraisal with the associate and give him/her an opportunity to review, respond and sign.

If this form has been returned to you for changes, click on "Clear" and then click on "Sign."

As the associate who has reviewed this performance appraisal, my signature indicates acknowledgement not necessarily agreement.

**Associate**

| | | | |
|---|---|---|---|
| Associate | CURTIS PATTON | Sign Date | 05/13/2014 |
| Associate Reviewed | ☑ | | |
| Associate Comments (Optional) | | | |

**Manager**

| | | | |
|---|---|---|---|
| Manager | JASON JALILI | Sign Date | 02/24/2014 |

**2nd Level Manager**

| | | | |
|---|---|---|---|
| 2nd Level Manager | RICHARD LACKIE | Sign Date | 03/03/2014 |

**Meeting Scheduled**

| | | | |
|---|---|---|---|
| Meeting Scheduled By | JASON JALILI | Meeting Topics | Delivery of appraisal |
| Sign Date | 05/06/2014 | | |
| Meeting Conducted | ☑ | | |

**HR**

**For HR Use Only**

```
 1                  REPORTER'S CERTIFICATE

 2

 3         I, Clay J. Frazier, CSR No. 13401, RMR,

 4  CRR, a Certified Shorthand Reporter in and for the

 5  State of California, do hereby certify:

 6         That prior to being examined, the witness

 7  named in the foregoing proceedings declared under

 8  penalty of perjury to testify to the truth, the

 9  whole truth, and nothing but the truth;

10         That said proceedings were taken by me in

11  shorthand at the time and place herein named and was

12  thereafter transcribed into typewriting under my

13  direction, said transcript being a true and correct

14  transcription of my shorthand notes.

15         I further certify that I have no interest

16  in the outcome of this action.

17

18

19

20

21

22

23         _____
           Clay J. Frazier
24         CSR No. 13401, RMR, CRR

25
```

EXHIBIT  R

```
 1              IN THE UNITED STATES DISTRICT COURT

 2            FOR THE CENTRAL DISTRICT OF CALIFORNIA

 3

 4   CURTIS PATTON, an          )

 5   individual, on behalf of   )

 6   himself and all others     )

 7   similarly situated,        )

 8        Plaintiffs,           )

 9        -vs-                  ) Case No. CV 15-3813-MWF

10   DOLLAR TREE STORES,        ) (PJWx)

11   INC., a Virginia           )

12   corporation; and DOES 1    ) Hon. Michael W.

13   Through 100, Inclusive,    ) Fitzgerald

14        Defendants.           )

15   _____

16

17

18           DEPOSITION OF STEVEN PEARSON

19         TAKEN ON BEHALF OF THE PLAINTIFFS

20              Norfolk, Virginia

21              June 16, 2016

22

23

24   JOB No. 2295742A

25   PAGES 1 - 74
```

                                                    Page 1

```
 1    they've been assigned for any one of their stores
 2    there's a process in place for them to reach out to my
 3    group.  And we will work and partner with those local
 4    district managers or regional directors to make the
 5    necessary adjustments based on the conditions that
 6    they're -- that we don't know about from a corporate
 7    perspective.
 8         Q.    All right.
 9         A.    So there is a process in place for them
10    to be able to make adjustments.
11         Q.    Okay.  And what is that process?
12         A.    That process entails a store manager
13    raising concerns to a district manager, and then that
14    process is bubbled up through either e-mail or a phone
15    call to their regional director and then to our group.
16         Q.    And are you aware of examples where the
17    SPEH was actually modified based on concerns by the
18    store manager?
19         A.    I have -- I can't speak to anything
20    specific in recent memory, not that I recall any
21    specifics in terms of the root of where that original
22    concern was raised.  And I can't think of anything
23    specific but I've made numerous changes over 12 years
24    in making adjustments to store SPEH targets after
25    we've gone through our process.
```

Page 50

1          Q.       Based on information coming from the

2     field?

3          A.       That's right.

4          Q.       Would you say that the SPEH has gone up

5     or down over the last, say, five years?  Generally?

6     Have you seen a trend?

7                   MR. MESSIHA:   Objection as it is vague

8     and compound.

9                   THE WITNESS:   Productivity or

10    sales-per-employee hours have risen slightly over the

11    last couple years.  A lot of that is driven by the

12    enhancements that we've made to our -- made to our

13    expectations and advancements in technology or tools

14    that have helped our stores be more effective and more

15    efficient with their labor.

16                   This is generally translated, though,

17    based on -- when you look at an individual store we

18    are still looking at the basic sales volume and the

19    historical relevance of that class and volume of size

20    of store to generate or SPEH targets.  So there are

21    some stores that would not have seen any type of

22    productivity improvement based on their sales

23    patterns.

24    BY MR. STAHLE:

25          Q.       How would the sales patterns inform

Page 51

```
 1    COMMONWEALTH OF VIRGINIA AT LARGE, to wit:

 2

 3         I, Emily Koppenhaver, RMR, a Notary Public for

 4    the Commonwealth of Virginia at Large, of

 5    qualification in the Circuit Court of the City of

 6    Norfolk, Virginia, whose commission expires September

 7    30, 2017, do hereby certify that the within deponent,

 8    STEVEN PEARSON, appeared before me at Norfolk,

 9    Virginia, as hereinbefore set forth; and after being

10    first duly sworn by me, was thereupon examined upon

11    his oath by counsel; that his examination was recorded

12    in Stenotype by me and reduced to typescript under my

13    direction; and that the foregoing transcript

14    constitutes a true, accurate, and complete transcript.

15         I further certify that I am not related to nor

16    otherwise associated with any party or counsel to this

17    proceeding, nor otherwise interested in the event

18    thereof.

19         Given under my hand and notarial seal at

20    Norfolk, Virginia, this 7th day of July, 2016.

21

22

          _____

23         Emily Koppenhaver, RMR, Notary Public

24         (Commissioned as Emily R. Clark)

25         Notary Registration No. 368886
```

Page 74

EXHIBIT  S

```
 1              UNITED STATES DISTRICT COURT

 2              CENTRAL DISTRICT OF CALIFORNIA

 3
     _____
 4   CURTIS PATTON, et al.,        )
                                   )
 5            Plaintiffs,          )
                                   )
 6        vs.                      )  No. CV15-3813-MWF(PJWx)
                                   )
 7   DOLLAR TREE STORES, INC.,     )
                                   )
 8            Defendants.          )
     _____)

 9

10

11

12

13

14           DEPOSITION of LARRY WHALEN

15             Los Angeles, California

16          Thursday, September 8, 2016

17                 Volume 1

18

19

20

21   Reported by:
     MARYAM T. SALAHUDDIN
22   CSR No. 9669

23   Job No. 2371342

24

25   PAGES 1 - 78


                                        Page 1
```

1     Q    So when you say, you know, very small and very

2   large, are you talking about the volume or the square

3   footage?  What were you referring to when you said that?

4     A    Square footage.

5     Q    Okay.  Can you give an estimate of the square

6   footage of a very small -- what you call a very small

7   store?

8     A    My experience has been -- like, I have one now in

9   my district that is about 63, 6,400 square feet.  And

10   about 6,000 is smallest I have dealt with personally.

11     Q    All right.  Can you give an estimate of the size

12   of the largest location in your district?

13     A    My district now I have one that is about just

14   under 15,000 square feet.

15     Q    Is that the largest one in your district?

16     A    In my district, yes.

17     Q    So the largest one that you have encountered as

18   an employee with Dollar Tree?

19     A    No.  When I had the high desert in Palmdale, I

20   believe it was about 18,000 square feet.  That is the

21   largest one I have had.

22     Q    Now, in terms of sales volume, there is a range

23   as well -- correct -- certain stores have lower volume.

24   Other stores have higher volume?

25     A    That is correct.

                                          Page 24

1    Q    Could you give an estimate as to the range there.

2    A    In my district now I have store -- one store that

3    does about $900,000 a year.   And then my large store

4    that I mentioned earlier, the 15,000 square foot store,

5    does just over $3 million a year.

6    Q    Okay.   Again, most stores are sort of somewhere

7    in between?

8    A    That is correct.

9    Q    Like in the middle which I guess would be around

10   2 million?

11   A    Yes.   About 1 -- let's say 1.7 to 2 million.

12   Q    And as far as size, meaning square footage, most

13   stores are what?   Around 10,000 square feet?

14   A    In my district now, 8 to 9,000 is more of the

15   average that I deal with.

16   Q    All right.   Let's talk about staffing of the

17   stores.

18         Is there a typical way that these stores are

19   staffed?

20         When I say typical, you know, there could be a

21   store manager, assistant manager, and then so forth down

22   in the hierarchy.

23         Do you understand the question?

24   A    Yes.   Our stores have a store manager and then

25   three assistant managers.

                                                    Page 25

```
 1        Q    Are they called assistant managers or assistant

 2    store managers?

 3        A    Assistant managers.

 4        Q    The store manager is an exempt position; correct?

 5        A    That is correct.

 6        Q    Is that the only exempt position in the Dollar

 7    Tree stores in California?

 8        A    To my understanding and experience, yes.

 9        Q    And as far as the hierarchy, then, going down,

10    what is the position or positions under the assistant

11    manager?

12        A    Just hourly associates.

13        Q    Okay.  They don't have specific titles like

14    supervisor, shift supervisor or anything like that?

15    They are just hourly associates?

16        A    That is correct.

17        Q    Are the hourly associates typically part time?

18        A    Yes.

19        Q    Are they always part time?

20        A    Yes.  They are all hired as part time.

21        Q    The store manager is full time; correct?

22        A    That is correct.

23        Q    You mentioned that -- you mentioned that there

24    are three assistant managers; right?

25        A    That is correct.
```

                                                    Page 26

1    Q    Is that true for every store even the small ones?

2    A    Yes.

3    Q    Okay.  And it is also true for the large ones?

4    A    The larger ones can actually go higher.  Once

5    they reach over $2.5 million in sales, we provide them

6    with four assistant managers.

7    Q    And why is that?  Why is there an additional one

8    added?

9    A    Just because of the volume of the store, the

10   difficulty in running it, and the labor needed.

11   Q    Okay.  Are Dollar Tree stores in California

12   24-hour stores, meaning, they are open to the public 24

13   hours a day?

14   A    Not in my experience.

15   Q    Okay.  Does Dollar Tree have 24-hour stores in

16   California?

17   A    I don't know.

18   Q    But you are not aware of any?

19   A    I'm not aware of any.

20   Q    Do the Dollar Tree stores in California have the

21   same hours of operation in terms of being open to the

22   public?  Are all of the stores on the same schedule?

23   A    No.

24   Q    Okay.  What are some -- the stores in your

25   district, what are the open hours for those stores?

                                                    Page  27

 1          If you can give me examples of the different

 2     ones.

 3        A    Well, most of my stores, the majority are from

 4     8:00 in the morning until 9:00 o'clock at night.   And

 5     then I have one store that is 8:00 in the morning until

 6     10:00 o'clock at night.

 7          And then I have like three of my lower-volume

 8     stores are 9:00 in the morning until 9:00 o'clock at

 9     night.   Sunday hours would be a little bit less.   Some

10     of the lower volume stores are only opened 9:00 to 7:00

11     on Sunday.

12        Q    Will the larger stores typically have longer

13     hours open to the public?

14               MR. MESSIHA:   Objection.   It is compound.

15               You can go ahead.

16               THE WITNESS:   I'm sorry.   Did you say the

17     larger stores?

18     BY MR. STAHLE:

19        Q    Yes.

20        A    It doesn't go so much by size.   It goes more by

21     volume, determining the length that they are opened

22     during the days.

23        Q    Okay.   So the higher the sales volume, the longer

24     the hours tend to be?

25        A    That is correct.

                                              Page 28

```
 1                MR. MESSIHA:  Objection.  Compound and

 2    assumes facts.

 3                THE WITNESS:  It is just based on volume.

 4    BY MR. STAHLE:

 5       Q   Okay.  So if you gave me a range, let's say, the

 6    smaller stores, how many hourly associates would be on

 7    the payroll?

 8       A   My lower-volume stores probably -- hourly

 9    associates only, 8 to 10.

10       Q   And the big stores?

11       A   I think you have 25 or 30.

12       Q   And at any given time -- I realize that could be

13    sort of a hard estimate, but let's see if you can.

14           At any given time in a small store, how many

15    employees would be present in the store?

16                MR. MESSIHA:  Objection as compound.

17                You can answer.

18                THE WITNESS:  At a lower-volume store

19    probably the majority of the time it would be two to

20    three people in the store, one of those being a member

21    of management.

22    BY MR. STAHLE:

23       Q   When you say a member of management, it is either

24    the store manager or an assistant manager?

25       A   That is correct.
```

Page 36

1       Q    Let's take a five-minute break.

2       A    Okay.

3               MR. MESSIHA:  Sure.

4               (Recess.)

5    BY MR. STAHLE:

6       Q    I believe you mentioned earlier that the store

7    manager is in charge of or responsible for creating the

8    store schedule?

9       A    Yes.

10      Q    Now, the store manager has certain constraints to

11   work within when it comes to scheduling, I believe,

12   based on what I have learned from other depositions.

13   And I would like you to tell me your understanding.

14          Isn't it true that the store managers only have

15   so many hours or dollars to utilize during a particular

16   week.  Is that fair?

17              MR. MESSIHA:  The question is compound.

18              You can answer to the extent you understand

19   it.

20              THE WITNESS:  They are given a budget.

21   BY MR. STAHLE:

22      Q    Okay.

23      A    Of what we call an SPEH budget which stands for

24   employee hour.  And they have to maintain that budget.

25   And that is divided into sales which gives them their

                                             Page 65

1    hours.

2         Q    The SPEH is a number?

3         A    Yes.

4         Q    What is the number?   Is that sort of a set

5    number?

6         A    Yes.   It just depends on the budget that the

7    company is giving us for each week.

8         Q    Okay.   And is SPEH different from store to store,

9    or is it sort of a number that this week companywide

10   this is the SPEH?   How does that work?

11        A    No.   It changes from store to store.

12        Q    So it is whatever the company determines is

13   appropriate for that store is the SPEH?

14        A    It has more to do with volume than store

15   specific.   It is more volume generated.

16        Q    Okay.   That is sales per -- what does SPEH stand

17   for?

18        A    Sales per employee hour.

19        Q    Is it SPEH?

20        A    Yes.

21        Q    The employee and the employee hour denominator in

22   what you just mentioned, does that include all of the

23   employees in the store, including the management?

24        Do you know?

25        A    It includes assistant store managers, not the

                                                    Page 66

1  store manager.

2      Q    Can you give me an example of an SPEH in one of

3  your stores?

4      A    Let's -- as an example purposes, let's say the

5  store is going to do $20,000 this week.  And their

6  budget for the SPEH is 100.  They would get 200 hours

7  for that week.

8      Q    The hundred is the SPEH in your example?

9      A    Right.

10     Q    So they get how many hours?

11     A    200.

12     Q    Okay.

13     A    Just divide the 100 into the sales.  The SPEH

14 into the sales.  And it gives you your hours.

15     Q    All right.  So those 200 hours in the example

16 would allow the store manager to schedule, not including

17 him or herself but to schedule the assistant manager and

18 the hourly associates for a total of up to 200 hours for

19 that week?

20     A    That is correct.

21     Q    Okay.  This process is the same throughout the

22 company as far as you know?

23     A    As far as I know, yes, it is.

24     Q    Now, does the store manager have any discretion

25 to depart from those numbers?

Page 67

```
 1      A    Not unless they have been given approval, you
 2  know.   The district manager or the regional director
 3  would have to -- they would have to have approval for
 4  that.   But the expectation is that they stay within
 5  their SPEH budget.
 6      Q    Okay.   Now, you mentioned earlier that -- you
 7  know, we talked about job descriptions and whatnot of
 8  the store manager.   I believe you summarized it as
 9  basically the store manager is responsible for
10  everything in the store.
11      A    Right.
12      Q    Is that fair?
13      A    That is fair.
14      Q    Okay.   Are there tools -- are there directives,
15  policies, procedures, what have you that the store
16  manager is given from corporate to help the store
17  manager carry out all of that stuff?
18      A    Well, there is a training program that all new
19  store managers, whether they are an assistant manager
20  that is coming up internally or an externally hired
21  candidate that we hired from externally, that they go
22  through a training program.
23          And for an internal candidate it is four weeks.
24  And right now it is.   And external person it is five
25  weeks of training.   And so all of the operations of the
```

Page 68

Larry Whalen                          Patton v. Dollar Tree                          9/8/16

 1

 2

 3

 4        I, the undersigned, a Certified Shorthand Reporter of

 5     the State of California, do hereby certify;

 6        That the foregoing proceedings were taken before me

 7     at the time and place herein set forth; that any

 8     witnesses in the foregoing proceedings, prior to

 9     testifying, were placed under oath; that a verbatim

10     record of the proceedings was made by me using machine

11     shorthand which was thereafter transcribed under my

12     direction; further, that the foregoing is an accurate

13     transcription thereof.

14        I further certify that I am neither financially

15     interested in the action nor a relative or employee of

16     any attorney of any of the parties.

17        IN WITNESS WHEREOF, I have this date subscribed my

18     name.

19

20     Dated:  9/19/2016

21

22               _Maryam I. Salahud-din_

23               MARYAM T. SALAHUD-DIN

                 CSR No. 9669

24

25

                                                      Page 78

EXHIBIT  T

1

2

3

4              IN THE UNITED STATES DISTRICT COURT

5            FOR THE NORTHERN DISTRICT OF CALIFORNIA

6

7  MIGUEL A. CRUZ, and JOHN D.      )  Case Nos. 07-2050 SC
   HANSEN, individually and on behalf )          07-4012 SC
8  of all others similarly situated, )
                                     )
9              Plaintiffs,           )  ORDER DECERTIFYING CLASS
                                     )
10      v.                           )
                                     )
11 DOLLAR TREE STORES, INC.,         )
                                     )
12             Defendant.            )
   ──────────────────────────────── )
13                                   )
   ROBERT RUNNINGS, individually, and )
14 on behalf of all others similarly )
   situated,                         )
15                                   )
               Plaintiffs,           )
16                                   )
        v.                           )
17                                   )
   DOLLAR TREE STORES, INC.,         )
18                                   )
               Defendant.            )
19 ──────────────────────────────── )

20 **I.    INTRODUCTION**

21      This is a certified class action brought by Plaintiffs Robert

22 Runnings ("Runnings"), Miguel Cruz ("Cruz"), and John Hansen

23 ("Hansen") (collectively, "Plaintiffs"), who allege that they and

24 other current and former store managers at Defendant Dollar Tree

25 Stores, Inc. ("Defendant" or "Dollar Tree") were misclassified as

26 executive-exempt employees and thereby denied overtime pay and meal

27 and rest breaks in violation of California law.  On May 27, 2011,

28 the Court conducted a hearing on the trial plans submitted by

**United States District Court**
For the Northern District of California

Plaintiffs and Defendant.  At the conclusion of the hearing, the
Court expressed concern over the continued propriety of class
treatment in this case and ordered the parties to submit briefs
addressing whether continued class treatment was appropriate.  The
parties have submitted briefs in response to the Court's order.
ECF Nos. 314 ("Def.'s Br."), 317 ("Pls.' Br.).[1]  After reviewing
these briefs, and many other papers submitted by the parties over
the course of this litigation, the Court finds that continued class
treatment is inappropriate and DECERTIFIES the class for the
following reasons.

## II.  **BACKGROUND**

The Court assumes the parties are familiar with the procedural
and factual background of this case, which the Court set out in its
May 26, 2009 Order Granting the Amended Motion for Class
Certification.  ECF No. 107 ("Orig. Cert. Order").  Accordingly,
the Court provides a truncated version here.

Plaintiffs are former Dollar Tree employees who held the
position of store manager.  On April 11, 2007, Cruz and Hansen
filed suit ("the Cruz action") on behalf of themselves and all
others similarly situated against Dollar Tree, alleging that Dollar
Tree improperly categorizes its store managers as executive-exempt
employees under California and federal labor laws.  ECF No. 1
("Compl.").  In August 2007, Runnings filed a similar action in
state court (the "Runnings action"), which was subsequently removed

---

[1] Cruz v. Dollar Tree, Case No. 07-2050 ("Cruz action"), and
Runnings v. Dollar Tree, Case No. 07-4012 ("Runnings action"), have
been consolidated.  Unless otherwise noted, all docket numbers in
this Order refer to docket entries in the Cruz action.

**United States District Court**
For the Northern District of California

and consolidated with the <u>Cruz</u> action.  <u>See</u> ECF No. 45.

On May 26, 2009, the Court certified a class of "all persons who were employed by Dollar Tree Stores, Inc. as California retail Store Managers at any time on or after December 12, 2004, and on or before May 26, 2009," and appointed Plaintiffs as class representatives.  <u>See</u> Orig. Cert. Order.  The class consisted of 718 store managers ("SMs") who worked in 273 retail locations.  <u>Id.</u>

On June 18, 2010, in the wake of two Ninth Circuit decisions regarding employment class actions -- <u>In re Wells Fargo Home Mortgage Overtime Pay Litigation</u>, 571 F.3d 953 (9th Cir. 2009) ("<u>Wells Fargo I</u>"), and <u>Vinole v. Countrywide Home Loans, Inc.</u>, 571 F.3d 935 (9th Cir. 2009) -- Dollar Tree moved for decertification, arguing that changes in the law made continued class treatment inappropriate.  ECF No. 188.  On September 9, 2010, the Court granted in part and denied in part Dollar Tree's motion for decertification.  ECF No. 232 ("Part. Decert. Order").

As explained in the Original Certification Order and the Partial Decertification Order, Dollar Tree requires its SMs to complete weekly payroll certifications indicating whether they spent more than fifty percent of their actual work time each week performing seventeen listed duties that Dollar Tree believes to be "managerial" in nature.  <u>See</u> Part. Decert. Order at 2.  The certification form states that SMs "may not spend more than a total of 35% of his/her actual work time each week receiving product, distributing and storing product, stocking product and cashiering." <u>Id.</u>  Each SM must certify "yes" if he or she spent the majority of his or her time performing the seventeen duties and "no" if he or she did not.  <u>Id.</u>  The payroll certification form further states

3

1    that if the SM responds no, "s/he must immediately provide an

2    explanation to both Payroll and Human Resources.  No salary or wage

3    will be withheld because of non-compliance."  Id.   The form

4    provides a space for SMs to write an explanation.   Id.

5         In its Partial Decertification Order, after reviewing the

6    Ninth Circuit's decisions in Wells Fargo I and Vinole and examining

7    subsequent district court reactions, the Court decided that, with a

8    modification of the class definition, this case could proceed as a

9    class action.  The Court held that Dollar Tree's payroll

10   certifications provided common proof of how SMs were spending their

11   time.  Part. Decert. Order at 12-13.  The Court reasoned that this

12   common proof -- which was lacking in other cases[2] where classes

13   were decertified after Vinole and Wells Fargo I -- would obviate

14   the need for much individual testimony from SMs concerning how they

15   spent their time.  Id.  However, the Court narrowed the class to

16   include only those SMs who certified "no" on a payroll

17   certification form at least once during the class period.  The

18   Court reasoned that, in order to prove liability with regard to the

19   SMs who always certified "yes," Plaintiffs would need to show that

20   these SMs were not truthful when completing their payroll

21   certifications.  Id.  Such credibility determinations would require

22   individualized inquiries that would overwhelm the common issues in

23   the case.  Id.  By narrowing the class, the Court sought to avoid

24   this problem.

25        The Partial Decertification Order resulted in a class

26

27   [2] See, e.g., In re Wells Fargo Home Mortg. Overtime Pay Litig., 268
     F.R.D. 604, 611 (N.D. Cal. Jan. 13, 2010) ("Wells Fargo
     II")(denying class certification because plaintiffs could not
28   produce "common proof that would absolve this court from inquiring
     into how each [manager] spent their working day").

4

consisting of 273 members and defined as "all persons who were employed by Dollar Tree Stores, Inc. as California retail store managers at any time on or after December 12, 2004, and on or before May 26, 2009, and who responded 'no' at least once on Dollar Tree's weekly payroll certifications." Id. at 23.  The class definition has not been altered further.[3]

The Court subsequently reviewed motions from Plaintiffs and Defendant addressing trial management issues, reviewed and denied a motion for reconsideration of the Partial Decertification Order filed by Plaintiffs, and held a May 27, 2011 hearing to discuss trial management issues.  See ECF Nos. 277 ("Def.'s Trial Plan"), 290 ("Pls.' Trial Plan"), 301 ("Mot. for Recon.").  These developments, along with the Ninth Circuit's decision in Marlo v. United Parcel Serv., Inc., No. 09-56196, 2011 U.S. App. LEXIS 8664 (9th Cir. Apr. 28, 2011) ("Marlo II"), made the Court increasingly concerned that individualized issues will predominate over class-wide issues if this case proceeds to trial as a class action.  The Court thus decided to entertain further briefing from the parties regarding the propriety of continued class treatment.  The Supreme Court's recent decision in Wal-Mart Stores, Inc. v. Dukes, No. 10-277, 2011 U.S. LEXIS 4567 (June 20, 2011), has since heightened the Court's concerns.  Having considered the parties' briefings, recent

---

[3] On March 8, 2011, the Court granted in part Dollar Tree's Motion to Dismiss Claims of Class Members Who Failed to Respond to Discovery Requests.  ECF No. 282 ("Mar. 8, 2011 Order").  The Court dismissed the claims of eighty-nine class members who failed to respond to limited discovery authorized by the Court despite multiple warnings that failure to respond might result in dismissal.  Id.  The Court declined to dismiss twenty class members who did not receive the final warning letter sent by Plaintiffs' counsel.  The March 8, 2011 Order reduced the class to its current size of 184 members.

**United States District Court**
For the Northern District of California

**United States District Court**
For the Northern District of California

1   developments in the case, and recent developments in the law of

2   class actions, the Court finds that decertification of the class is

3   warranted.

4

5   **III. <u>LEGAL STANDARD</u>**

6        The district court has the discretion to certify a class under

7   Federal Rule of Civil Procedure 23. <u>See</u> <u>Molski v. Gleich</u>, 318 F.3d

8   937, 946 (9th Cir. 2003). Rule 23(a) requires that the plaintiff

9   demonstrate (1) numerosity, (2) commonality, (3) typicality, and

10  (4) fair and adequate representation of the class interest. Fed.

11  R. Civ. P. 23(a). In addition to meeting these requirements, the

12  plaintiff must also show that the lawsuit qualifies for class

13  action status under one of the three criteria found in Rule 23(b).

14  <u>Dukes</u>, 2011 U.S. LEXIS 4567, at *12.

15       A district court's order to grant class certification is

16  subject to later modification, including class decertification.

17  <u>See</u> Fed. R. Civ. P. 23(c)(1)(C) ("An order that grants or denies

18  class certification may be altered or amended before final

19  judgment."). "If evidence not available at the time of

20  certification disproves plaintiffs' contentions that common issues

21  predominate, the district court has the authority to modify or even

22  decertify the class." <u>Dukes v. Wal-Mart Stores, Inc.</u>, 603 F.3d

23  571, 579 (9th Cir. 2010), <u>rev'd on other grounds</u>, No. 10-277, 2011

24  U.S. LEXIS 4567 (June 20, 2011).

25       In considering the appropriateness of decertification, the

26  standard of review is the same as a motion for class certification:

27  whether the Rule 23 requirements are met. <u>O'Connor v. Boeing N.</u>

28  <u>Am., Inc.</u>, 197 F.R.D. 404, 410 (C.D. Cal. 2000). "Although

certification decisions are not to focus on the merits of a plaintiff's claim, a district court reevaluating the basis for certification may consider its previous substantive rulings in the context of the history of the case, and may consider the nature and range of proof necessary to establish the class-wide allegations." Marlo v. United Parcel Serv., Inc., 251 F.R.D. 476, 479 (N.D. Cal. 2008) ("Marlo I") (internal citations omitted).

**IV.   DISCUSSION**

The central issue in this case is whether Dollar Tree misclassified its SMs as exempt. Here, the Court previously ruled that Plaintiff had satisfied Rule 23(a) and certified the class under Rule 23(b)(3). See Orig. Cert. Order. Dollar Tree argues that continued certification under Rule 23(b)(3) is improper because Plaintiffs have failed to provide common proof of misclassification, and that therefore individual inquiries will predominate at trial.[4] Def.'s Br. at 1. Plaintiffs argue that there have been no new developments in the facts of this case or in the law that compel decertification. Pls.' Br. at 4. The Court agrees with Dollar Tree.

Rule 23(b)(3) requires that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). Among

---

[4] Dollar Tree also argues that Plaintiffs fail to satisfy the commonality requirement of Rule 23(a). Because the Court finds that the predominance requirement is not met, it does not address whether Rule 23(a) is satisfied.

7

the issues central to the predominance inquiry is whether the case, if tried, would present intractable management problems. Fed. R. Civ. P. 23(b)(3)(D).

Developments in this case and in the case law since the Court issued its Partial Decertification Order in September 2010 have persuaded the Court that individual issues predominate in this case and trial as a class action would present unmanageable difficulties. In particular, the basis for continued certification of the present class in the Court's Partial Decertification Order -- the determination that the payroll certification forms could serve as reliable common proof of how SMs were spending their time -- is no longer tenable. Both parties have repeatedly attacked the reliability of the certification forms. Additionally, it has become clear to the Court that "the crux" of Plaintiffs' proof at trial will be representative testimony from a handful of class members. See ECF No. 290 ("Pls.' Mot. for Pre-Trial Order") at 6. The appropriateness of such a trial plan was a questionable proposition under this circuit's case law at the time of the Court's Partial Decertification Order.[5] It is now untenable in light of the Ninth Circuit's decision in Marlo II and the Supreme Court's decision in Dukes.

The Court begins by briefly reviewing the California labor law

_____

[5] See, e.g., Wells Fargo II, 268 F.R.D. at 612 ("[T]he court has been unable to locate any case in which a court permitted a plaintiff to establish the non-exempt status of class members, especially with respect to the outside sales exemption, through statistical evidence or representative testimony."); Beauperthuy v. 24 Hour Fitness USA, Inc., 2011 U.S. Dist. LEXIS 24768, *59-60 (N.D. Cal. 2011) (rejecting the use of representative testimony where deposition testimony "show[ed] that for every manager who says one thing about his or her job duties and responsibilities, another says just the opposite.").

8

United States District Court
For the Northern District of California

1   at issue in this case and then proceeds to explain why continued

2   class treatment is no longer appropriate.

3       **A.  California's Executive Exemption in Class Actions**

4       California law requires that all employees receive overtime

5   compensation and authorizes civil actions for the recovery of

6   unpaid compensation.  Cal. Lab. Code §§ 510, 1194.  However, the

7   law recognizes an exemption for "executive" employees who meet six

8   criteria.  To qualify as executive-exempt, an employee must: (1)

9   manage the enterprise, a customarily recognized department, or

10  subdivision thereof; (2) direct the work of two or more other

11  employees; (3) have the authority to hire or fire, or have their

12  recommendations to hire, fire, or promote given weight; (4)

13  exercise discretion and independent judgment; (5) be "primarily

14  engaged" in exempt duties; and (6) earn a monthly salary equal to

15  twice the state minimum wage for full-time employment.  Cal. Code

16  Regs. tit. 8, § 11070(1)(A)(1)(a)-(f).

17      The "primarily engaged" prong of the exemption inquiry

18  requires a week-by-week analysis of how each employee spent his or

19  her time.  <u>Marlo II</u>, 2011 U.S. App. LEXIS 8664, at *14.  The

20  applicable regulations state that in determining whether an

21  employee is "primarily engaged" in exempt work, "[t]he work

22  actually performed by the employee during the course of the

23  workweek must, first and foremost, be examined and the amount of

24  time the employee spends on such work . . . shall be considered."

25  Cal. Code Regs. tit. 8, § 11090(1)(A)(1)(e).  California courts

26  have construed this requirement to mean that "the Court must

27  determine whether any given class members (or all the class

28  members) spend more than 51% of their time on managerial tasks <u>in</u>

1   any given workweek." <u>Dunbar v. Albertson's, Inc.</u>, 47 Cal. Rptr. 3d

2   83, 86 (Ct. App. 2006) (emphasis added).

3        In order to satisfy Rule 23(b)(3), Plaintiffs must provide

4   common proof that "misclassification was the rule rather than the

5   exception." <u>Marlo II</u>, 2011 U.S. App. LEXIS 8664, at *12.  Thus,

6   Plaintiffs must provide common proof that, among other things,

7   class members were spending more than fifty-one percent of their

8   time on managerial tasks in any given workweek.  In its Partial

9   Decertification Order, the Court held that the payroll

10  certification forms could provide this proof.  Subsequent

11  developments have demonstrated that the certification forms cannot

12  serve as reliable common proof and that Plaintiffs instead intend

13  to rely on individual testimony by exemplar class members at trial.

14       **B.  <u>Changes in the Legal Landscape Favor Decertification</u>**

15       Two developments in the law of employment class actions since

16  the Court issued its Partial Decertification Order bear heavily on

17  the Court's decision that class treatment in this case is no longer

18  proper.

19       First, the Ninth Circuit's recent decision in <u>Marlo II</u> affirms

20  the impropriety of relying on representative testimony where

21  plaintiffs have provided no reliable means of extrapolating that

22  testimony to the class as a whole.  In <u>Marlo II</u>, the Ninth Circuit

23  affirmed the decision of this district court decertifying a class

24  of employees who alleged they were misclassified as executive-

25  exempt.  2011 U.S. App. LEXIS 8664, at *17.  The district court

26  found that the plaintiffs had failed to satisfy Rule 23(b)(3)'s

27  predominance requirement because they had failed to provide common

28  evidence of misclassification that would obviate the need for

United States District Court
For the Northern District of California

10

individualized inquiries. Marlo I, 251 F.R.D. at 485. The court explained that the plaintiffs' primary evidence at trial would be the testimony of individual class members. Id. at 486. The court concluded:

> Without more than this individual testimony, the Court cannot conceive how the overtime exemption will be presented to the jury as a common issue for class-wide adjudication, as opposed to a number of individualized inquiries. There is a significant risk that the trial would become an unmanageable set of mini-trials on the particular individuals presented as witnesses.

Id. In affirming the district court's decision, the Ninth Circuit held that the plaintiffs' evidence did not support predominance, and that the district court did not abuse its discretion by holding that representative testimony did not support a class-wide determination. Marlo II, 2011 U.S. App. LEXIS 8664, at *15-17. As explained below, given that the payroll certification forms in the instant case can no longer be considered reliable proof, Plaintiffs' evidence in this case closely parallels that in Marlo II and fails to establish predominance for the same reasons.

Second, the United States Supreme Court's recent decision in Dukes provides a forceful affirmation of a class action plaintiff's obligation to produce common proof of class-wide liability in order to justify class certification. In Dukes, the Court reversed certification of a class of current and former female Wal-Mart employees who alleged that Wal-Mart discriminated against them on the basis of their sex by denying them equal pay and promotions in violation of Title VII of the Civil Rights Act of 1964. 2011 U.S. LEXIS 4567, at *37-38. The Court found that the plaintiffs had failed to satisfy the commonality requirement of Rule 23(a). Id.

United States District Court
For the Northern District of California

The Court emphasized that it was not enough to pose common
questions; rather, those questions must be subject to common
resolution.  Id. at *19.  The evidence of commonality the
plaintiffs offered -- consisting of statistical evidence of pay and
promotion disparities, anecdotes from class members, and the
testimony of a sociologist who opined that Wal-Mart had a culture
of sex discrimination -- failed to provide the "glue" necessary to
render all class members' claims subject to common resolution.  Id.
at *27-34.  Similarly here, as explained below, Plaintiffs have
failed to provide common proof to serve as the "glue" that would
allow a class-wide determination of how class members spent their
time on a weekly basis.  In the absence of such proof, the
commonality threshold, let alone the predominance inquiry of Rule
23(b)(3), has not been met.

    Also of importance to this case, Dukes rejected a "Trial by
Formula" approach to damages akin to that which Plaintiffs have
proposed here.  Id. at *48-51.  The Dukes plaintiffs intended to
determine each class member's damages using a formulaic model
approved by the Ninth Circuit in Hilao v. Estate of Marcos, 103
F.3d 767, 782-87 (9th Cir. 1996).  Id.  In Hilao, compensatory
damages for 9,541 class members were calculated by selecting 137
claims at random, referring those claims to a special master for
valuation, and then extrapolating the validity and value of the
untested claims from the sample set.  See Dukes, 603 F.3d at 625-
26.  The Ninth Circuit in Dukes concluded that a similar procedure
could be used by allowing Wal-Mart "to present individual defenses
in the randomly selected sample cases, thus revealing the
approximate percentage of class members whose unequal pay or

1  nonpromotion was due to something other than gender
2  discrimination." Id. at 627 n.5.  The Supreme Court rejected this
3  "novel project" as a "Trial by Formula" that would deprive Wal-Mart
4  of its right to assert statutory defenses to the individual claims
5  of all class members.  Dukes, 2011 U.S. LEXIS 4567, at *48-51.
6  Here, Plaintiffs rely on Hilao to propose determining
7  individualized damages "in a formulaic manner."  Pls.' Mot. for
8  Pre-Trial Order at 4 n.10.  In light of the Supreme Court's
9  rejection of this approach, it is not clear to the Court how, even
10 if class-wide liability were established, a week-by-week analysis
11 of every class member's damages could be feasibly conducted.

12        **C.  Recent Developments in this Case Compel Decertification**

13        Since issuing its Partial Decertification Order, the Court has
14 learned that the payroll certification forms cannot serve as
15 reliable common proof of misclassification, and that Plaintiffs
16 intend to rely primarily on individual testimony by exemplar class
17 members to prove their case.  These developments lead the Court to
18 conclude that individual issues will predominate at trial.

19        1. The Payroll Certification Forms Can No Longer Be
20           Considered Reliable Common Proof

21        In its Partial Decertification Order, the Court found that the
22 payroll certifications appeared reliable based on the analysis of
23 Dollar Tree's expert Robert Crandall.  See Part. Decert. Order at
24 17-20.  In making this determination, however, the Court expressly
25 noted that "[t]he Court is not bound by these determinations as the
26 litigation progresses.  If persuaded by the parties to do so, the
27 Court can revise its determination concerning the overall
28 reliability of the certifications."  Id. at 20.  The Court has

13

since learned that approximately sixty percent of class members stated under oath that either (1) they were not truthful when submitting their weekly payroll certifications, or (2) their "yes" responses did not in fact indicate that they spent more than fifty percent of their actual work time performing the tasks listed on the form. ECF No. 298-1 ("Vandall Decl. ISO Objections to Ngo Decl.") at ¶ 4.[6] An additional twenty-five percent of the class could not recall whether they were truthful when submitting their weekly certifications or provided no response at all. Id.

In addition, Plaintiffs themselves have argued on numerous occasions since the Court's Partial Decertification Order that the payroll certifications are not an accurate indication of how class members spent their time. They have made this argument despite the Court's repeated admonition that "if Plaintiffs intend to argue that the certifications do not provide a reliable measure of weeks when SMs were not spending most of their time performing managerial tasks, then it is not clear to the Court how this case can proceed as a class action." Part. Decert. Order at 17; see also ECF No. 294 ("Order Granting Leave to File Mot. for Recons.") at 2 (same). Indeed, in opposition to Defendant's motion for summary adjudication, Plaintiffs argued that "the certification responses are clearly unreliable." Runnings action, ECF No. 337 ("Pls.' Opp. To MSA") at 10. Plaintiffs argued that class members were confused about how to complete the forms, that the analysis of Defendant's

---

[6] When it issued the Partial Decertification Order, the Court was only presented with evidence that ten class members indicated they were not truthful when submitting their payroll certifications. See Part. Decert. Order at 17. Dollar Tree has subsequently provided evidence that 111 class members indicated the same. Vandall Decl. ISO Objections to Ngo Decl. at ¶ 4.

expert Crandall was based on old data compiled prior to the narrowing of the class, and that there are a large number of weeks for which class members did not fill out certification forms.  Id. Similarly, in Plaintiffs' motion for reconsideration filed on April 22, 2011, Plaintiffs argued that "[r]ecent events . . . have revealed that Dollar Tree's [payroll certification] records are wrought with problems and have therefore provided an unreliable basis by which to establish eligibility for class membership."  ECF No. 301 at 1.

Plaintiffs now argue that the certification forms are indeed reliable common proof of how class members were spending their time.  Pls.' Br. at 8-10.  Their argument, however, amounts to nothing more than pointing to the Court's determination in the Partial Decertification Order and noting that Dollar Tree has used the process for years.  Id.  This does nothing to overcome the fact that a majority of class members have stated under oath that their certifications were not truthful or did not accurately reflect the time they actually spent performing the tasks listed on the form.

In sum, the Court's certification of the current class was premised on the reliability of the payroll certifications as common proof of misclassification.  Subsequent briefing by both parties has made this premise no longer sustainable.  As a result, it is no longer possible to view the negative responses as, in the words of the Supreme Court, the "glue" that holds all of the individualized experiences of the class members together.  See Dukes, 2011 U.S. LEXIS 4567, at *24.

///

///

15

## 2. Representative Testimony Cannot Properly Serve as
## Common Proof of Class-wide Liability in This Case

Plaintiffs indicated in their trial plan that they intend to make representative testimony "the crux" of their case.  Pls.' Mot. for Pretrial Order at 6 ("exemplar plaintiffs' testimony will be the crux of the Plaintiffs' case"); id. at 8 ("the liability issues in this case should be driven by the actual work performed by the class members as evidenced by the exemplar plaintiffs' testimony.").  They now contend that this Court already decided that representative testimony of exemplar plaintiffs would be binding on the rest of the class when it chose to certify this case as a class action.  Pls.' Br. at 19.  According to Plaintiffs, "this Court should simply order that the testimony of five exemplar plaintiffs will be extrapolated to the class as a whole."  Id.  The Court declines to do so.  In its Partial Decertification Order, the Court noted that "representative testimony seems appropriate as part of Plaintiffs' case-in-chief."  Part. Decert. Order at 21 n.5. However, as the order makes clear, this statement was premised on the determination that the payroll certifications provided the glue necessary to justify extrapolation from a subset of class members to the class as a whole.  As explained above, this conclusion is no longer tenable.

Courts in this district have repeatedly decertified classes in overtime exemption cases where Plaintiffs have provided no reliable means of extrapolating from the testimony of a few exemplar class members to the class as a whole.  In Marlo I, the Court explained that:

Plaintiff's evidence at trial primarily would be

16

**United States District Court**
For the Northern District of California

1  individual [class members'] testimony . . . .  The
2  exempt/non-exempt inquiry focuses on what an employee
   actually does.   The declarations and deposition
3  testimony of [class members] submitted by the parties
   suggest variations in job duties . . . .  Without more
4  than this individual testimony, the Court cannot
   conceive how the overtime exemption will be presented
5  to the jury as a common issue for class-wide
   adjudication, as opposed to a number of individualized
6  inquiries.

7

8  251 F.R.D. at 486.  The court decertified the class because the

9  plaintiff failed "to provide common evidence to support

10 extrapolation from individual experiences to a class-wide judgment

11 that is not merely speculative."  Id.  The Ninth Circuit affirmed,

12 as explained supra.  See also Wells Fargo II, 268 F.R.D. at 612

13 (denying class certification in overtime exemption case because

14 differences among class members rendered representative testimony

15 insufficient common proof of misclassification); Whiteway v. FedEx

16 Kinkos Office and Print Servs., Inc., No. 05-CV-02320 (N.D. Cal.

17 Oct. 2, 2009) (decertifying class in overtime exemption case

18 because plaintiff could not show how testimony of 10-20 class

19 members could be extrapolated to the class).

20      Because it is no longer viable to consider the payroll

21 certifications reliable common proof of how class members were

22 spending their time, there is no basis for distinguishing this case

23 from those in which this district has found certification improper.

24 As in those cases, the failure of Plaintiffs here to offer a basis

25 for extrapolation of representative testimony to the class as a

26 whole is fatal to continued certification.

27 ///

28 ///

17

**United States District Court**
For the Northern District of California

### 3. <u>Plaintiffs' Other Evidence Does Not Provide Common</u>
### <u>Proof of How Class Members Spent Their Time</u>

Plaintiffs contend that, even if the payroll certification forms are not reliable, class-wide liability may be tried by a plethora of other common evidence. Pls.' Br. at 10. Plaintiffs have presented evidence of Dollar Tree's centralized operational and human resources hierarchy. <u>See</u> <u>Runnings</u> action, ECF No. 124 ("Pls.' Am. Mot. for Class Cert."). They have likewise presented evidence that all store managers are given uniform training and training-related materials, use the same on-the-job tools, receive "daily planners" that require them to perform certain tasks, and are subject to other Dollar Tree policies intended to standardize the experiences of all store managers. <u>Id.</u>

While this evidence does provide some proof that class members shared a number of common employment experiences, it does not provide common proof of whether they were spending more than fifty percent of their time performing exempt tasks. As the Ninth Circuit explained in <u>Marlo II</u>, the existence of "documents explaining the activities that [managers] are expected to perform, and procedures that [managers] should follow . . . does not establish whether [the managers] actually are 'primarily engaged' in exempt activities during the course of the workweek." 2011 U.S. App. LEXIS 8664, at *13. This evidence is therefore insufficient to establish that common issues will predominate over individualized ones at trial.

///

///

///

18

United States District Court
For the Northern District of California

V.    <u>CONCLUSION</u>

    For the foregoing reasons, the Court finds that continued class treatment is not appropriate in this case and DECERTIFIES the class.  The Court invites Class Counsel to file a motion to equitably toll the statute of limitations on the misclassification claims of former class members to preserve their right to pursue individual claims against Dollar Tree.  The Court encourages the parties to resolve this issue by stipulation.

    The parties shall appear for a Case Management Conference on September 9, 2011 at 10:00 a.m. in Courtroom 1, on the 17th floor, U.S. Courthouse, 450 Golden Gate Avenue, San Francisco, CA 94102.


    IT IS SO ORDERED.


    Dated:  July 7, 2011

                                        _____
                                        UNITED STATES DISTRICT JUDGE

# Exhibit U

FILED
2012 Sep-19 AM 11:13
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

| | | |
|---|---|---|
| SUSIE KNOTT, et al., | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | CIVIL ACTION NO. |
| | ) | 7:06-CV-1553-LSC |
| DOLLAR TREE STORES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

| | | |
|---|---|---|
| CHELSIE RICHARDSON, | ) | |
| CYNTHIA ANN COLLINS, | ) | |
| BERYL DAUZAT, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | CIVIL ACTION NO. |
| v. | ) | 7:08-CV-693-LSC |
| | ) | |
| DOLLAR TREE STORES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

The Court has for its consideration Defendant's renewed motion to decertify the collective action. (Doc. 503.) For the reasons expressed in the accompanying Memorandum of Opinion, the Court GRANTS certain of the relief sought in the motion. The above matter is hereby DECERTIFIED as a collective action.

Done this 19th day of September 2012.

L. SCOTT COOGLER

UNITED STATES DISTRICT JUDGE

171032

FILED
2012 Sep-19 AM 11:11
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

| | | |
|---|---|---|
| SUSIE KNOTT, et al., | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | CIVIL ACTION NO. |
| | ) | 7:06-CV-1553-LSC |
| DOLLAR TREE STORES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

_____

| | | |
|---|---|---|
| CHELSIE RICHARDSON, | ) | |
| CYNTHIA ANN COLLINS, | ) | |
| BERYL DAUZAT, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | CIVIL ACTION NO. |
| v. | ) | 7:08-CV-693-LSC |
| | ) | |
| DOLLAR TREE STORES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM OF OPINION

I.    Introduction

    Plaintiffs, who worked at different Dollar Tree Stores throughout the country

as store managers, filed the above actions pursuant to the Fair Labor Standards Act

("FLSA"), 29 U.S.C. § 201 et seq., claiming that they were wrongfully classified as

exempt and thus improperly denied overtime compensation. Pending before this Court

is the Renewed Motion to Decertify the Collective Action (Doc. 503)[1] filed by

Defendant, Dollar Tree Stores, Inc., ("Dollar Tree") as well as the responses thereto

filed by Plaintiffs. After due consideration, the Motion will be granted.

## II.    Background

Dollar Tree owns and operates more than 7,000 retail stores throughout the

United States. Dollar Tree's stores range in size from 4,000 square feet to more than

20,000 square feet. On August 8, 2006, the complaint in this matter was filed as a

collective action pursuant to 29 U.S.C. § 216(b), the FLSA's class action provision.

This Court initially granted class status to Plaintiffs[2] on April 12, 2007, and

simultaneously granted the motion to facilitate notice pursuant to section 216(b).

(Doc. 63.)

From the beginning, this case has proceeded through what can only be described

as a war between the parties over discovery. Regardless, the conflict seems to have

moderated when the Eleventh Circuit Court of Appeals denied Plaintiffs' petition for

a writ of mandamus to block this Court's order requiring them to turn over to Dollar

Tree certain communications between their attorneys and the opt-in Plaintiffs. (Doc.

---

[1] Unless otherwise noted, all document citations are to the lead case 2006-1553-LSC.

[2] Hereinafter, the opt-in class of plaintiffs will be referred to as the "opt-in Plaintiffs," and the collective group of all plaintiffs will be referred to as "Plaintiffs."

475.) These communications arguably demonstrate an effort by Plaintiffs' counsel to influence answers on special interrogatories ordered by this Court.[3] Dollar Tree filed a motion for sanctions against Plaintiffs (Doc. 468), based on what it described as Plaintiffs' efforts to "present false evidence that all Plaintiffs do manual labor and not managerial duties." (Doc. 480 at 7.) This Court denied Dollar Tree's motion for sanctions, pending the briefing of Dollar Tree's decertification motion, with leave to renew the motion following this Court's ruling on the motion to decertify.

Dollar Tree asserts in its present motion (Doc. 503), that the originally certified class is due to be decertified because the members of the class are not "similarly situated." Dollar Tree contends the evidence indicates dissimilar responsibilities and duties among the opt-in Plaintiffs and argues that it should not be forced to defend the current class action with and against representative evidence and testimony. Not surprisingly, Plaintiffs see the members of the present class as sufficiently similar in that they, for the most part, operate under a system of detailed upper management control with little discretion. Plaintiffs assert that Dollar Tree applies the same operational controls to every store regardless of size and because of limited labor budgets, forces all of its managers to spend substantially more than fifty percent of

---

[3]The purpose of which was to aid this Court in determining whether the opt-in Plaintiffs were "similarly situated."

their time performing manual labor. (Doc. 507.)

III.    Discussion

    A.    The Certification Standard

Section 216(b) provides that " [a]n action . . . may be maintained against any employer . . . by any one or more employees for and on behalf of himself or themselves and other employees *similarly situated*."  (emphasis added.)   Thus it is necessary, in order to maintain a collective action under the FLSA, for Plaintiffs to demonstrate that they are similarly situated. *Anderson v. Cagle's Inc.*, 488 F.3d 945, 952 (11th Cir. 2007).

There is no guidance in the FLSA for determining how similar a group of plaintiffs must be before a collective action may proceed, nor has the Eleventh Circuit precisely defined the term "similarly situated." *Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1259 (11th Cir. 2008). The Eleventh Circuit has, however, suggested a two-tiered approach to dealing with collective action certification and notice pursuant to § 216(b). *See Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1218 (11th Cir. 2001). When this Court addressed class certification "at the initial stage, [it] appl[ied] a 'fairly lenient standard' for determining whether the plaintiffs are truly similarly situated." *Anderson*, 488 F.3d at 953. At that stage, "plaintiff[s] ha[d] the burden of showing a 'reasonable basis' for [their] claim that there [were] other similarly situated employees." *Morgan*, 551 F.3d at 1260–61.

At the current stage, "triggered by an employer's motion for decertification . . . [the standard is] . . . less lenient, and the plaintiff[s] bear[] a heavier burden." *Id.* at 1261. The Eleventh Circuit has "refused to draw bright lines in defining *similarly*, but explained that as more *legally significant differences* appear amongst the opt-ins, the less likely it is that the group of employees is similarly situated." *Id.* (emphasis added). The Eleventh Circuit has also observed that "the 'ultimate decision rests largely within the district court's discretion,' and . . . in order to overcome the defendant's evidence, a plaintiff must rely on more than just 'allegations and affidavits.'" *Morgan*, 551 F.3d at 1261 (quoting *Anderson*, 488 F.3d at 953). Further, "although the FLSA does not require potential class members to hold identical positions . . . , the similarities necessary to maintain a collective action under § 216(b) must extend 'beyond the mere facts of job duties and pay provisions.'" *Anderson*, 488 F.3d at 953 (citing *White v. Osmose, Inc.,* 204 F. Supp. 2d 1309, 1314 (M.D. Ala. 2002)). To properly address the issue, this Court must consider several factors, such as: "(1) disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendant[] [that] appear to be individual to each plaintiff; [and] (3) fairness and procedural considerations." *Morgan*, 551 F.3d at 1261 (hereinafter, these three factors will be referred to as the "*Morgan* analysis").

The three factors of the *Morgan* analysis are not mutually exclusive—there is

considerable overlap among them. Each factor directly influences the others. For example, the ability of Dollar Tree to assert its executive exemption defense depends on the experiences and job duties of each individual employee. Also, the more dissimilar Plaintiffs are and the more individuated Dollar Tree's executive exemption defense is, the greater doubts there are about the fairness of a ruling on the merits that is reached on the basis of purportedly representative evidence.

The executive exemption criteria set forth in the Department of Labor's regulations must be considered, as the executive exemption is a defense at issue in this case. The executive exemption, which applies to "any employee employed in a bona fide executive capacity," 29 U.S.C. § 213(a)(1), is an affirmative defense to the FLSA's requirement that employees be paid overtime hours at time and one-half the regular rate of pay. *Id.* § 207(a)(1); *Morgan*, 551 F.3d at 1265. "To establish an employee is a bona fide executive, an employer must show: (1) the employee is '[c]ompensated on a salary basis at a rate of not less than $455 per week'; (2) the employee's 'primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof'; (3) the employee 'customarily and regularly directs the work of two or more other employees'; and (4) the employee 'has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or

any other change of status of other employees are given particular weight.'" *Morgan*,

551 F.3d at 1266 (quoting 29 C.F.R. § 541.100(a)).[4]

Neither party substantively addresses whether all Plaintiffs are compensated on

a salary basis at the requisite rate or whether all Plaintiffs customarily and regularly

direct the work of two or more other employees; so, for the purposes of this opinion

these two prongs are met as to each Plaintiff.[5] Therefore, the only elements where

Plaintiffs must show substantial similarity are: (1) whether Plaintiffs' primary duty is

management, and (2) whether Plaintiffs have the authority to hire or fire other

employees or whether their suggestions and recommendations as to the hiring, firing,

advancement, promotion, or any other change of status of other employees are given

particular weight.

## B.    Application of *Morgan* Analysis

### 1.    Differences in Employment Experiences and Job Duties

In order to examine the first factor of the *Morgan* analysis, the extent to which

---

[4]Prior to this test for the executive exemption—effective August 23, 2004—there was no independent requirement that the employee have the authority to hire or fire other employees, or that the employee's recommendation be given particular weight. Instead, the "old regulations" "considered the selection of employees as a management task under the primary duty inquiry." *Morgan*, 551 F.3d at 1267 n.51.

[5]Such a finding would benefit Dollar Tree on the overall issue of whether the executive exemption applies, but would benefit Plaintiffs on the current issue of whether the opt-in Plaintiffs are "similarly situated" for purposes of section 216(b) certification.

Plaintiffs' relevant employment experiences and job duties as Dollar Tree employees were similar or disparate, a separate examination of both the "primary duty" and "authority to hire or fire" factors of the executive exemption test is necessary.

### i.    Primary Duty of Management

An employee's "primary duty" is "the principal, main, major or most important duty that the employee performs." 29 C.F.R. § 541.700(a). "Determination of an employee's primary duty must be based on all the facts in a particular case, with the major emphases on the character of the employee's job as a whole." *Id.* The regulations define "management" to include:

> activities such as interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures.

*Id.* § 541.102. The current regulations list several non-exclusive factors to consider in determining the primary duty of an employee, including: (1) "the relative importance of the exempt duties as compared with other types of duties;" (2) "the amount of time

spent performing exempt work;" (3) "the employee's relative freedom from direct supervision;" and (4) "and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee." *Id.* § 541.700(a).[6]

The current regulations also note that "employees who spend more than [fifty] percent of their time performing exempt work will generally satisfy the primary duty requirement." *Id.* § 541.700(b). That is, they will generally be considered as exempt. It appears from the evidence submitted to the Court that a majority of the opt-ins who responded to discovery directed at the issue of their performance of "manual labor" may well have spent more than fifty percent of their time at work performing "manual labor" rather than "exempt work." (Doc. 505-3.)[7] If that were all that need be considered, this Court's opinion addressing the motion to decertify the existing class would be much more concise. Regrettably, it is not. "Employees who do not spend more than [fifty] percent of their time performing exempt duties may nonetheless meet the primary duty requirement if the other factors support such a conclusion." 29 C.F.R. § 541.700(b). "In other words, an employee's performance of nonexempt work does

---

[6]The old regulations included "the frequency with which the employee exercises discretionary powers." *Morgan*, 551 F.3d at 1268.

[7]This Court has not checked each evidentiary citation made by Plaintiffs in their chart but assumes that they are substantially accurate in noting the testimony.

Page 9 of 21

not preclude the exemption if the employee's primary duty remains management." *Morgan*, 551 F.3d at 1268-69.

In addition, "[c]oncurrent performance of exempt and nonexempt work does not disqualify an employee from the executive exemption if the requirements of [executive employee status] are otherwise met." *Id.* § 541.106(a). "Whether an employee meets the requirements of [executive employee status] when the employee performs concurrent duties is determined on a case-by-case basis and based on the factors set forth in § 541.700." *Id.* In this case, many Plaintiffs have admitted to simultaneously performing exempt and nonexempt work. (Doc. 504 at 49-50.) Therefore, it would be impossible to determine whether Plaintiffs are "similarly situated" based solely on the fact that most, if not all of them, spent over fifty hours per week on nonexempt work. Rather, this Court must consider Plaintiffs individually, on a case by case basis, to see if they are truly "similarly situated."

In this case, Plaintiffs differ in the type and amount of work they performed in several ways. Some work in large stores with more associates to manage, while others work in smaller stores with less management needed and thus more time available to perform manual labor. (Doc. 504-20 at 18–19; Doc. 504-40 at 13; Doc. 504-49 at 13; Doc. 504-92 at 17.) A store's location may also contribute to differences among Plaintiffs. A store in a high-crime location may require Plaintiffs to spend more time

managing safety, securing the store, and protecting company assets (Doc. 504-71 at 47; Doc. 504-72 at 27–28.), while a store in a high-income location may require Plaintiffs to spend more time interviewing and training associates because of high turnover. (Doc. 504-85 at 11–12.)

Plaintiffs also differed in the type and amount of work they performed in several other respects.[8] First, their responsibilities for setting and adjusting the associates' rates of pay differed. Setting and adjusting an employee's rate of pay is defined as "management" by the regulations. 29 C.F.R. § 541.102. Some Plaintiffs' recommendations for pay raises were frequently or almost always followed. (Doc. 504-85 at 34; Doc. 504-72 at 54–56; Doc. 504-54 at 17; Doc. 504-55 at 40–41; Doc. 504-31 at 43; Doc. 504-27 at 65–66.) Other Plaintiffs' recommendations were rarely or never followed, or recommendations were never made. (Doc. 504-19 at 74-75; Doc. 504-51 at 62; Doc. 504-88 at 70; Doc. 504-50 at 39; Doc. 504-87 at 43; Doc. 504-23 at 72; Doc. 504-30 at 74.)

Second, Plaintiffs' authority to discipline other employees varied. Disciplining employees is also defined as "management" by the regulations. 29 C.F.R. § 541.102. Some Plaintiffs could issue a variety of written discipline to all types of associates.

---

[8] For the sake of brevity, this Court does not list each example of or citation to a named difference in Plaintiffs' circumstances. Those listed sufficiently demonstrate the substantial variations.

(Doc. 504-50 at 23; Doc. 504-42 at 46; Doc. 504-93 at 32–33; Doc. 504-61 at 52; Doc. 504-48 at 43; Doc. 504-81 at 18.) Others had little control over disciplinary action. (Doc. 504-55 at 12; Doc. 504-76 at 33–35; Doc. 504-90 at 27–28; Doc. 504-58 at 27; Doc. 504-43 at 43–45; Doc. 504-89 at 52.)

Third, Plaintiffs were vested with varying degrees of authority regarding associate performance evaluations, another exempt "management" activity. 29 C.F.R. § 541.102. Some Plaintiffs performed evaluations with little or no district manager input. (Doc. 504-18 at 57-58; Doc. 504-42 at 41; Doc. 504-45 at 40–41; Doc. 504-67 at 26, 38; Doc. 504-88 at 31; Doc. 504-93 at 29, 41.) Others had constant input and assistance from district managers, never performed evaluations, or performed very few. (Doc. 504-61 at 39; Doc. 504-37 at 20; Doc. 504-30 at 53-54; Doc. 504-59 at 20; Doc. 504-20 at 55–56.)

Fourth, the amount of time Plaintiffs spent training associates varies. Training employees is defined as "management" according to the regulations. 29 C.F.R. § 541.102. While several testified that they were responsible for training associates (Doc. 504-37 at 16; Doc. 504-20 at 30; Doc. 504-81 at 18; Doc. 504-87 at 53), many never trained associates or delegated their duty and spent very little time training. (Doc. 504-43 at 24; Doc. 504-27 at 84; Doc. 504-18 at 22–23; Doc. 504-94 at 34, 49; Doc. 504-78 at 47.) In contrast, others spent a significant amount of time training associates. (Doc.

Page 12 of 21

504-5 at 111–12; Doc. 504-31 at 47–48; Doc. 504-34 at 24–25; Doc. 504-93 at 44; Doc.

504-35 at 55, 63.)

Fifth, the amount of time Plaintiffs spent directing the work of store associates

varies. Directing the work of employees is another "management" activity. 29 C.F.R.

§ 541.102. Some Plaintiffs spent a significant amount of time performing this exempt

duty. (Doc. 504-4 at 27; Doc. 504-50 at 41,45; Doc. 504-5 at 102, 111.) Others spent

very little time or never directed the work of store associates. (Doc. 504-22 at 23-24;

Doc. 504-46 at 23-24; Doc. 504-88 at 35; Doc. 504-51 at 89; Doc. 504-5 at 42; Doc.

504-43 at 50–51.)

Sixth, some Plaintiffs spent significantly more time processing reports related

to store sales, personnel, and operations than others. Maintaining production or sales

records for use in supervision or control is defined as "management" by the

regulations. 29 C.F.R. § 541.102. Some processed reports every day, or spent a

significant amount of time doing so (Doc. 504-93 at 20, 45; Doc. 504-3 at 20; Doc.

504-4 at 27; Doc. 504-5 at 33.), while others spent very little time processing reports

or never did so. (Doc. 504-5 at 14, 111; Doc. 504-3 at 37, 80; Doc. 504-22 at 28.)

Seventh, Plaintiffs spent different amounts of time managing safety, securing

the store, and protecting company assets. "[P]roviding for the safety and security of

the employees or the property" is a management duty according to the current

Page 13 of 21

regulations. 29 C.F.R. § 541.102. Some of them spent a significant amount of time performing these duties. (Doc. 540-5 at 24, 102; Doc. 540-4 at 27, 63, 115; Doc. 540-93 at 29; Doc. 504-50 at 38–39; Doc. 504-36 at 21.) Others were too busy performing other tasks to spend any time managing safety, securing the store, or protecting company assets. (Doc. 504-61 at 41; Doc. 504-55 at 42; Doc. 504-52 at 76, 90; Doc. 504-31 at 44.)

While the differences in the amount of time spent on any individual act of "management," such as training associates, might not seem material, these differences as a whole could ultimately lead to differing conclusions as to each employee's "primary duty." Furthermore, even if every Plaintiff spent a similar amount of time performing "management" duties as a whole, the relative importance of the different types of exempt work performed may also lead to differing "primary duty" determinations. If each Plaintiffs' claims were tried separately, the primary duty of some would no doubt be found to be management, while the primary duty of others would not. Thus, this factor in the *Morgan* analysis tends to show that Plaintiffs are not similarly situated regarding their primary duty.

### ii. Authority to Hire or Fire or Recommendations given Particular Weight

In this case, Plaintiffs' authority to hire employees varied. Some hired associates

unilaterally (Doc. 504-59 at 21-24; Doc. 504-67 at 56-57; Doc. 504-1 at 7.), while others simply made recommendations. (Doc. 504-1 at 9.) There are some who neither hired associates nor made recommendations. (Doc. 504-56 at 17.) In addition, their authority to fire employees also varied. Some could terminate an associate without a district manager's approval (Doc. 504-1 at 17.), and others could only make termination recommendations. (Doc. 504-1 at 15-16.)

Even though the authority vested in Plaintiffs to hire or fire associates differs among members of this class, the *Morgan* analysis may still favor a finding that the class is similarly situated if their recommendations were all given " particular weight." 29 C.F.R. § 541.100(a). The current regulations list several non-exclusive factors to consider in determining whether an employee's suggestions and recommendations are given "particular weight," including: (1) "whether it is part of the employee's job duties to make such suggestions and recommendations;" (2) "the frequency with which such suggestions and recommendations are made or requested;" and (3) "the frequency with which the employee's suggestions and recommendations are relied upon." 29 C.F.R. § 541.105. The regulations go on to note that "[a]n employee's suggestions and recommendations may still be deemed to have 'particular weight' even if a higher level manager's recommendation has more importance and even if the employee does not have authority to make the ultimate decision as to the employee's change in status." *Id.*

Page 15 of 21

These factors tend to show dissimilarity among Plaintiffs regarding the weight their recommendations were given. For example, the frequency that each of them made recommendations varies, as does the frequency that those recommendations were relied upon. For example, for many Plaintiffs, their recommendations were always accepted. (Doc. 504-20 at 37; Doc. 504-24 at 28, 29; Doc. 504-26 at 44–45; Doc. 504-47 at 35; Doc. 504-89 at 23.) The recommendations of many others were usually accepted. (Doc. 504-50 at 31; Doc. 504-36 at 29; Doc. 504-93 at 39, 40; Doc. 504-23 at 24–25; Doc. 504-27 at 22, 64; Doc. 504-40 at 41.) Some of them stated that their recommendations were only occasionally accepted. (Doc. 504-88 at 26–27; Doc. 504-70 at 72; Doc. 504-18 at 15; Doc. 504-19 at 14; Doc. 504-35 at 16; Doc. 504-45 at 19–20, 16.) Finally, a few of them related that their recommendations were rarely accepted. (Doc. 504-48 at 9–10; Doc. 504-66 at 19–20; Doc. 504-63 at 36.)

These differences in the frequency with which recommendations were made and accepted could ultimately lead to differing conclusions as to whether an employee's recommendations were given "particular weight." If each Plaintiffs' claims were tried separately, the recommendations of some would be found to be given particular weight, while the recommendations of others would not. Thus, this factor of the *Morgan* analysis tends to show that Plaintiffs are not similarly situated regarding their ability to hire or fire, or regarding the weight given to their recommendations.

Page 16 of 21

2.     Extent Dollar Tree can assert its executive exemption defense
       on a collective or individual basis

The Court now turns its attention to the second factor of the *Morgan* analysis, whether there are defenses individual to each Plaintiff. While "applying the executive exemption is 'an inherently fact-based inquiry' that depends on the many details of the particular job duties and actual work performed by the employee seeking overtime pay," this "does not preclude a collective action where plaintiffs share common job traits." *Morgan*, 551 F.3d at 1263 (quoting *Rodriguez v. Farm Stores Grocery, Inc.*, 518 F.3d 1259, 1263 (11th Cir. 2008)).

Plaintiffs argue that this case is similar to *Morgan* because there is "scant evidence to support [the] argument" that "the duties of store managers varied significantly depending on the store's size, sales volume, region, and district." (Doc. 507 at 16; *Morgan*, 551 F.3d at 1263.) Plaintiffs further argue that Dollar Tree operates under a policy of "classify[ing] all General Managers as exempt, regardless of their store size, location, salary, or any other factor," similar to the defendant in *Morgan*, and these facts "weigh heavily in favor of a finding of similarly situated." (Doc. 507 at 14.) However, *Morgan* was not decided solely on the defendant's classification of its employees. Rather, "[g]iven the volume of evidence showing the [plaintiffs] were similarly situated, and the fact that [the defendant] applied the executive exemption

across-the-board to every store manager–no matter the size, region, or sales volume of the store" the defendant did not show " clear error in the district court's finding that its defenses were not so individually tailored to each [p]laintiff as to make [the] collective action unwarranted or unmanageable." *Morgan*, 551 F.3d at 1263. In that case, the Eleventh Circuit determined that the district court did not abuse its discretion when it determined that a § 216(b) class of plaintiffs was similarly situated based on several findings of similarity.[9] This case is different for two reasons.

First, there is not an abundance of evidence in this case showing that Plaintiffs are similarly situated. On the contrary, the other evidence, specifically the depositions and special interrogatories, tends to show substantial differences between the multiple

---

[9]Specifically, the district court found that opt-in plaintiffs were similar in a number of respects, including:

> (1) their universal classification as store managers with the same job duties; (2) the small fraction of time they spent on managerial duties; (3) the large amount of time they spent on non-managerial duties such as stocking shelves, running the cash registers, unloading trucks, and performing janitorial work; (4) the restrictions on their power to manage stores as compared to the district manager's sweeping managerial discretion; (5) the amount of close district manager supervision of store managers; (6) the lack of managerial discretion that Family Dollar corporate policies afforded to store managers; (7) their day-to-day responsibilities; (8) their receiving base salaries regardless of the hours worked and no overtime pay; (9) their sharing certain managerial duties with hourly employees; (10) their maintaining production and sales records; (11) their inability to authorize pay raises; (12) their power to train subordinates; (13) their restricted authority to close stores in the event of emergencies; and (14) their inability to select outside vendors without district manager approval.

*Id.* at 1262-63.

Plaintiffs' job duties and the potential importance of those duties. (*See supra* Part
III.B.1.) Some Plaintiffs were given significant authority and autonomy to run their
stores, while others could essentially be described as shelf-stockers. To make a ruling
based on the representative testimony of some Plaintiffs—specifically those with less
authority and autonomy to run their store—would be unfair to Dollar Tree.[10]

Second, in affirming the district court's decision, the Eleventh Circuit in
*Morgan* was simply deciding that the district court had not abused its discretion by
finding the multiple plaintiffs similarly situated. It does not necessarily follow that a
contrary ruling would have been an abuse of the district court's discretion. This
argument is exceedingly persuasive in the case at hand given the abundance of
evidence showing that Plaintiffs are not similarly situated.

While Dollar Tree applied its executive exemption across-the-board, the defense
is individuated in this case as Plaintiffs' job duties and employment experiences vary
dramatically. Although some may have performed uniform tasks mandated by a
corporate manual, others routinely exercised their independent judgment and the
amount of time they spent performing managerial duties is a matter of individual

---

[10]Dollar Tree also argues that the opt-in Plaintiffs' due process rights would be violated if
this Court rules in favor of Dollar Tree based on representative testimony of some of those opt-in
Plaintiffs. This is not a concern, however, as they must "opt-in" in order to assert their rights,
unlike an "opt-out" class action where a plaintiff class member must affirmatively act to be
excluded from the outcome.

inquiry. Furthermore, Dollar Tree may be able to apply the exemption to different Plaintiffs based on different circumstances. Even if every Plaintiff spent similar amounts of time performing exempt job duties as a whole, because they performed a wide array of differing exempt job duties with varying degrees of importance, one group of them cannot reasonably be said to be representative of them all. Thus, a one-size-fits-all determination is impossible. For these reasons, the second factor of the *Morgan* analysis tends to show that Plaintiffs are not similarly situated.

### 3. Fairness and Procedural Concerns

Finally, the Court turns to the third factor of the *Morgan* analysis, whether it would be just to collectively and finally adjudicate Plaintiffs' claims on the representative evidence before the Court. This determination is made in light of the purposes of FLSA class actions: "(1) reducing the burden on plaintiffs through the pooling of resources, and (2) efficiently resolving common issues of law and fact that arise from the same illegal conduct." *Morgan*, 551 F.3d at 1264.

A collective action in this case would certainly reduce the burden on Plaintiffs, as they would not be forced to adjudicate their respective claims in multiple different courts. Furthermore, "[t]here is nothing inherently unfair about collectively litigating an affirmative executive-exemption defense [if a court makes] well-supported and detailed findings with respect to similarity." *Morgan*, 551 F.3d at 1264. This Court,

however, is unable to make such findings here. While the executive-exemption defense is common among all Plaintiffs, there is an abundance of evidence concerning their differences. Because it is an extensively fact-based inquiry, these differences directly affect an assessment of the executive-exemption for each individual Plaintiff. It would be fundamentally unfair to Dollar Tree if the class were to remain certified. The efficiency gained by holding one trial as opposed to many cannot be obtained at the expense of Dollar Tree's due process rights.

VI.    Conclusion.

     For the reasons set forth above, Dollar Tree's Renewed Motion to Decertify the Collective Action will be granted. A separate order will be entered.

     Done this 19th day of September 2012.

L. SCOTT COOGLER
UNITED STATES DISTRICT JUDGE

171032

# Exhibit V

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

OSCAR MOLINA,

             Plaintiff,

v.

DOLLAR TREE STORES, INC.,

             Defendants.

Case No.  CV 12-1428- BRO (FFMx)

**FINDINGS OF FACT AND CONCLUSIONS OF LAW AFTER COURT TRIAL**

## I.

## INTRODUCTION

On October 30, 2012, Defendant Dollar Tree Stores, Inc. ("Dollar Tree") removed this action for damages, alleging, among other things, a violation of:  (1) California Business and Professions Code section 17200; (2) California Labor Code sections 510, 1194,  1198 for failure to pay overtime compensation; (3)  California Labor Code sections 226, for failure to provide itemized wage statements; (4) California Labor Code sections 201, 202, and 203, for failure to provide wages when due; and, (5) California Labor Code section 2699.3, Private Attorney General Action ("PAGA").  (Dkt. No. 1.)  The court has federal diversity jurisdiction pursuant to 28 U.S.C. section 1332. The parties waived their right to a jury trial.

On November 5 through November 8, 2013, and November 19, 2013, the Court tried this matter. After consideration of the parties' trial briefs, the witnesses and evidence presented by both sides at trial in the case, as well as arguments of counsel, and Plaintiff's objections to Defendant's Proposed Findings of Fact and Conclusions of Law, the Court makes the following Findings of Fact and Conclusions of Law.[1]

## II.

## FINDINGS OF FACT

A. Admitted Facts

Plaintiff Oscar Molina and Defendant Dollar Tree admitted certain facts, which the Court finds as true.

1. Dollar Tree operates more than 4,000 retail stores in the United States and Canada with over 360 stores in California.

2. Dollar Tree sells a variety of items at a one dollar price point in many of its stores.

3. Dollar Tree reports revenues in excess of $6.6 billion.

4. Molina began his employment as a non-exempt associate in 2004 and was promoted to the Store Manager position in December 2005.

5. Molina worked for Dollar Tree as a Store Manager in the Westminster, California store from July 20, 2008 through February 16, 2011 and from May 12, 2011 until December 31, 2011.

6. Dollar Tree terminated Molina's employment on December 31, 2011.

7. Molina earned an annual salary ranging from $46,350 to $47,277, as a Store Manager. This amount did not include any bonuses.

8. From July 5, 2007 to July 5, 2008, Molina earned an annual base salary of $45,000, which did not include bonuses.

---

[1] Any finding of fact which constitutes a conclusion of law is hereby adopted as a conclusion of law.

9. From July 6, 2008 to July 11, 2009, Molina earned an annual base salary of $46,350, which did not include bonuses.

10. From July 12, 2009 to December 31, 2011, Molina earned an annual base salary of $47, 277, which did not include bonuses.

11. Dollar Tree classified Molina as an exempt employee during his tenure as a Store Manager.

12. During Molina's tenure as a Store Manager, he was expected to schedule the hours he would be at the store and available.

B. Trial Testimony

The following summarized testimony reflects the testimony presented to the Court in the order in which it was presented.

   *1. Oscar Molina*

Molina would schedule employee hours through Dollar Tree's Compass scheduling program. In so doing, he would take into account sales per employee hours. Dollar Tree limited the number of employee hours based upon projected sales. David Peachey would review Molina's scheduling of employee hours. Molina spent time completing schedules, counting employee tills and responding to emails. In Exhibit 14, Molina certified that he spent no more than 35 per cent of his time on non-exempt duties, that is, non-supervisory duties such as receiving stock, distributing, storing and re-stocking product, preparing the store and cashiering.

A representative from Dollar Tree telephoned Molina in March 2009. The representative asked Molina why he was certifying, "no" on his certification of duties.

Previously, in February 2008, Dollar Tree employee Reed Balderas telephoned Molina and asked him why he was stating "no" on his duty certifications. During his deposition, Molina testified that he did not remember the second telephone call of March 2009.

Exhibit 12[2] is Molina's July 2008 to July 2009 performance evaluation from his supervisor, Matt Rodrigues. His overall rating was "meets expectations". Molina did not meet his budgeted payroll hours. His appraisal cautioned him to "lead by example, Don't be the first one to leave or not show at a work party." Exhibit 5 is Molina's performance appraisal from July 2009 to July 2010. The appraisal stated that Molina missed his payroll budget by $4 and detailed Molina's need to work on his "first-of-the-month displays" as well as become more aggressive in merchandising. Exhibit 6 is Molina's performance appraisal from July 2010 to July 2011, given to Molina by Dollar Tree District Manager Matthew Franz. Molina received an overall rating of "unsatisfactory". Exhibit 7 details discipline imposed upon Molina by Matthew Rodrigues based upon Molina's unsatisfactory performance during the period from December 2010 to January or February 2011. The appraisal specified that Molina had changed his schedule and was absent from work without notifying his supervisor, in violation of company policy. Exhibit 8 is an email to Reed Balderas. It states that Molina left the store on three days without notifying his superior, did not report for work on two days and worked less than one-half of his

---

[2] The Court refers only to exhibits which were received in evidence.

shift one day.

Molina lied on his resume, introduced in evidence as Exhibit 1. Specifically Molina did not complete four years of high school and did not graduate from high school. Molina also answered "no" when asked whether he had ever been convicted of a felony. Molina was previously convicted of a felony.[3] When previously reviewing Exhibit 12, Molina did not challenge the accuracy of the transactions; however, when testifying at trial, Molina challenged the accuracy of Exhibit 12.[4] The Court accepts the accuracy of Exhibit 12.

Molina also falsified the initials of another Dollar Tree employee and took the deposit to the bank by himself, in violation of company policy. Comparing Exhibits 41, 251, 252, 253 and 254 demonstrates that Molina lied when he stated he worked alone on December 29, 2008 because Richard Aguilar initialed the deposit slip along with Molina. Molina lied when he maintained that he worked alone, took the deposit to the bank by himself and forged Aguilar's initials. Exhibit 254 is a cash register transaction report showing Aguilar signed on to a cash register. Molina admitted that Dollar Tree employees, such as Anay Gomez or Richard Aguilar, forgot to clock in. *See* Exhibit 123. Molina admitted that he might have left for lunch and not returned

---

[3] Molina claimed that his parole officer told him that he (Molina) was not required to disclose his prior felony conviction because it was over 7 years old. In any event, Molina's conviction was not 7 years old, rather it was five years old. The Court finds this testimony not credible.

[4] The Court finds Exhibit 12 to be accurate and finds Molina's testimony to the contrary not credible.

until the end of his shift. He claimed that this conduct occurred only when he was "going through his troubles."

Molina also falsely testified that he requested a leave of absence from Dollar Tree because he was having emotional problems with his girlfriend. Previously, Molina was asked in deposition whether his relationship had anything to do with his requesting a leave, to which Molina responded, "not really." The Court credits Mr. Molina's deposition testimony, not his trial testimony.

Molina created a resume, Exhibit 3, detailing his job experience at Dollar Tree. Molina describes his job duties as managing up to 40 employees at peak times, overseeing "all aspects of the business", "training associates", "delegation of tasks," ordering, scheduling associates, inventory control, as well as the "overall presentation and maintenance, protecting all company assets." While at Dollar Tree, Molina hired approximately 100 people, the majority of which he interviewed by himself. Molina also assigned job priorities to his associates. The employees numbered between 12 and 40; Molina had discretion to assign the number of associates he felt appropriate, within the amount of hours. In scheduling hours, Molina went over the allotted hours. Molina's store manager manual stated his responsibility to plan, delegate and follow up on all activities within the store.

Molina admitted using his judgment to schedule workers, including changing cashier hours, freight processors, and sales recovery personnel. Molina also trained and cross-trained these employees. Exhibit 197, for example, lists 25 employees with

6.

362.39 employee hours.   Molina also ordered freight.  Dollar Tree required Molina to plan, delegate and follow up on all activities within the store.  Exhibit 197 also details 75 hours allotted to receipt and merchandise a load of freight consisting of 97 cartons. Molina was also responsible for reviewing a "break variance report" and to schedule employees in a fashion so that they could take their breaks.  With the Appleseed planner, Exhibit 127, Molina scheduled various employees to fill back stock, fill impulse drinks, stationery, housewares, u-boats and other tasks.  Molina also evaluated, rated and disciplined his employees, as reflected in Exhibit 60.

### 2. *McDearmon Testimony*

Mr. David McDearmon worked as the Director of Human Resources for Store Operations for Dollar Tree since 1998.  His team oversees staffing support as well as manpower planning support. His team provides support to the district managers with soliciting and screening store manager level candidates. The team also assists regional directors with soliciting and screening district manager level candidates, among other tasks. Molina would have completed both assistant manager training as well as store manager training.  The training consists of learning the operational management aspects of the store which is the front end cash handling and so forth, learning the backroom freight flow processing, and then dealing with the general merchandising, sales component of the store. When Molina was promoted, there was less specific training from the assistant manager to manager position. Dollar Tree implemented the revised training to decrease the number of unsuccessful store managers.

Exhibit 19 reflects the store manager certification process. When a store manager listed 'No" in response to the question whether they were spending more than 50 per cent of their time on non-managerial tasks, they would be required to explain the reason. McDearmon directed his team to follow up with the managers who responded "no" and have an "open conversation" with them to discover the problem. After discussing the problem, the two would "partner" with the right person to "alleviate the problem." However, discipline would not be tied to certifying "no", rather whether the person was appropriately managing his store.

Exhibit 15 reflects a log detailing a conversation McDearmon's, along with his team member, had with Molina. They asked Molina why he certified "no" on his report. Molina responded that he believed that his payroll hours were the principle reason he spent his time on non-managerial tasks. Exhibit 16 details a call between Dollar Tree employee Kathryn Johnson and Molina on March 18, 2009 discussing why Molina certified "no" on his report, representing to spend more than 50 per cent of his time on non-managerial tasks. Exhibit 190 reflects Dollar Tree records, including performance evaluations, showing that on February 8, 2011, Molina, despite being scheduled to work from 7:00 a.m. to 5:00 p.m., failed to notify his supervisor that he would be missing a conference call.

*3. David Peachey Testimony*

Mr. Peachey served as a district manager for Dollar Tree from 2007 to 2009. His district covered Molina's store. His duties included developing store managers.

As a result, he would visit the store managers, review store operations, review company programs, and coach managers. Molina requested additional payroll hours from Peachy.  In order to authorize additional payroll hours, the store manager was required to justify his need, which would be evaluated by the district manager. Depending upon whether the district manager had additional hours, he could approve the request or present the request to the regional manager who would make a decision whether to grant the store additional hours for special projects. Peachey cannot remember whether he spoke to Molina about certifying "no" or expressing displeasure with Molina's certifications.  Peachey communicated Dollar Tree's expectation that Molina work 45 hours per week as a store manager.  In speaking with Molina, Peachey believed Molina understood the policy.  Molina was to schedule himself for 50 hours per week and take a one-hour lunch break.  Peachey communicated this policy to Molina. Peachey would expect that a store manager spend 30 hours per week on managerial duties.

Between July 2008 until early 2009, when Peachey no longer served as the district manager, there were occasions when Molina was not in the store when he was scheduled to be there. For example, one time Peachey called the store looking to speak with Molina, but was told that Molina had left to pick up his children from school. Molina was scheduled to be in the store at that time.  This happened more than once and Peachey told Molina it was okay.

Peachey had conversations with Molina regarding Molina's complaint that he did not have enough payroll hours. Peachey would calculate the needed hours for Molina's store. Peachey would also conduct iVisits, where he would go to the Westminster store when Molina was present, walk through the store and discuss store operations, areas for improvement and areas where the store was performing well. Afterward, Peachey would follow up to ensure that the store manager was focusing on improving the store operations. Exhibits 45-47, 50, 52-58 record iVisits with Molina at the Westminster store.

### 4. Jamie Reyes Testimony

Mr. Reyes served as the part time assistant store manager for the Dollar Tree store in Westminster, when Molina was the store manager. Reyes worked with Molina and more often than not, Molina would not complete his scheduled shift. Molina would leave the store a "couple of hours early."

### 5. Leticia Salgado Testimony

Ms. Salgado is a store manager in training, but worked with Molina from 2009 to 2011 as his assistant manager. Sometimes her shift overlapped with Molina's shift. When Molina worked with Salgado, Molina left the store before the end of his shift. Salgado estimated that if her shift overlapped with Molina's shift four times in one week, Molina would leave early two to three times in the week. Salgado characterized Molina's behavior of leaving early as "routine", with Molina typically saying he was going to make the bank deposit and then not return. Molina instructed Salgado to tell

10.

the district manager that he was at lunch.  Molina also took lunches.  Molina would also step outside of the store to smoke a cigarette.

### 6. *David Flores Testimony*

Dollar Tree employs Mr. Flores as a district manager and in 2011, he supervised the Westminster Dollar Tree where Molina served as the store manager. Mr. Flores investigated a bank report of money missing from a deposit in December 2011. Flores received an email of an overage on one deposit ($40) and shortage on another ($600).  Flores informed Molina of the shortage and Molina expressed surprise, stating that he and Dollar Tree Associate Adrian had gone to the bank to make the deposit. Flores then went to the bank to investigate further. When Flores returned, he again spoke with Molina.  At that time Molina admitted that he (Molina) had forged Adrian's initials and had taken the deposit to the bank by himself, in violation of Dollar Tree policy. On another occasion, Flores visited the Westminster store during Molina's scheduled shift.  Molina was not at the store and had left early. Molina stated it would never happen again.

### 7. *Steven Pearson Testimony*

Mr. Pearson works for Dollar Tree as its Director of Productivity and Store Services, and has done so for the past nine years.  Mr. Pearson achieved a Bachelor's degree in management from Old Dominion University in Virginia and has worked in retail sales for over 20 years.  He worked for 20 years in a grocery chain, before moving to Dollar Tree.  At one point, Pearson served as a retail labor analyst, where

11.

he supported the labor scheduling aspects of the business in terms of through systems and through data reporting and information. In his previous employment, he used a precursor to Dollar Tree's Compass system, Timera. He performed that job for 13 months.

Thereafter, Pearson worked for six months within one of the retail stores doing time studies and process analysis. Pearson defines "time study" as the evaluation and observation of how processes or activities are performed at the store level, measuring how long it takes to perform a particular activity. One can complete a time study by simply timing an associate completing the task or incorporate a "time-and-motion study," where one looks at the various steps putting all the building blocks together to create a standard on how long it takes to accomplish tasks. Pearson assisted Dollar Tree in cross-referencing sales data and transaction data to forecast sales estimates. In addition, Pearson used the sales forecasts to determine a "productivity target" or "sales per employee hour" target. The sales per employee hour divided into their forecast sales yields the number of permissible payroll hours. Pearson takes the sales information, using Compass to help generate those numbers, and then applies the sales-per-employee-hour productivity factor based on that sales projection. Pearson believes those predictors are a realistic predictor of the number of hours the store needs to operate.

According to Pearson, a manager is permitted to modify schedules, switch shifts, or create shifts to meet its business needs. Within 48 hours of freight arriving at the

12.

store, the store manager receives a "DC Delivery Prep Sheet," to assist with arrival of the freight truck. The sheet details the categories of merchandise the store is to receive off of the truck. It also provides the number of "u-boats" or carts necessary to transport the freight, as well as the "stock rate". The "stock rate" is the amount of employee time necessary to unload the freight. Pearson assisted in the development of the stock rates, which vary depending upon the department, but are based upon his timed studies. In calculating the stock rates, Pearson watched "hundreds of associates doing work and thousands of cases." These estimates are not ambitious, but based upon an average person with an average skill set.

In addition, Dollar Tree created Appleseed, a resource for managers for processing freight which implemented the planning principles used by the more successful store managers in order to spread "best practices" throughout the company. Prior to Appleseed, store managers would use a 20-case-per-hour estimate for unloading freight. Each of the best practices materials provided to store managers states that the store manager is responsible for delegating tasks to assistant managers or hourly store employees.

### 8. Paul Jones Testimony

Mr. Jones serves as Dollar Tree's Vice President of Applications and before that, served as the Director of Application Development. In that capacity, Jones was responsible for building and maintaining all Dollar Tree information systems, including freight flow and freight delivery productivity. Exhibit 121 details the

freight deliveries to the store Molina managed, during July 2008 through December 2011. Exhibit 254 lists the sale transaction for Richard A. on 12/29/2008 at 1:59 in the afternoon.

### 9. Jeff Whitmore Testimony

Mr. Whitmore works for Dollar Tree as its Manager of Field Compensation. In that capacity, Mr. Whitmore is in charge of data extraction and reporting information within the computer system. Specifically, Mr. Whitmore extracts data points and fills the data into reports requested. Exhibit 148 lists the hours worked by assistant managers and hourly employees in the store Molina managed. Exhibit 145 indicates that the between July 20, 2007 and December 31, 2011, there were zero hours where Mr. Molina was not spending 80 hours supervising.

### 10. Reed Balderas Testimony

Mr. Balderas is Dollar Tree's Human Resources Manager. Between 2008 and 2011, Balderas once spoke with Molina regarding Molina certifying "no" on his weekly manager certifications as to his duties. Mr. Balderas doesn't remember specifically, but asked Molina why he certified "no." Molina responded, but Balderas did not communicate that response to anyone. To Balderas's knowledge, Molina was not disciplined in any way as a result of his conversation with Balderas. Nor did Molina have his pay reduced in any way as a result of the conversation. In addition, Balderas denies that Molina ever told him that he (Molina) had been convicted of a felony or spent five years in prison.

**11.  Kathryn Johnson Testimony**

Ms. Johnson as worked as Dollar Trees HR Director for Logistics for three years.  In that capacity, she spoke with Molina regarding his certification of "no" on his weekly reports, as well as Molina failing to check anything on certain reports. Molina responded that he wasn't sure what he should be checking, and would follow up with his district manager.  To Johnson's knowledge,  Molina was not disciplined in any way as a result of his conversation with Balderas.  Nor did Molina have his pay reduced in any way as a result of the conversation.

**12.  David Bevilacqua Testimony**

Mr. Bevilacqua works as the Manager of Field Training and Development for the region encompassing the Westminster store which Molina managed.  Exhibit 108 shows email "invitations" to a training session which store managers were expected to attend regarding Appleseed Best Practices.

**13. Ryan Prettyman Testimony**

Mr. Prettyman is employed for Dollar Tree as its Zone Sales Director for the area which includes the Westminster store.  Dollar Tree vests every store manager with discretion to organize over one-half of the end caps in the store.  Dollar Tree asks that some end caps remain uniform, but the rest are left to the discretion of the store manager.  Store managers also have discretion to place items together to increase sales.  Seasonal items are located in the front of the store and arranged by the store manager.  A store manager also chooses which items to order, and in what quantities

15.

for certain areas called "flex space."

C. Credibility Determinations

Ninth Circuit Model Jury Instruction 1.11 provides guidance to jurors when assessing credibility. The factors include: (1) the opportunity and ability of the witness to see or hear or know the things testified to; (2) the witness's memory; (3) the witness's manner while testifying; (4) the witness's interest in the outcome of the case and any bias or prejudice; (5) whether other evidence contradicted the witness's testimony; (6) the reasonableness of the witness's testimony in light of all the evidence; and, (7) any other factors that bear on believability. Ninth Cir. Model Jury Instr. 1.11 (Civil) (2007). The Court finds these factors helpful in assessing the credibility of the witnesses.

First, the Court finds Plaintiff Molina's testimony to be *not credible*. The Court observed his demeanor while testifying. Mr. Molina lied about his felony conviction, seeking to blame his parole officer for his failure to detail his prior felony conviction. Mr. Molina also admitted that he lied with respect to his education, as he did not graduate from high school. Mr. Molina's memory was selective; he remembered certain things when asked by his attorney, but could not remember when asked by opposing counsel. Mr. Molina admitted to forging his associate's signature, and when Mr. Molina stated that he worked alone on December 29, 2008. The Court observed Mr. Molina's demeanor and found his to be evasive at times. His memory was selective. In addition, Mr. Molina has an interest in the outcome of the case. As a

16.

result, the Court finds Mr. Molina to be not credible.

In contrast, the Court finds the testimony of Mr. Molina's associates, Jamie Reyes and Leticia Salgado to be *credible*. The Court observed their demeanor and found them to be credible witnesses. Although they may still work for Dollar Tree and with respect to Ms. Salgado, were given a benefit, their testimony is mutually corroborative. Each witness testified in a straightforward manner. Accordingly, the Court deems their testimony to be *credible*.

With respect to the other Dollar Tree representatives, the Court finds their testimony to be *credible*. The Court observed the demeanor of the witnesses, and found them to be consistent with the documents and with each other. The witnesses responded to questions in a straightforward and forthright manner. They presented as an unbiased witness who simply answered the questions. They held no bias against Mr. Molina. Accordingly, the Court believes the testimony of the Dollar Tree employees, specifically Mr. McDearmon, Mr. Peachey, Mr. Flores, Mr. Jones, Mr. Whitmore, Mr. Balderas, Ms. Johnson, Mr. Bevilacqua and Mr. Prettyman.

## III.

## CONCLUSIONS OF LAW

Plaintiffs alleged five state causes of action against Defendant: (1) unfair competition in violation of California Business & Professions Code section 17200, *et seq.*; (2) failure to pay overtime compensation in violation of California Labor Code sections 510, 1194, and 1198; (3) failure to provide accurate itemized statements in

violation of California Labor Code section 226; (4) failure to provide wages when due in violation of California Labor Code sections 201-203; and (5) a violation of California Labor Code section 2699.3, PAGA. In essence, Plaintiff premises his five causes of action on an allegation that Dollar Tree mischaracterized "Store Managers" as "exempt" employees. "An employee who brings suit under s 16(b) of the Act for unpaid minimum wages or unpaid overtime compensation, together with liquidated damages, has the burden of proving that he performed work for which he was not properly compensated." *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 686-87 (1946).

**A.** Plaintiff Failed to Prove his Case-in-Chief.

*1. Plaintiff's testimony was not credible*

According to Federal Rule of Civil Procedure 52(a)(6), a "the reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility" unless there is clear error. "When findings are based on determinations regarding the credibility of witnesses, Rule 52(a) demands even greater deference to the trial court's findings; for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said." *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 575 (1985); *see also McLaughlin v. Ho Fat Seto*, 850 F.2d 586, 589 (9th Cir. 1988) (according "great deference to the trial court's opportunity to assess the credibility of witnesses").

18.

Here, Mr. Molina was not credible. He lied on multiple occasions, for example his education, his criminal history, working alone and the December 29, 2008 bank deposit incident. Thus, his claims that he consistently worked more than 35 per cent on non-exempt tasks, never took a lunch break and was coerced into certifying yes on his duty certifications are rejected. In contrast, the other witnesses whom the Court found credible directly contradicted Mr. Molina's testimony. For example, Jamie Reyes, and Leticia Salgado testified that Mr. Molina routinely left work early and took lunch. Mr. Balderas testified the Mr. Molina never told him that he (Molina) had been convicted of a felony. As Plaintiff's case consisted predominately of Mr. Molina's testimony and documents which he created, he has failed to meet his burden of proof.

2. *Plaintiff failed to prove that He Worked Overtime or was not Provided Meal Periods.*

a. Plaintiff did not provide competent or credible evidence that he worked overtime hours.

Under California law, an employee is presumptively entitled to overtime compensation for all hours worked in excess of eight hours per day or forty hours per week.[5] Cal. Lab.Code § 510(a); *see Lopez v. United Parcel Serv., Inc.*, No. C08-05396 SI, 2010 WL 728205, at *3 (N.D. Cal. Mar. 1, 2010) (citing Cal. Lab. Code § 501(a)).

California law provides that an employee may provide estimates of time worked

[5] "Federal law interpreting *similar components* of the FLSA exemptions is properly considered as persuasive authority, even if *not binding* on this court." *In re United Parcel Serv. Wage & Hour Cases*, 190 Cal. App. 4th 1001, 1015 (2010).

19.

to prove the existence of unpaid overtime hours and missed meal periods. *Eicher v. Advanced Bus. Integrators, Inc.*, 151 Cal. App. 4th 1363, 1377 (2007). In *Eicher* the Court explained that

> Although the employee has the burden of proving that he performed work for which he was not compensated, public policy prohibits making that burden an impossible hurdle for the employee. [Citation.] '[W]here the employer's records are inaccurate or inadequate and the employee cannot offer convincing substitutes a ... difficult problem arises. The solution, however, is not to penalize the employee by denying him any recovery on the ground that he is unable to prove the precise extent of uncompensated work. Such a result would place a premium on an employer's failure to keep proper records in conformity with his statutory duty; it would allow the employer to keep the benefits of an employee's labors without paying due compensation.... In such a situation we hold that an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference. The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence. If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate.'

*Id.* (quoting *Hernandez v. Mendoza*, 199 Cal.App.3d 721, 727 (Ct. App. 1988)).

"[O]nce an employee proves he or she 'has in fact performed work' that was improperly compensated, and presents enough evidence to allow an inference as to the amount of this work, the burden shifts to the employer to prove the precise amount of work performed or to negate the inference drawn from the employee's evidence." *Amaral v. Cintas Corp. No. 2*, 163 Cal. App. 4th 1157, 1189 (2008) (citation omitted).

Plaintiff argues that he has satisfied the burden of his case in chief by demonstrating that his minimum hours worked were those scheduled in Defendant's Compass system, which hours exceed eight in a workday. (Dkt. No. 156 at 1.) Plaintiff relied on the Compass system records at trial and argues that Defendant "failed to meet its burden of rebutting the inferences raised by Plaintiff's evidence or prove the precise amount of hours worked." (Dkt. No. 156 at 6.) Accordingly, Plaintiff argues that the Compass system is the best evidence of hours worked and *Amaral* applies. *See Hernandez*, 199 Cal. App. 3d at 727 ("[I]n cases such as the present one, where the employer has failed to keep records required by statute, the consequences for such failure should fall on the employer, not the employee. In such a situation, imprecise evidence by the employee can provide a sufficient basis for damages.").

First, Molina controlled the creation of the Compass schedules. In addition, according to the testimony of Peachey, the 50 hours per week which Molina was expected to work included a one-hour lunch break each day. The Court credits the testimony of Peachey. Additionally, Ms. Salgado testified that she never saw Molina work his entire shift when her shift overlapped with his. The Court credits Salgado's testimony. Thus, Plaintiff failed to meet his burden of proof.

> **b.** Plaintiff did not establish that he was not provided an opportunity to take meal and rest breaks

"Cal. Lab. Code § 512(a) requires employees working more than five hours in a shift must be relieved of all work duties for 30 minutes." *Brinker Rest. Corp. v. Super.*

*Ct.*, 53 Cal.4th 1004, 1040-1041 (2012).

An employer satisfies this obligation if it "relieves its employees of all duty, relinquishes control over the activities and permits [employees] a reasonable opportunity to take an uninterrupted 30-minute break and does not impede or discourage them from doing so." *Id*. at 1040. "[T]he employer is not obligated to police meal breaks and ensure no work thereafter is performed." *Id*.

"If an employer's records show no meal period for a given shift over five hours, a rebuttable presumption arises that the employee was not relieved of duty and no meal period was provided. This is consistent with the policy underlying the meal period recording requirement, which was inserted in the IWC's various wage orders to permit enforcement." *Brinker*, 53 Cal. 4th at 1053.

"An employer's assertion that it did relieve the employee of duty, but the employee waived the opportunity to have a work-free break, is not an element that a plaintiff must disprove as part of the plaintiff's case-in-chief. Rather, as the Court of Appeal properly recognized, the assertion is an affirmative defense, and thus the burden is on the employer, as the party asserting waiver, to plead and prove it." *Brinker*, 53 Cal. 4th at 1053.

As stated above, the Court believed the testimony of Peachey that the schedule assumed a one-hour lunch break daily. Moreover, the Court disbelieves Molina's testimony that he never took lunch breaks. Rather the Court credits the testimony of

22.

Salgado, who testified that Molina routinely took a lunch break. Therefore, Plaintiff

has failed to establish that he was not provided an opportunity to take meal and rest

breaks.

    **c.** Defendant carried its burden to show Molina was properly classified as an exempt employee.

"Exempt" employees are not bound by the wage and hour restrictions of

California Labor Code section 510 and as such are not entitled to overtime pay. Wage

Order 7-2001; *see also Lopez*, WL 728205, at *3 (N.D. Cal. Mar. 1, 2010) (quoting

Cal.Code Regs. tit. 8, § 11090(1)(A)(1)). An employer who claims that an employee

is exempt from overtime compensation bears the burden of proving as an affirmative

defense that the exemption applies. *Gomez v. Lincare, Inc.,* 173 Cal.App.4th 508, 516

(Cal. Ct. App. 2009). "Exemptions are narrowly construed against the employer and

their application is limited to those employees plainly and unmistakably within their

terms." *Nordquist v. McGraw-Hill Broadcasting Co.*, 38 Cal. App. 4th 555, 562

(1995); *see generally Lopez*, 2010 WL 728205, at *3 (N.D. Cal. Mar. 1, 2010).

An employee qualifies for exemption if: (a) his or her "duties and

responsibilities involve the management of the enterprise in which he/she is employed

. . .;" and (b) he or she "customarily and regularly directs the work of two or more

other employees herein;" and (c) he or she "has the authority to hire or fire other

employees or [his or her] suggestions and recommendations as to the hiring or firing

[are] given particular weight"; and (d) he or she "customarily and regularly exercises

23.

discretion and independent judgment;" and (e) he or she is "primarily engaged in duties which meet the test of exemption." Wage Order 7-2001 (a)-(e); Cal. Code Regs. tit. 8, § 11090(1)(A)(1). "Exempt" employees "must also earn a monthly salary equivalent to no less than two (2) times the state minimum. Wage Order 7-2001(f).

Defendant classified Plaintiff as an "exempt" employee under the executive exemption of Industrial Welfare Commission Wage Order 7-2001. Defendant argues that even assuming Molina provided credible evidence that he worked overtime or was not provided with full meal period breaks, he was not entitled to overtime or breaks because he was not properly classified as an exempt executive employee. (Dkt. No. 177 at 41.)

Plaintiff argues that Defendant failed to meet its burden for all the workweeks between July 20, 2008 to March 14, 2009 because Plaintiff contemporaneously indicated on a workweek by workweek basis between July 20, 2008 to March 14, 2009 that he was not primarily engaged in exempt duties, but rather was engaged in nonexempt duties due to insufficient hourly employees in the store to do the work in the allotted hours." (Dkt. No. 156 at 2.) The Court will examine the requirements of Wage Order 7-2001 in turn.

        i.    Plaintiff managed an entire establishment

Plaintiff did not object to Defendant's assertions that he managed an entire establishment. (Dkt. No. 174 ¶ 83.) In addition, Dollar Tree presented credible testimony showing that Molina, as the store manager, was responsible for running the

entire store.  Accordingly, the Court finds this prong has been established.

           ii.     Plaintiff customarily and regularly directed more than 2 full time employees

Plaintiff did not object to Defendant's assertions that he customarily and regularly directed employees. (Dkt. No. 174 ¶¶ 84-85.) The Court finds Molina's resume, Exhibit 3, describing his duties while at Dollar Tree to be credible and revealing.  Mr. Molina stated that he managed up to 40 employees, overseeing "all aspects of the business" "training associates" and "delegation of tasks".  He admitted using his judgment to schedule workers, cashier hours, freight processors and sales recovery personnel.  The Court credits this testimony as it is corroborated by exhibits 143, 248 and McDearmon's testimony regarding assistant store manager and store manager training.  Thus, the Court finds this prong to be met.

           iii.    Plaintiff had the authority to hire and fire

Plaintiff did not object to Defendant's assertions that he had the authority to hire, fire and advance employees and that his suggestions or recommendations were given particular weight. (Dkt. No. 174 ¶ 86.) In addition, Molina admitted this in his testimony.  The Court credits this testimony as it is corroborated by Dollar Tree training materials, Exhibits 3, 60, 122, and Dollar Tree testimony.  Accordingly, the Court finds this Wage Order requirement to be met.

           iv.    Plaintiff exercised discretion and independent judgment

Plaintiff did not object to Defendant's assertions that "he customarily and

regularly exercised discretion and independent judgment with respect to planning for his store, managing his payroll, time and attendance, inventory and ordering, merchandising . . ." (Dkt. No. 174 ¶¶ 87-89.) The Court credits the testimony of Prettyman who explained that store managers were vested with authority to organize a large portion of the store. Dollar Tree vested Molina with discretion to create certain "end caps" and organize aisles. Mr. McDearmon's testimony regarding the assistant store manager and store manager training provides circumstantial evidence that Molina exercised independent judgment and discretion. Further, Mr. Prettyman also testified that Dollar Tree permits a store manager to choose which items to order, and in what quantities. Mr. Peachey's testimony and the iVisit exhibits also support this conclusion. Accordingly, the Court finds Molina to have exercised discretion and independent judgment.

> v. Plaintiff's monthly salary exceeded two times California's minimum wage

California law requires, that an executive employee "earn a monthly salary equivalent of no less than two times the state minimum wage for full-time employment." 8 Cal. Code Regs. § 11040(1)(A). Plaintiff stipulated to this fact and posed no objections in its response to Defendant's memorandum of contentions of law and fact. (Dkt. No. 174 ¶¶ 90-92.) Accordingly, the Court finds this element of the Wage Order requirement has been met.

> vi. Molina was primarily engaged in exempt tasks.

The California Wage Order incorporates the definitions set forth in the regulations promulgated under the FLSA. 8 Cal. Code Regs. § 1070 1(A)(1)(e). Specifically, the Wage Order incorporates the following definition of exempt tasks:

> interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures.

29 C.F.R. § 541.102.

"[T]he trial court should also consider whether the employee's practice diverges from the employer's realistic expectations, whether there was any concrete expression of employer displeasure over an employee's substandard performance, and whether these expressions were themselves realistic given the actual overall requirements of the job." *Ramirez v. Yosemite Water Co., Inc.*, 20 Cal. 4th 785, 802 (1999).

Defendant argues that Plaintiff's failure to meet their realistic expectations is due to his substandard performance as a manager. *Korte v. Dollar Tree Stores, Inc.*, No. CIV. S-12-541 LKK, 2013 WL 2604472, at *7 (E.D. Cal. June 11, 2013) (finding Dollar Tree's argument credible that the plaintiff "spent more than 50 percent of his time on non-exempt functions because he failed to meet the company's realistic

27.

1    expectations for job performance").

2

3         This element forms the centerpiece of the parties' dispute.  First, the Court does

4    not credit Molina's testimony that he predominately engaged in non-exempt activities.

5    Mr. Molina consistently certified "yes" that he was spending more than 50 per cent of

6    his time on supervisory duties.  The Court finds Mr. Molina was not coerced into

7    certifying "yes".  Molina certified over 144 times "yes." *See* Exhibits 14, 17. The

8    Court also finds that Molina did not receive discipline or a reduction in pay as a result

9    of certifying "no" on those occasions.  Specifically, the Court believes the testimony

10   of Balderas and Johnson which supports this conclusion.  In addition, Molina hired

11   and fired employees, trained employees, completed the work schedule, planned for

12   freight deliveries, and outlined and organized the layout of the store as outlined by

13   Dollar Tree exhibits. Mr. Prettyman's testimony further supports the conclusion that

14   Molina exercised judgment in ordering and organizing the store. Exhibit 3 supports

15   this conclusion.

16        In addition, Mr. Pearson's testimony reflects detailed, realistic expectations for

17   the average worker based upon a comprehensive time study.  Pearson watched

18   thousands of hours of tape which led to realistic expectations of employee task hours.

19   Therefore, the Court concludes, as an independent basis that Dollar Tree has carried

20

21

22

23

24

25

26

27

28

its burden to show that Molina was properly categorized as an "exempt" employee.[6]

### d. Molina's fails to show California Labor Code Violations.

Plaintiff also alleges claims for failure to: (1) pay overtime, in violation of California Labor Code sections 510, 1194, 1198; (2) provide accurate itemized statements, in violation of California Labor Code section 226; and, (3) pay wages, in violation of California Labor Code section 203. As detailed previously, Plaintiff has failed to carry his burden of proof and Dollar Tree properly classified Molina as an exempt employee. As a result, these claims necessarily fail.

### e. Molina Fails to Show He is an Appropriate Representative to Seek a Violation of the Private Attorneys General Act (Cal. Labor Code Sections 2698, et seq.) ("PAGA")

Plaintiff brings this representative action claim under California Labor Code section 2699, ("PAGA"), on behalf of the State of California with respect to themselves and all other individuals who are or were employed by Defendant as "Store Managers" during the applicable statutory period. Under PAGA, Plaintiff is deputized to recover civil penalties for California Labor Code violations. Cal. Lab. Code § 2699(a); *see Arias*, 46 Cal. 4th at 986. Plaintiff's PAGA claim is limited to the last 13 pay periods or 26 weeks of Plaintiff's employment; from July 20, 2011 through December 31, 2011 (the "PAGA Period"). (Dkt. No. 176 at 29.)

---

[6] Given the Court's findings of fact, it need not address each of Plaintiff's objections. To the extent inconsistent with the Court's Findings of Fact and Conclusions of Law, Plaintiff's objections are overruled.

Plaintiff is acting "as the proxy or agent of the state's labor law enforcement agencies" seeking civil penalties "that otherwise would have been assessed and collected by the [LWDA]." *Arias*, 46 Cal. 4th at 986; *see McKenzie*, 765 F. Supp.2d at 1231. In the Court's Order denying Defendant's motion to strike the representative allegations, the Court ruled that Plaintiff alleged to be an aggrieved employee and as such he had standing to bring this claim. (Dkt. No. 95 at 18.) As detailed previously, Plaintiff did not prove at trial he was an aggrieved employee, therefore may not pursue a representative action under PAGA.

> **f.** *Molina fails to show Unfair Competition in Violation of California Business and Professions Code § 17200, et seq., ("UCL").*

The UCL "allows recovery for 'any unlawful, unfair or fraudulent business act or practice....' An action based on this state statute 'borrows' violations of other laws when committed pursuant to business activity. *Harris v. Investor's Bus. Daily, Inc.*, 138 Cal. App. 4th 28, 32-33, 41 Cal. Rptr. 3d 108, 111 (2006) (quoting *Farmers Ins. Exchange v. Superior Court*, 2 Cal.4th 377, 383 (1992)).

Plaintiff seeks unpaid overtime and meal period wages for the four years prior to the filing of their complaint under California Business & Professions Code section 17208. Plaintiff argues "Defendant benefitted from Plaintiff's working overtime and performing non-exempt duties and the proper award of restitution is payment of Plaintiff's back wages." (Dkt. No. 156 at 17.) Plaintiff's allegations under the UCL are premised on a violation of wage and hour violations and meal break violations.

Because Plaintiff did not bear his burden of proof at trial, and because the Court found that he was properly categorized as an exempt employee, his UCL claim fails.

Judgment is for Defendant.

**IT IS SO ORDERED.**

Dated:  May 19, 2014                    _____

HONORABLE BEVERLY REID O'CONNELL
UNITED STATES DISTRICT COURT JUDGE

31.

# Exhibit W

1  MAUREEN E. MCCLAIN, Bar No. 062050
2  MATTHEW P. VANDALL, Bar No. 196962
   LITTLER MENDELSON
3  A Professional Corporation
   650 California Street
   20th Floor
4  San Francisco, CA 94108.2693
   Telephone:    415.433.1940
5
6  Attorneys for Defendant
   DOLLAR TREE STORES, INC.
7
8               SUPERIOR COURT OF THE STATE OF CALIFORNIA
9                         COUNTY OF SANTA CRUZ
10

**F I L E D**

OCT 1 2 2010

ALEX CALVO, CLERK
BY JAN BIEGENZAHN
DEPUTY, SANTA CRUZ COUNTY

11  RANDY SMITH,                    Case No.  CISCV160473
12              Plaintiff,          [PROPOSED] JUDGMENT
13      v.
14  DOLLAR TREE STORES, INC., a     COMPLAINT FILED:      June 9, 2008
    Virginia Corporation, HAYIM GANNON,  FIRST AMENDED
15  an individual, and DOES 1-50, inclusive,  COMPLAINT FILED:  July 16, 2008
                                    TRIAL DATE:           August 30, 2010
16              Defendants.         JUDGE:                Hon. Jeff Almquist
17
18          This action came on regularly for trial on August 30, 2010, in Department 5 of the
19  above-entitled court, the Honorable Jeff Almquist presiding.  Appearing as counsel for Plaintiff
20  Randy Smith ("Plaintiff") were Gerald Emanuel and Joel Waelty of Hinckle Jachimowicz Pointer &
21  Emanuel.  Appearing as counsel for Defendant Dollar Tree Stores, Inc. ("Dollar Tree") were
22  Maureen E. McClain and Matthew P. Vandall of Littler Mendelson, P.C.
23          This action was commenced on June 9, 2008.  Plaintiff filed a Complaint for
24  Damages against Dollar Tree and former Defendant Hayim Gannon ("Gannon"), in the Superior
25  Court of the State of California in Santa Cruz County.  Thereafter, on July 16, 2008, Plaintiff filed a
26  First Amended Complaint asserting nine causes of action variously against Dollar Tree and Gannon:
27  (1) Retaliation for Opposing Sexual Harassment; (2) Failure to Pay Principal Wages; (3) Failure to
28  Pay Overtime Wages; (4) Pay Stub Violations; (5) Rest Break and Meal Period Violations;

(FILED BY FACSIMILE)

LITTLER MENDELSON
A Professional Corporation
650 California Street
20th Floor
San Francisco, CA 94108-2693
415.433.1940

[PROPOSED] JUDGMENT                    1                    Case No.  CISCV160473

1  (6) Waiting Time Penalties; (7) Unfair Competition; (8) Failure to Allow Inspection of Employment

2  Records; and (9) Wrongful Termination in Violation of Public Policy. The first count was plead

3  against both Dollar Tree and Gannon and the remaining eight counts were plead against Dollar Tree

4  alone.

5        On August 26, 2009, the Honorable Paul Burdick issued an Order Granting in Part

6  and Denying In Part Defendant Dollar Tree's Motion For Summary Adjudication (the "MSA

7  Order"). This Court dismissed with prejudice Plaintiff's retaliation-based theories of recovery,

8  including the first and ninth causes of action as well as the seventh cause of action to the extent that

9  count was premised upon retaliation allegations. Following the MSA Order, the only claims

10  remaining against Dollar Tree were premised upon alleged violations of California's wage and hour

11  laws. Plaintiff's claim against Gannon was dismissed with prejudice from this action on November

12  9, 2009.

13        Trial on Plaintiff's wage and hour claims commenced on August 30, 2010 before the

14  Honorable Jeff Almquist. Plaintiff received a full and fair opportunity to present his case-in-chief

15  and did so over five trial days. On September 3, 2010, after the presentation of Plaintiff's case in

16  chief, Dollar Tree moved the Court for Judgment pursuant California Code of Civil Procedure

17  section 631.8. Dollar Tree's Motion for Judgment was GRANTED on September 10, 2010 for the

18  reasons fully set forth in the Order Granting Defendant's Motion for Judgment.

19        NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED

20  that:

21        (1)    Defendant Dollar Tree is granted judgment on Plaintiff's first cause of action

22  for retaliation for opposing sexual harassment.

23        (2)    Defendant Dollar Tree is granted judgment on Plaintiff's second cause of

24  action for failure to pay principal wages.

25        (3)    Defendant Dollar Tree is granted judgment on Plaintiff's third cause of action

26  for failure to pay overtime wages.

27        (4)    Defendant Dollar Tree is granted judgment on Plaintiff's fourth cause of

28  action for pay stub violations.

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
650 California Street
20th Floor
San Francisco, CA 94108-2693
415.433.1940

[DEFENDANT'S PROPOSED] JUDGMENT       2       Case No. CISCV160473

1    (5)    Defendant Dollar Tree is granted judgment on Plaintiff's fifth cause of action

2  for rest break and meal period violations.

3    (6)    Defendant Dollar Tree is granted judgment on Plaintiff's sixth cause of action

4  for waiting time penalties.

5    (7)    Defendant Dollar Tree is granted judgment on Plaintiff's seventh cause of

6  action for unfair competition to the extent that it relied upon Plaintiff's retaliation based theory of

7  recovery.

8    (8)    Defendant Dollar Tree is granted judgment on Plaintiff's eighth cause of

9  action for failure to allow inspection of employment records.

10    (9)    Defendant Dollar Tree is granted judgment on Plaintiff's ninth cause of action

11  for wrongful termination in violation of public policy.

12    Plaintiff Randy Smith shall take nothing from his Complaint and Defendant Dollar

13  Tree Stores, Inc., as the prevailing party, is entitled to recover cost and Defendant Dollar Tree is

14  entitled to recover costs pursuant to California Code of Civil Procedure section 1032.

15

16    **IT IS SO ORDERED.**

17

18  Dated:  10/12  , 2010

19

20    /S/

21    HON. JEFF ALMQUIST
      Judge of the Superior Court

22

23

24  Firmwide:97580604.1 061603.1008

25

26

27

28

[DEFENDANT'S PROPOSED] JUDGMENT                3                Case No. CISCV160473

# Exhibit X

**LABOR COMMISSIONER, STATE OF CALIFORNIA**
Department of Industrial Relations
Division of Labor Standards Enforcement
100 Paseo de San Antonio, Ste. 120
San Jose, CA 95113
  FAX(408) 277-9643

For Court Use Only:

Plaintiff:   **David A. Toto**

Court Number

Defendant:   **Dollar Tree Store Inc., a foreign corporation**

| State Case Number | |
|---|---|
| **12 - 83406     AS** | **ORDER, DECISION OR AWARD OF THE LABOR COMMISSIONER** |

1. The above-entitled matter came on for hearing before the Labor Commissioner of the State of California as follows:

   **DATE: January 5, 2012**      ☐ **CONTINUED TO**

   **CITY:  100 Paseo de San Antonio, Ste. 120 San Jose, CA  95113   FAX.408.277.9643**

2. IT IS ORDERED THAT:      **Plaintiff take nothing by virtue of his/her complaint.**

| | | |
|---|---|---|
| $ | 0.00 | for wages  **(with lawful deductions)** |
| $ | 0.00 | Reimbursable business expenses |
| $ | 0.00 | for interest pursuant to Labor Code Section 98.1 |
| $ | 0.00 | for additional wages accrued pursuant to Labor Code Section 203 as a penalty *and that same shall not be subject to payroll or other deductions.* |
| $ | 0.00 | for recovery on dishonored payroll check |
| $ | 0.00 | other compensation(specify) |
| $ | **0.00** | **TOTAL AMOUNT OF AWARD** |

3.   The herein Order, Decision or Award is based upon the Findings of Fact, Legal Analysis and Conclusions attached hereto and incorporated herein by reference.

4.   The parties herein are notified and advised that this Order, Decision or Award of the Labor Commissioner shall become final and enforceable as a judgment in a court of law unless either or both parties exercise their right to appeal to the appropriate court* within ten (10) days of service of this document. Service of this document can be accomplished either by first class mail or by personal delivery and is effective upon mailing or at the time of personal delivery.  If service on the parties is made by mail, the ten (10) day appeal period shall be extended by five (5) days.  For parties served outside of California, the period of extension is longer (See Code of Civil Procedure Section 1013).  In case of appeal, the necessary filing fee must be paid by the appellant and appellant must, immediately upon filing an appeal with the appropriate court, serve a copy of the appeal request upon the Labor Commissioner.  If an appeal is filed by a corporation, a non-lawyer agent of the corporation may file the Notice of Appeal with the appropriate court, but the corporation must be represented in any subsequent trial by an attorney, licensed to practice in the State of California.  Labor Code Section 98.2(b) provides that if the parties seeking review by filing an appeal to the court are unsuccessful in such appeal, the court shall determine the costs and reasonable attorney's fees incurred by the other party to the appeal and assess such amount as a cost upon the party filing the appeal.  **PLEASE TAKE NOTICE:** Labor Code Section 98.2(b) requires that as a condition to filing an appeal of an Order, Decision or Award of the Labor Commissioner, the employer shall first post a bond or undertaking with the court in the amount of the ODA; and the employer shall provide written notice to the other parties and the Labor Commissioner of the posting of the undertaking.  Labor Code Section 98.2(b) also requires the undertaking contain other specific conditions for distribution under the bond.

* Superior Court, County of Santa Clara
  LIMITED CIVIL CASE
  191 North First Street
  San Jose, CA 95113

**LABOR COMMISSIONER, STATE OF CALIFORNIA**

BY: _Steven Wegner_

Steven Wegner                                         HEARING OFFICER

**DATED: January 17, 2012**

DLSE 535 (REV 2/11)               ORDER, DECISION OR AWARD OF THE LABOR COMMISSIONER               L.C. 98

BEFORE THE LABOR COMMISSIONER

OF THE STATE OF CALIFORNIA

| | |
|---|---|
| David A. Toto,<br><br>                   Plaintiff,<br><br>                   v.<br><br>Dollar Tree Store Inc., a foreign corporation,<br><br>                   Defendant. | CASE NO.    12-83406 AS<br><br>ORDER, DECISION, OR AWARD OF THE LABOR COMMISSIONER |

BACKGROUND

Plaintiff filed an initial claim with the Labor Commissioner's office on May 10, 2011. The complaint raises the following allegations:

1. Overtime wages earned, but unpaid, from July 13, 2008 through January 16, 2010, claiming 1,575 hours at $51 an hour (time and ½ the regular rate of pay);

2. Meal period premium wages for denied meal periods from July 13, 2008 through January 16, 2010, claiming 237 days at $34 per day;

3. Rest period premium wages for denied rest period(s) from July 13, 2008 through January 16, 2010, claiming 474 days at $34 per day;

4. Liquidated damages pursuant to *Labor Code* Section 1194.2 equal to the amount in unpaid minimum wages. From July 13, 2008 through January 16, 2010 a minimum wages of $8.00 an hour was due for 1,575 hours. However, minimum wages were not paid;

5. Interest pursuant to *Labor Code* sections 98.1 and 1194.2;

6. Waiting time penalties pursuant to *Labor Code* section 203 at a daily rate of $349.04 for 30 days.

On January 5, 2012 a hearing was conducted in the offices of the Labor Commissioner in San Jose, California, before the undersigned hearing officer designated by the Labor Commissioner to hear this matter.  Plaintiff David A. Toto appeared in pro per. Katrina Pham, former Assistant Manager, testified as a witness for plaintiff.

1 | Defendant Dollar Tree Store Inc. was represented by Matthew P. Vandall, Esquire.

2 | Roselyn K. Hammond, District Manager, testified as a witness for defendant.

3 |     Due consideration having been given to the testimony, documentary evidence,

4 | and arguments presented, the Labor Commissioner hereby adopts the following Order,

5 | Decision, or Award.

6 | FINDINGS OF FACT

7 |     Plaintiff was employed by defendant to perform personal services as a Store

8 | Manager for the period May 13, 2008 through January 22, 2010 in the County of Santa

9 | Clara, California, under the terms of an oral agreement at the promised rate of $61,000

10 | per year, later raised to $65,000 per year effective September 21, 2008, and finally raised to

11 | $66,625 per year effective July 31, 2009. Plaintiff was discharged on January 22, 2010.

12 |     By way of background, sometime in 2008 or 2009 a number of defendant's Store

13 | Managers got together and filed a class action lawsuit[1] alleging they were misclassified as

14 | exempt employees and were entitled to, among other things, overtime, meal periods, and

15 | rest periods. As part of that lawsuit plaintiff submitted a declaration dated February 14,

16 | 2009. (Defendant's exhibit A). On June 16, 2009 defendant took plaintiff's deposition.[2]

17 | (The deposition was marked as defendant's exhibit D). The Court rejected plaintiff as a

18 | class member. Plaintiff then filed his claim with the Labor Commissioner.

19 |     Plaintiff's February 14, 2009 declaration seems to indicate that plaintiff was not

20 | primarily engaged in exempt duties. However, during the course of his deposition on

21 | June 16, 2009 plaintiff testified that his declaration did not accurately describe his duties

22 | or what he actually did each day.

23 |     Defendant asserts that plaintiff is exempt from the provisions regarding overtime,

24 | meal periods, and rest periods because of the executive exemption of *Industrial Welfare*

25 | 

26 | 

27 | [1] Plaintiff's claim is not barred by the class action lawsuit because plaintiff was not a member of the class. The class action lawsuit was ultimately de-certified.

28 | [2] At his deposition plaintiff swore to tell the truth and was instructed to ask if he did not understand a question. Plaintiff's declaration is under penalty of perjury.

ORDER, DECISION, OR AWARD OF THE LABOR COMMISSIONER       (Case No. 12-83406 AS)

1   *Commission (IWC) Wage Order* 7-2001. Plaintiff responds that he was not primarily

2   engaged in exempt duties.

3   During the claim period plaintiff was the Store Manager of store number 1254.

4   There was no one physically at the store with more authority than plaintiff. In his

5   deposition plaintiff described himself as "the captain of the ship". At the hearing plaintiff

6   testified that upper level management was frequently in his store and during those times

7   he was no longer in charge. However, in his deposition plaintiff testified that upper level

8   management was only occasionally in his store and during those times he remained in

9   charge.[3]

10   Store 1254 is a permanent and a recognized subdivision of defendant. Plaintiff was

11   in charge of store number 1254 and his primary duty was to manage store number 1254.

12   There is no credible evidence that, during the claim period, plaintiff was ever relieved of

13   his job of managing store number 1254.

14   There were approximately 70 to 90 employees at store 1254. All of those employees

15   were subject to plaintiff's control. Plaintiff would usually direct the unit managers

16   regarding what to do and the unit managers would determine what resources, including

17   personnel, would be used to accomplish the task. However, plaintiff had the discretion

18   and authority to direct individual employees as he saw fit.

19   Plaintiff could recommend the hiring or firing of personnel. Plaintiff could also

20   recommend employees for promotion or de-motion. Plaintiff's recommendations were

21   usually followed.

22   Plaintiff was able to use his discretion and independent judgment. Defendant is a

23   chain store. As a chain, many of its operations are subject to form workflows, uniformity

24

25

26   [3] Throughout the hearing plaintiff explained the discrepancies between his testimony at the deposition and

27   the Hearing as he was not lying at his deposition but he was embellishing in order to make defendant look good. It is not clear what the difference is between lying and embellishing. Nonetheless, it is noted that

28   neither one is the truth. Also, at the deposition plaintiff testified that he did not prepare for the deposition and the only attorneys he spoke with prior to the deposition were plaintiff's class action attorneys.

ORDER, DECISION, OR AWARD OF THE LABOR COMMISSIONER                    (Case No. 12-83406 AS)

1   of display, etc. Nonetheless, plaintiff could, and would, use his discretion and

2   independent judgment to determine how best to achieve the desired goal. Plaintiff would

3   assign work to employees, including himself, as he thought was best.

4       Plaintiff would receive a bonus based on the performance of his store. Plaintiff's

5   W-2 for 2009 shows total income of $80,675.16. Plaintiff testified that his income for 2009

6   was his base salary plus his bonus.

7       Plaintiff testified that, through his experience with a previous employer, he had

8   come to value customer service very highly. As such, when plaintiff noticed, what he

9   considered to be, long lines at the checkout counter; plaintiff would open a register and

10   begin operating the cash register. While plaintiff could have assigned someone else to

11   perform the cashiering, he chose to do it himself.

12       Each week plaintiff was required to certify the duties he had performed. The

13   certification was on defendant's intranet and screen shots were marked as defendant's

14   exhibit B. A copy of plaintiff's job description was a link on the certification screen. That

15   job description outlined the exempt duties that plaintiff was to spend more than 50% of

16   his work time performing. The job description went on to state that the "Store Manager

17   may not spend more than a total of 35% of his/her actual work time each week receiving

18   product, distributing and storing product, stocking product, and cashiering". Each week

19   plaintiff certified that, yes; he was spending more than 50% of his work time performing

20   the enumerated exempt duties. (Defendant's exhibit B).

21       Plaintiff testified that he spent two hours on office work and two hours as a

22   cashier. Plaintiff also testified that he spent an unspecified amount of time cleaning,

23   marking down products, merchandising and stocking. However, plaintiff also testified

24   that he worked very long hours. Nonetheless, at the Hearing plaintiff estimated that he

25   spent 60% to 80% of his time on non-exempt duties.

26       Plaintiff's witness testified that plaintiff spent 15% to 18% of his time doing non-

27   management work. In his deposition, at page 196, plaintiff testified that he spent 80% of

28   his time managing and 20% of his time doing other things. (Defendant's exhibit D).

LEGAL ANALYSIS

"Section 1(A) of *IWC Wage Order* 7-2001 provides:

Provisions of Sections 3 through 12[4] of this order shall not apply to persons employed in administrative, executive, or professional capacities. The following requirements shall apply in determining whether an employee's duties meet the test to qualify for an exemption from those sections:

(1) <u>Executive Exemption.</u>  A person employed in an executive capacity means any employee:

(a) Whose duties and responsibilities involve the management of the enterprise in which he/she is employed or of a customarily recognized department or subdivision thereof; **and**

(b) Who customarily and regularly directs the work of two or more other employees herein; **and**

(c) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring or firing and as to the advancement and promotion or any other change of status of other employees will be given particular weight; **and**

(d) Who customarily and regularly exercises discretion and independent judgment; **and**

(e) Who is primarily engaged in duties which meet the test of the exemption. The activities constituting exempt work and non-exempt work shall be construed in the same manner as such items are construed in the following regulations under the *Fair Labor Standards Act* effective as of the date of this order: 29 C.F.R. Sections 541.102, 541.104-111, and 541.115-116. Exempt work shall include, for example, all work that is directly and closely related to exempt work and work which is properly viewed as a means for carrying out exempt functions. The work actually performed by the employee during the course of the work week must, first and foremost, be examined and the amount of time the employee spends on such work, together with the employer's realistic expectations and the realistic requirements of the job,

---

[4] Section 3 provides for overtime, section 11 provides for meal periods, and section 12 provides for rest periods.

ORDER, DECISION, OR AWARD OF THE LABOR COMMISSIONER                    (Case No. 12-83406 AS)

shall be considered in determining whether the employee satisfies this requirement.

(f) Such an employee must **also** earn a monthly salary equivalent to no less than two (2) times the state minimum wage for full-time employment. Full-time employment is defined in *Labor Code* Section 515(c) as 40 hours per week." (*IWC Wage Order* 7-2001, section 1, emphasis added).

Regarding the requirement for the exemption that the employee "customarily and regularly exercises discretion and independent judgment," this phrase means the comparison and evaluation of possible courses of conduct and acting or making a decision after the various possibilities have been considered. The employee must have the authority or power to make an independent choice, free from **immediate** direction or supervision and with respect to matters of significance. However, 29 *C.F.R.* 541.207(e)) states that "[t]he term ``discretion and independent judgment'' . . . does not necessarily imply that the decisions made by the employee must have a finality that goes with unlimited authority and a complete absence of review. The decisions made as a result of the exercise of discretion and independent judgment may consist of recommendations for action rather than the actual taking of action. The fact that an employee's decision may be subject to review and that upon occasion the decisions are revised or reversed after review does not mean that the employee is not exercising discretion and independent judgment . . . ."

The evidence is undisputed that plaintiff managed a recognized subdivision; customarily and regularly directed the work of two or more people; plaintiff's recommendations regarding hiring, firing, promotion, and other personnel changes were given particular weight; plaintiff customarily and regularly exercised discretion and independent judgment; and plaintiff was paid a monthly salary of more than twice the minimum wage.

Plaintiff's argument that he was not an exempt employee hinges on the *Wage*

1    *Order's* requirement that an exempt employee be "primarily engaged" in exempt duties.[5]

2    Throughout his employment plaintiff certified on a weekly basis that he was primarily

3    engaged in exempt duties. On June 16, 2009 plaintiff gave deposition testimony

4    indicating that he was primarily engaged in exempt duties. At that deposition plaintiff

5    testified that his February 14, 2009 declaration did not accurately describe the work that

6    he actually did. Further, plaintiff's witness testified that plaintiff spent 15% to 18% of his

7    time on non-management work. In light of the above evidence, plaintiff's testimony at the

8    hearing that he was not primarily engaged in exempt duties is found to be not credible.

9    Defendant has presented evidence establishing that plaintiff was subject to the executive

10   exemption of *IWC Wage Order* 7-2001. Accordingly, plaintiff is not entitled to overtime,

11   meal periods, or rest periods. Further, plaintiff is not entitled to interest or waiting time

12   penalties because of overtime, meal periods, or rest periods. Moreover, plaintiff was paid

13   more than the minimum wage for his regular hours and is not entitled to the minimum

14   wage for any overtime. As such, plaintiff is not entitled to an award of liquidated

15   damages for a failure to receive minimum wages for all hours worked. Therefore,

16   plaintiff shall take nothing by way of his claims for overtime wages, meal period

17   premium wages, rest period premium wages, liquidated damages pursuant to *Labor Code*

18   section 1194.2, interest pursuant to *Labor Code* section 98.2, and waiting time penalties

19   pursuant to *Labor Code* section 203.

20   ///

21   ///

22   ///

23   ///

24   ///

25   ///

26

27

28   [5] "Primarily engaged" means that the employee spends something more than 50% of their working time doing exempt work.

CONCLUSIONS

For all the foregoing reasons, IT IS HEREBY ORDERED that plaintiff shall take nothing by way of his claims for overtime wages, meal period premium wages, rest period premium wages, liquidated damages pursuant to *Labor Code* section 1194.2, interest pursuant to *Labor Code* sections 98.2 and 1194.2, and waiting time penalties pursuant to *Labor Code* section 203.

Dated: January 17, 2012

Steven G. Wegner
Hearing Officer

ORDER, DECISION, OR AWARD OF THE LABOR COMMISSIONER                    (Case No. 12-83406 AS)

Edmund G Brown, Jr., Governor



LABOR COMMISSIONER, STATE OF CALIFORNIA
Department of Industrial Relations
Division of Labor Standards Enforcement
100 Paseo de San Antonio Room 120
San Jose, CA 95113

---

## ATTENTION – INFORMATION ON YOUR ORDER, DECISION OR AWARD

Either party may file an appeal for a trial de novo (new trial) within fifteen days from the date the Order, Decision or Award is mailed from this office. Appeals must be filed in the appropriate court listed on the bottom left hand corner of the Order, Decision or Award.

Plaintiffs will be notified by mail if the Defendant (the former employer) files an appeal. Plaintiffs will also be sent the appropriate forms to request representation by our attorney.

If the Defendant does not appeal the Order, Decision or Award, the full amount show on the Decision is due and payable to our office within 15 days from the date the Decision is mailed.

If the Defendant neither pays nor appeals the Decision, a judgment will be file don the Plaintiff's behalf with the appropriate court. It currently takes about 30 days for a judgment to be filed. You will be notified when this occurs.

PLEASE DO NOT CONTACT THIS OFFICE TO DETERMINE IF PAYMENT HAS BEEN RECEIVED OR FOR A STATUS REPORT ON YOUR CASE. IF PAYMENT IS RECEIVED, YOU WILL BE ISSUED A CHECK AS PROMPTLY AS POSSIBLE. IF PAYMENT HAS NOT BEEN RECEIVED, APPROPRIATE ACTION WILL BE TAKEN AND YOU WILL BE NOTIFIED

Edmund G Brown, Jr., Governor



LABOR COMMISSIONER, STATE OF CALIFORNIA
Department of Industrial Relations
Division of Labor Standards Enforcement
100 Paseo de San Antonio Room 120
San Jose, CA 95113

---

## ATENCIÓN – INFORMACION SOBRE SU ORDEN, DECISION O INDEMNIZACION

Cualquier de las partes puede presentar un apelacion para juicio de novo *dentro de quince dias* apartir de la fecha de quese envie la Orden, Decision O Indemnizacion. La fecha se encuentra en el formulario contenido en el certificado de envoi. Apeaciones deben presentarse en el tribunal apropiado listado en la baja esquina izquierda de la Orden, Decision O Indemnizacion.

El demandante sera notificado si el demandado (el empleador anterior) presenta un apealcion. Incluso, del demandante recibira formularios apropriados para solicitor representacion legal de nuestro abogado.

Si el demandado no apela la Orden, Decision O Indemnizacion, la cantidad mostrada en la Decision sera debido y pagable en total a nuestra oficina dentro de quince dias a partir de la fecha que se envio la decision.

Se el demandado no paga ni apela la Decision, se presentara un fallo en favor del demandante en el tribunal apropiado. Acualmente, se toma aproximadamento 30 dias para archivar un fallo. Usted sera notificado cuando esto occure.

POR FAVOR DE NO COMUNICARSE CON ESTA OFICINA PARA DETERMINAR SI FONDOS SE HAN RECIVIDO O PARA ALGUN INFORME DE SU CASO. AL RECIBIR FONDOS, SE LE ENVIARA UN CHEQUE LO MAS PRONTO POSIBLE. SI NO SE RECIBE PAGO, ACTUACION APROPRIODA RESULTARA Y USTED SERA NOTIFICADO.

# APPEAL BOND REQUIREMENT
# FOR EMPLOYERS

PLEASE TAKE NOTICE that Labor Code section 98.2(b) requires that, when an employer appeals an Order, Decision, or Award (ODA) of the Labor Commissioner, the employer <u>shall post a bond or undertaking with the court</u> in the amount of the ODA and the employer <u>shall provide written notice to the other parties and the Labor Commissioner of the bond or undertaking.</u>

Labor Code section 98.2(b) also has other conditions regarding the bond or undertaking. Labor Code section 98.2(b) reads as follows:

98.2 Employee complaints; Appeal; Bond; Coasts and fees; Form to identify assets; Stay; Satisfaction of judgment.

Subsection (b) As a condition to filing an appeal pursuant to this section, an employer shall first post an undertaking with the reviewing court in the amount of the order, decision, or award. The undertaking shall consist of an appeal bond issued by a licensed surety or a cash deposit with the court in the amount of the order, decision, or award. The employer shall provide written notification to the other parties and the Labor Commissioner of the posting of the undertaking. The undertaking shall be on the condition that, if any judgment is entered in favor of the employee, the employer shall pay the amount owed pursuant to the judgment, and if the appeal is withdrawn or dismissed without entry of judgment, the employer shall pay the amount owed pursuant to the order, decision, or award of the Labor Commissioner unless the parties have executed a settlement agreement for payment of some other amount, in which case the employer shall pay the amount that the employer is obligated to pay under the terms of the settlement agreement. If the employer fails to pay the amount owed within 10 days of entry of the judgment, dismissal, or withdrawal of the appeal, or the execution of a settlement agreement, a portion of the undertaking equal to the amount owed, or the entire undertaking if the amount owed exceeds the undertaking, is forfeited to the employee.

DEPARTMENT OF INDUSTRIAL RELATIONS
DIVISION OF LABOR STANDARDS ENFORCEMENT
100 PASEO DE SAN ANTONIO, ROOM 120
SAN JOSE, CA   95113





SC01733425 C013      ‖.‖.‖.‖.‖.‖....‖.‖.‖.‖.‖.‖.‖.‖.‖.‖.‖.‖.‖....‖.‖

# CT Corporation

**Service of Process Transmittal**
01/26/2012
CT Log Number 519863670

| | |
|---|---|
| **TO:** | Debbie Torrence<br>Dollar Tree Stores, Inc.<br>500 Volvo Parkway<br>Chesapeake, VA 23320- |

**RE:** **Process Served in California**

**FOR:** Dollar Tree Stores, Inc. (Domestic State: VA)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | David A. Toto, Pltf. vs. Dollar Tree Store, Inc., etc., et al., Dfts.<br>*Name discrepancy noted.* |
| **DOCUMENT(S) SERVED:** | Certification, Order, Decision or Award(s), Information, Attachment |
| **COURT/AGENCY:** | Department of Industrial Relations, CA<br>Case # 12B3406AS |
| **NATURE OF ACTION:** | Employee Litigation – It is ordered that plaintiff shall take nothing by way of his claims for overtime wages, meal period premium wages, rest period premium wages pursuant to Labor Code |
| **ON WHOM PROCESS WAS SERVED:** | C T Corporation System, Walnut Creek, CA |
| **DATE AND HOUR OF SERVICE:** | By Regular Mail on 01/26/2012 postmarked on 01/19/2012 |
| **JURISDICTION SERVED :** | California |
| **APPEARANCE OR ANSWER DUE:** | None Specified |
| **ATTORNEY(S) / SENDER(S):** | Steven Wegner<br>Department of Industrial Relations<br>Division of Labor Standards Enforcement<br>100 Paseo de San Antonio<br>Suite 120<br>San Jose, CA 95113 |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 01/26/2012, Expected Purge Date: 01/31/2012<br>Image SOP<br>Email Notification, Cathy Eichelbaum ceichelbaum@dollartree.com<br>Email Notification, Debbie Torrence dtorrence@dollartree.com |
| **SIGNED:**<br>**PER:**<br>**ADDRESS:**<br><br>**TELEPHONE:** | C T Corporation System<br>Nancy Flores<br>818 West Seventh Street<br>Los Angeles, CA 90017<br>213-337-4615 |

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.

## CT Corporation

**Service of Process Transmittal**
01/26/2012
CT Log Number 519863670

**TO:**   Debbie Torrence
Dollar Tree Stores, Inc.
500 Volvo Parkway
Chesapeake, VA 23320-

**RE:**   **Process Served in California**

**FOR:**   Dollar Tree Stores, Inc. (Domestic State: VA)

**DOCKET HISTORY:**

| DOCUMENT(S) SERVED: | DATE AND HOUR OF SERVICE: | TO: | CT LOG NUMBER: |
|---|---|---|---|
| Certification, Notice(s), Complaint, Attachment(s), Answer, Confirmation, Document in a Foreign Language | By Regular Mail on 12/15/2011 postmarked on 12/07/2011 | Debbie Torrence Dollar Tree Stores, Inc. | 519649707 |
| Certification of Service, Notice(s), Complaint, Answer, Letter, Attachment(s) | By Certified Mail on 12/09/2011 postmarked on 12/07/2011 | Debbie Torrence Dollar Tree Stores, Inc. | 519624386 |

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.

STATE OF CALIFORNIA
DEPARTMENT OF INDUSTRIAL RELATIONS
DIVISION OF LABOR STANDARDS ENFORCEMENT

## CERTIFICATION OF SERVICE BY MAIL
## (C.C.P. 1013A) OR CERTIFIED MAIL

I, ........Rebecca Segura............, do hereby certify that I am a resident of or employed in the County
of .........Santa Clara..........., over 18 years of age, not a party to the within action, and that I am
employed at and my business address is:

### LABOR COMMISSIONER, STATE OF CALIFORNIA
#### 100 Paseo de San Antonio, Ste. 120
#### San Jose, CA  95113
FAX(408) 277-9643

I am readily familiar with the business practice of my place of business for collection and processing
of correspondence for mailing with the United States Postal Service.  Correspondence so collected
and processed is deposited with the United States Postal Service that same day in the ordinary course
of business.

On ......January 19, 2012...... at my place of business, a copy of the following document(s):

............................**Order, Decision or Award**............................

was(were) placed for deposit in the United States Postal Service in a sealed envelope, by
first class mail................................., with postage fully prepaid, addressed to:

NOTICE TO:   Dollar Tree Store, Inc., a Foreign Corporation
**C T Corporation System, Agent**
818 W. Seventh Street
Los Angeles, CA  90017

and that envelope was placed for collection and mailing on that date following ordinary
business practices.

*I certify under penalty of perjury that the foregoing is true and correct.*

Executed on:  .....January 19, 2012..... at  ............San Jose..............., California

STATE CASE NUMBER:  12- 83406        **AS**

*Rebecca Segura*
Rebecca Segura

DLSE 544/DEF. #1 (3/06)            CERTIFICATION OF MAILING            L.C. 98